

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCHE MASTER FUND, L.P.,

Plaintiff,

v.

XE–R, LLC,

Defendant.



07 CV 2993

COMPLAINT

Plaintiff Arche Master Fund, L.P. ("Arche") through its attorneys, Quinn Emanuel

Urquhart Oliver & Hedges, LLP, alleges the following as and for its complaint against defendant

XE–R, LLC ("XE–R" or "the Company"):

## STATEMENT OF THE CASE

1.    This is an action to recover payment on a debt that is due and owing to

plaintiff Arche as a result of defendant XE–R's failure to comply with the terms of a certain joint

venture agreement and a Note Purchase Agreement between the parties, thereby triggering an

Event of Default under a Note Purchase Agreement between the parties.

## THE PARTIES AND RELEVANT ACTORS

2.    Plaintiff Arche is an investment fund organized under the laws of

Bermuda with its principal place of business at c/o BISYS Hedge Fund Services Limited,

Hemisphere House, 9 Church Street, Hamilton HM 11, Bermuda.

3.    XE Capital Management, LLC ("XE Capital"), the sole member of the

investment manager of Arche, is a limited liability company organized under the laws of the

State of Delaware with its principal place of business at 24 West 40th Street, 3rd Floor, New

York, New York, 10019.  XE Capital is an asset management firm specializing in structured

finance and alternative investments, including insurance products.

4.    Defendant XE–R is a limited liability company organized under the laws of the State of Delaware with its principal place of business at c/o R 2004, LLC, 400 Park Avenue, 18th Floor, New York, New York, 10022.  XE–R is a joint venture owned 44.44% by XE Capital and 55.56% by R 2004, LLC (R 2004), a limited liability company formed to act as the Managing Member of XE–R.

5.    Mark Ross & Co., Inc. ("MRC") is a corporation organized under the laws of the State Florida with its principal place of business at 400 Park Avenue, 18th Floor, New York, New York, 10022.  MRC is an insurance broker engaged in the business of marketing and selling life insurance policies.

6.    Mark E. Ross is an individual residing in Manhattan.  Ross is the President of XE–R, the principal owner of R 2004, and the principal owner, President, Chief Executive Officer and Chairman of the Board of MRC.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332, because Arche and XE–R do not share common state citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

9.    Personal jurisdiction exists over XE–R because XE–R is doing and transacting business in New York as those terms are understood under N.Y. C.P.L.R. §§ 301 and 302(a)(1), and by virtue of the express agreement between the parties set forth in § 22.8 of the Note Purchase Agreement.

## BACKGROUND ALLEGATIONS

**The Formation of XE–R, LLC**

10.    In August of 2004, XE Capital and MRC negotiated the creation of a joint venture entity that would provide high net worth individuals with greater flexibility in financing their life insurance policies.  The result was XE–R, a joint venture between XE Capital and Ross's newly created management company, R 2004.

2

11.     The XE–R Agreement provides that the Company was formed for the following purposes:

> "(i) to originate loans collateralized by life insurance policies ("Loans") in exchange for a loan origination fee; (ii) to sell the Loans to investors; (iii) to service the Loans; (iv) to sell newly issued life insurance policies financed through the origination of new Loans and receives sales commissions of such policy sales; (v) to broker life settlements of policies and receive compensation related to such brokerage; (vi) to purchase in–force policies and 'bank' them on a short–term basis to facilitate the life settlement of such policies to settlement companies or investment funds; and (vii) to transact the foregoing (except items specified in clauses (ii) and (iii)) with policy owners on a direct basis with MRC and the Company as co–brokers, and as a 'wholesaler' for other life insurance brokers and intermediaries through the Company." §2.2(a).

A true and correct copy of the XE–R Agreement is attached hereto as Exhibit A.

12.     Pursuant to the XE–R Agreement, MRC, as a licensed insurance broker and on behalf of XE–R, communicates with insurance agents to identify individuals wishing to finance the purchase of an insurance policy. If the candidate meets certain criteria, XE–R then extends a loan, which is secured by the life insurance policy, to an irrevocable life insurance trust established by the insured. XE–R subsequently issues notes to various purchasers, including Arche.

13.     The principal amount of the loan covers the life insurance premiums for a fixed term, often a two–year period. When the loan matures, the principal and interest become payable. At that point the insured has the option of purchasing the policy by repaying the amount of principal and interest due on the loan, or tendering the policy to XE–R.

14.     In exchange for receiving financing for his or her premiums, the insured agrees that if he or she repays the loan and then decides to re–sell his policy within three years of the maturity date of the loan, the insured will use XE–R as the broker for the resale of the policy in the life settlement market. XE–R therefore finances life insurance premiums partly for the purpose of brokering future life settlements of the policies.

**The Note Purchase Agreement and the XE–R Agreement**

15.     When XE–R was formed, XE–R and Arche entered into a Note Purchase Agreement, dated as of August 23, 2004, which provided for the issuance and sale of 15% Senior Notes due August 21, 2009.  A true and correct copy of the Note Purchase Agreement is attached hereto as Exhibit B.

16.     The Note Purchase Agreement is a valid and enforceable agreement.

17.     Pursuant to the terms of the Note Purchase Agreements, XE–R has issued notes in the aggregate principal amount of $30,000,000.  Arche currently holds 100% of the outstanding notes in XE–R.

18.     The Note Purchase Agreement contains several key provisions that protect Arche's investment.  Most importantly, the Note Purchase Agreement expressly governs XE–R's transactions with its affiliates.  §10.1.  Pursuant to §10.1, XE–R covenants that "so long as any of the Notes are outstanding[,]" it "will not ... enter into directly or indirectly any transaction or group of related transactions ... with any Affiliate ... except for the Services Agreement ... and except in the ordinary course and pursuant to the reasonable requirements of the Company's ... business and upon fair and reasonable terms no less favorable to the Company ... than would be expected to be obtainable in a comparable arm's–length transaction with a Person not an Affiliate."

19.     MRC is an Affiliate of XE–R within the meaning of §10.1 of the Note Purchase Agreement.

20.     The Note Purchase Agreement also requires that XE–R deliver to Arche quarterly financial statements within 90 calendar days of the close of each quarter, §7.1, and that XE–R "conduct its affairs strictly in accordance with its LLC Agreement," §9.7(f).

21.     The XE–R Agreement contains additional covenants made by the Managing Member, which protect the Company and, ultimately, Arche.  One such covenant is that "[t]he Company will be the exclusive means by which the Managing Member and its Affiliates transact as a wholesaler through other life insurance brokers and intermediaries as to

the transactions listed in Section 2.2." §3.6(a)(iv).  This covenant applies to the brokerage of life settlements of policies as one of the transactions listed in Section 2.2.

22.    The Managing Member also more generally covenants that "[i]n managing the Company, [it] will at all times act in accordance with applicable law and in a good faith and commercially reasonable manner."  §3.6(a)(ii).

23.    Finally, the XE–R Agreement also expressly prohibits the Managing Member from undertaking certain actions, including "misappropriat[ing] Company property."  §3.1(b)(ii).

24.    The Managing Member of the Company is, for all practical purposes, Mark Ross.

**Definition of "Event of Default" Under the Note Purchase Agreement**

25.    The Note Purchase Agreement defines "Event of Default" broadly to include violations both of the terms of the Note Purchase Agreement and of the terms of the XE–R Agreement.  Note Purchase Agreement §§ 11(c),11(d).

26.    An "Event of Default" exists under the Note Purchase Agreement if any of the following conditions or events shall occur and be continuing:  "the Company defaults in the performance of or compliance with any term contained in Sections 9.5, *9.7, or 10*," §11(c) (emphasis added); or "the Company defaults in the performance of or compliance with any term contained herein ... or in any other Transaction Document and such default is not remedied within 30 days after the earlier of (i) a Responsible Person obtaining actual knowledge or such default and (ii) the Company receiving written notice of such default from any holder of a Note (any such written notice to be identified as a 'notice of default' and to refer specifically to this Section 11(d)," Section 11(d).

27.    The XE–R Agreement is a "Transaction Document" within the meaning of Section 11(d) of the Note Purchase Agreement.

28.     Accordingly, a violation of §10.1 of the Note Purchase Agreement, the covenant against certain transactions with Affiliates, triggers an immediate Event of Default under §11(c) of the Note Purchase Agreement.

29.     A violation of the terms of the XE–R Agreement triggers both an immediate Event of Default under §11(c) of the Note Purchase Agreement, and, if not cured within thirty days, under §11(d) of the Note Purchase Agreement as well.

**Events of Default as Admitted in the MCC Complaint**

30.     On March 13, 2007, MRC and XE–R filed a complaint in California state court for intentional interference with contract, intentional interference with prospective economic advantage, and other claims. A true and correct copy of that complaint (the "MCC Complaint") is attached hereto as Exhibit C.

31.     By the allegations in the MCC Complaint, Ross admits that, acting on behalf of the Managing Member of XE–R, he is extending capital out of XE–R to finance life insurance premiums in exchange for securing business opportunities for MRC, including the opportunity to broker future life settlements of those policies.

32.     Specifically, in the MCC Complaint at paragraph 31, Ross alleges that: "XE–R provided [to the Trust] the funds for the payment [of the principal plus interest on the premium finance loan]. In consideration of its provision of valuation and other services, the Trust agreed to appoint Mark Ross & Co., Inc. as the broker of record in the event that the Trust later decided to sell the Policy on the secondary market through a life settlement."

33.     The MCC Complaint further alleges at paragraph 50 that "Defendants ... knew that there was an existing contract and business relationship between XE–R, Mark Ross & Co., Inc. and the Trust, through which XE–R would help the Trust repay the MCC loan and obtain a release of MCC's collateral assignment. The Trust, through XE–R's refinancing, would be able to maintain ownership of the Policy. In the event that the Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary market using Mark Ross & Co., Inc. as the broker."

34.     Finally, the MCC Complaint alleges at paragraph 54 that "Defendants ... knew that the Trust intended to repay the MCC loan and obtain a release of MCC's collateral assignment through financing from XE–R ... In the event that the Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary market using Mark Ross & Co., Inc. as the broker."

35.     By virtue of the actions alleged in paragraphs 31, 50, and 54 of the MCC Complaint, XE–R is engaged in a transaction with an Affiliate—MRC—on terms less favorable to the Company than would be expected in a comparable arm's–length transaction.

36.     XE–R is therefore in violation of §10.1 of the Note Purchase Agreement and has thereby triggered an immediate Event of Default under §11(c) of the Note Purchase Agreement.

37.     Moreover, by virtue of the actions alleged in paragraphs 31, 50, and 54 of the MCC Complaint, Ross, acting on behalf of the Managing Member of XE–R, is engaged in self–dealing and usurpation of corporate opportunities that rightfully belong to XE–R and is in violation of the express terms of the XE–R Agreement.

38.     Specifically, Ross is in violation of the covenants to act in a good faith and in a commercially reasonable manner under §3.6(a)(ii) of the XE–R Agreement, and to use XE–R as the exclusive vehicle for brokering the life settlements of policies in the secondary market under §3.6(a)(iv) of the XE–R Agreement.

39.     As a result of the actions listed above, the Company has failed to "conduct its affairs strictly in accordance with its LLC Agreement," as required by §9.7(f) of the Note Purchase Agreement, and has thereby triggered an immediate Event of Default under §11(c) of the Note Purchase Agreement.

40.     Additionally, a separate Event of Default will occur under §11(d) of the Note Purchase Agreement unless the above–listed breaches of the XE–R Agreement are cured within thirty days of the Company's receipt of a Notice of Default.

**Additional Events of Default**

41.     Compounding the foregoing, Ross, on behalf of the Managing Member of
XE–R, has misappropriated Company property and violated the XE–R Agreement by refusing to
pay XE–R commissions earned on the sales of newly issued life insurance policies that were
financed by XE–R, as contemplated by Section 2.2(a)(iv) of the XE–R Agreement.

42.     To date, approximately $30,000,000 in commissions owed to XE–R under
the terms of the XE–R Agreement have been withheld by Ross.   Ross's failure to pay these
commissions is currently the subject of an arbitration pending between XE Capital, as Claimant,
and R2004, MRC, and Ross, as Respondents.

43.     XE–R has also been habitually late in delivering to Arche the quarterly
financial statements to which Arche is entitled under §7.1 of the Note Purchase Agreement and
which enable Arche to assess the current financial health of the Company.

**Remedies Upon an Event of Default**

44.     Section 12.1 of the Note Purchase Agreement provides that if an Event of
Default "has occurred and is continuing, any holder or holders of Notes at the time outstanding
affected by such Event of Default may at any time, at it or their option, by notice or notices to the
Company, declare all the Notes held by it or them to be immediately due and payable."

45.     By letter dated April 12, 2007, Arche delivered a Notice of Default
informing XE–R that an Event of Default had occurred under §11(c), and that Arche was thereby
declaring all outstanding Notes immediately due and payable under §12.1(b) of the Note
Purchase Agreement.  In addition, Arche informed XE–R that a separate Event of Default would
occur under §11(d) of the Note Purchase Agreement unless the breaches of the XE–R Agreement
were cured within thirty days.   A true and correct copy of that Notice of Default is attached
hereto as Exhibit D.

46.     The Notice of Default complied with the applicable notice provisions in §
18 of the Note Purchase Agreement.

47.    Under the terms of the Note Purchase Agreement, XE–R is now obligated to pay, and has failed to pay, the full amount of principal and 15% interest on the notes declared due and owing, for an aggregate amount of $31,125,000.

48.    Arche is further entitled under § 12.2 of the Note Purchase Agreement to "proceed to protect and enforce [its] rights [] by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise."

<u>COUNT I</u>
**(Breach Of Contract)**

49.    Arche repeats and realleges paragraphs 1–48 hereof, as if fully set forth herein.

50.    XE–R has defaulted in the due performance and observance of the terms of the Note Purchase Agreement.

51.    XE–R has defaulted in the due performance and observance of the terms of the XE–R Agreement.

52.    Arche has sent XE–R a Notice of Default and declared all notes immediately due and owing.

53.    Under the terms of the Note Purchase Agreement, XE–R is obligated to pay, and has failed to pay, the full amount of principal and 15% interest on the notes declared due and owing, for an aggregate amount of $31,125,000.

54.    By virtue of the foregoing, XE–R has breached the Note Purchase Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Arche respectfully requests the entry of:

a.  a declaration by the Court that a breach of the Note Purchase

   Agreement has occurred;

b.  judgment for Arche in the amount of $31,125,000; and

c.  such other and further relief as the Court may deem appropriate.

Dated: New York, New York
       April 13, 2007

                          QUINN EMANUEL URQUHART
                          OLIVER & HEDGES LLP

                          By:   *Jaimie Leeser Nawaday*
                                Peter E. Calamari (PC–3964)
                                Kevin S. Reed (KR–5386)
                                Jaimie Leeser Nawaday (JL–4756)
                                51 Madison Avenue, 22nd Floor
                                New York, New York 10010
                                Tel.: (212) 849–7000
                                Fax: (212) 849–7100

                                *Attorneys for Plaintiff*
                                *Arche Master Fund LP*

10

# EXHIBIT A

XE–R, LLC

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

Dated as of August 23, 2004

## TABLE OF CONTENTS

Section                                                                                                          Page

ARTICLE I

DEFINITIONS

ARTICLE II

ORGANIZATION, ETC.

2.1    Continuation, etc. ...................................................................................5
2.2    Purpose and Powers. ...............................................................................6
2.3    Authorized Person....................................................................................8
2.4    Place of Business .....................................................................................8
2.5    Registered Agent and Office....................................................................8
2.6    Fiscal Year ...............................................................................................9
2.7    Term .........................................................................................................9

ARTICLE III

MANAGEMENT; CERTAIN MEMBERS' RIGHTS AND OBLIGATIONS

3.1    The Managing Member.............................................................................9
3.2    Reliance by Third Parties.......................................................................11
3.3    Non-Managing Members .......................................................................11
3.4    Notice to Members .................................................................................11
3.5    Key Person Provision.............................................................................11
3.6    Representations and Warranties; Covenants...........................................11
3.7    Compensation of Officers ......................................................................13

ARTICLE IV

MEMBERSHIP INTERESTS AND CAPITAL

4.1    Classes of Interests.................................................................................13

ARTICLE V

CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; ALLOCATIONS

5.1    Capital Contributions.............................................................................14
5.2    Capital and Memorandum Accounts. .....................................................14
5.3    Allocation of Net Profit and Net Loss. ..................................................14

i

Section                                                                                                                    Page

5.4    Tax Matters. ........................................................................................................15
5.5    Pro Rata Allocations .........................................................................................16
5.6    Separate Computations .....................................................................................16

ARTICLE VI

SHARING OF DISTRIBUTABLE CASH; DISTRIBUTIONS; WITHHOLDING

6.1    Withdrawal of Capital .......................................................................................16
6.2    Priority Distributions ........................................................................................16
6.3    Other Distributions ...........................................................................................17
6.4    Tax Withholding ...............................................................................................17
6.5    Final Distribution .............................................................................................18
6.6    Overriding Provision .........................................................................................18
6.7    Distributions in Kind .........................................................................................18
6.8    Determination of Asset Values ..........................................................................18

ARTICLE VII

LIABILITY, EXCULPATION AND INDEMNIFICATION

7.1    Liability .............................................................................................................20
7.2    Exculpation. ......................................................................................................21
7.3    Indemnification. ................................................................................................21

ARTICLE VIII

BOOKS AND RECORDS; REPORTS TO MEMBERS

8.1    Books and Records ...........................................................................................23
8.2    United States Federal Income Tax Information ...................................................23
8.3    Reports to Members ..........................................................................................23

ARTICLE IX

ADMISSION OF ADDITIONAL MEMBERS; TRANSFERS

9.1    Admission of Additional Members......................................................................24
9.2    Transfer by Members. .......................................................................................24
9.3    Further Actions .................................................................................................24

ARTICLE X

DURATION AND TERMINATION OF THE COMPANY

ii

| Section | | Page |
|---|---|---|
| 10.1 | Dissolution | 25 |
| 10.2 | Distribution Upon Dissolution | 25 |
| 10.3 | Distributions in Cash or in Kind | 26 |
| 10.4 | Termination | 26 |
| 10.5 | Bankruptcy of a Member | 26 |
| 10.6 | Time for Liquidation, etc | 27 |

## ARTICLE XI

## SEPARATE LEGAL ENTITY

| 11.1 | Separate Legal Entity | 27 |
|---|---|---|

## ARTICLE XII

## MISCELLANEOUS

| 12.1 | Notices | 29 |
|---|---|---|
| 12.2 | Counterparts | 29 |
| 12.3 | Table of Contents and Headings | 29 |
| 12.4 | Successors and Assigns | 29 |
| 12.5 | Severability | 29 |
| 12.6 | Further Actions | 30 |
| 12.7 | Determinations of the Managing Member | 30 |
| 12.8 | Non-Waiver | 30 |
| 12.9 | Intellectual Property | 30 |
| 12.10 | Governing Law | 31 |
| 12.11 | Waiver of Partition | 31 |
| 12.12 | Entire Agreement | 31 |
| 12.13 | Arbitration | 31 |
| 12.14 | Expenses | 31 |
| 12.15 | Provisions Relating to Loans | 32 |

## ARTICLE XIII

## POWER OF ATTORNEY

| 13.1 | Power of Attorney | 32 |
|---|---|---|

## SCHEDULE

Schedule A    Members

iii

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of XE-R, LLC (the "Company") is entered into as of August 23, 2004, among R 2004, LLC, a New York limited liability company, as the managing member of the Company ("R 2004" or the "Managing Member"), XE Capital Management, LLC, a Delaware limited liability company ("XE Capital"), and the Persons listed on Schedule A hereto (as such Schedule may be amended or supplemented from time to time as provided herein), as the other members of the Company (each of XE Capital and such other Persons, a "Non-Managing Member" and collectively, together with the Managing Member, the "Members"), for the purpose of amending and restating the Limited Liability Company Agreement, dated August 5, 2004, of the Company (the "Initial Agreement") and to provide for the governance of the Company in pursuit of its purpose as described herein.  Certain capitalized terms used herein without definition have the meanings specified in Article I.

In consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I

## DEFINITIONS

"Accounting Period" shall mean for the first Accounting Period, the period commencing on the date of this Agreement and ending on the next succeeding Adjustment Date, and for any subsequent Accounting Period, the period commencing on the day after an Adjustment Date and ending on the next succeeding Adjustment Date.

"Act" shall mean the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-101 *et seq.*, as amended from time to time, and any successor to such statute.

"Adjustment Date" shall mean the last day of each Fiscal Quarter of the Company or any other date determined by the Managing Member as appropriate for an interim closing of the Company's books.

"Affiliate" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.

"Agreement" shall mean this Amended and Restated Limited Liability Company Agreement of the Company, as from time to time amended, supplemented or restated.

"Business Day" shall mean any day on which banks are generally open for business in New York, New York.

"Capital Account" shall have the meaning set forth in Section 5.2.

"Capital Account Balance" shall mean the balance outstanding in a Capital Account from time to time.

"Capital Contribution" shall mean, with respect to any Member, the aggregate amount of any cash that such Member shall have contributed from time to time to the capital of the Company as provided in Section 5.1 hereof.

"Carrier" shall have the meaning set forth in Section 4.1(b).

"Cause" shall mean (i) a conviction of a felony or the entering of a plea of *nolo contendere* as to a felony that would have a material adverse effect on the business of the Company, (ii) a breach of any law, regulation or rule that would have a material adverse effect on the business of the Company, or (iii) fraud, willful misfeasance or a breach of this Agreement by a Member, which breach either is incurable or, if curable, is not cured within 30 days of written notice thereof given by the Company to such Member and would have a material adverse effect on the business of the Company.

"Certificate" shall have the meaning set forth in Section 2.3.

"Claims" shall have the meaning set forth in Section 7.3(a).

"Class A Interests" shall have the meaning set forth in Section 4.1(a).

"Class A Member" shall mean a Member holding Class A Interests.

"Class B Member" shall mean a Member holding Class B Preferred Interests.

"Class B Preferred Interests" shall have the meaning set forth in Section 4.1(b).

"Class B Preferred Return" shall have the meaning set forth in Section 4.1(b).

"Closing" shall mean the date of this Agreement.

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Company" shall have the meaning set forth in the preamble of this Agreement.

"Covered Person" shall mean each Member and its Affiliates; the Managing Member and its Affiliates; each of the shareholders, officers, directors, employees,

2

partners, members, managers and agents of any Member, the Managing Member and each of their respective Affiliates; any officer, employee or agent of the Company or any of its Affiliates; or any Person who was, at the time of the act or omission in question, such a Person.

"Damages" shall have the meaning set forth in Section 7.3(a).

"Disabling Conduct" shall mean, with respect to any Person, fraud, willful misfeasance, a material violation of this Agreement or any other agreement relating to the business of the Company or any of its Affiliates that, if curable, is not cured within 30 days after a written notice describing such violation has been given to such Person, conviction of a felony or the entering of a plea of *nolo contendere* as to a felony, a breach of law or regulation that would have a material adverse effect on the business of the Company or any of its Affiliates, or reckless disregard of duties in the conduct of such Person's office.

"Distributable Cash" shall mean the excess of the sum of cash receipts (excluding Capital Contributions) of the Company over cash disbursements and additions to reserves of the Company determined by the Managing Member, in its sole discretion, to be available for distribution to the Members.

"Fiscal Quarter" shall mean for the first Fiscal Quarter, a period beginning on the date hereof and ending on September 30, 2004, and thereafter, a three-month period ending on December 31, March 31, June 30 or September 30.

"Fiscal Year" shall have the meaning set forth in Section 2.6.

"GAAP" shall mean generally accepted accounting principles as in effect in the United States from time to time.

"Initial Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Intellectual Property" shall mean (i) patents and patent applications, (ii) copyrights, trademarks, trade names and service marks, including registrations and applications for registration thereof, (iii) confidential and proprietary information, including trade secrets, data models, technology, and processes, and (iv) other intellectual property rights of any type.

"Interest" shall mean a limited liability company interest in the Company.

"Liabilities" shall mean the liabilities of the Company, including: (i) all bills and accounts payable; (ii) all administrative expenses accrued and unpaid; (iii) all contractual obligations for the payment of money or property, including any amount that the

3

Managing Member has determined is distributable but that has not yet been distributed to the Members; (iv) all reserves authorized or approved by the Managing Member for taxes or contingencies; and (v) all other liabilities of whatsoever kind and nature.

"Loans" shall have the meaning set forth in Section 2.2(a).

"Managing Member" shall mean R 2004, LLC in its capacity as a Member of the Company. The Managing Member shall be a "manager" within the meaning of the Act.

"Members" shall mean the members listed on Schedule A from time to time, in their capacities as members of the Company and shall mean the Managing Member and the Non-Managing Members.

"Membership Percentage" shall mean the Membership Percentage set forth on Schedule A applicable to the date of determination of such Membership Percentage.

"MRC" shall mean Mark Ross & Co., Inc., a Florida corporation.

"Net Asset Value" shall mean, as of any date, the excess, if any, of the value of all the assets of the Company over its Liabilities.

"Net Profit (Loss)" shall mean the difference between (a) the Net Asset Value of the Company allocable to the Members' Interests in the Company as of the close of business on the last day of such Accounting Period and (b) the Net Asset Value of the Company allocable to the Members' Interests in the Company as of the close of business on the last day of the immediately preceding Accounting Period (or, for the first Accounting Period, the initial Capital Contribution made by such Member), with (i) such difference to be Net Profit where it is a positive number and (ii) such difference to be Net Loss where it is a negative number. In determining the amount of Net Profit (Loss) to be allocated pursuant to Section 5.3, appropriate adjustments shall be made to take account of any Capital Contribution to, withdrawal from or distribution by the Company during such Accounting Period.

"Non-Managing Member" shall mean any Member other than the Managing Member.

"Note Purchase Agreement" shall mean the Note Purchase Agreement, dated as of August 23, 2004, between the Company and a fund sponsored by XE Capital.

"Person" shall mean any individual or entity, including a corporation, partnership, association, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, government or governmental agency or authority.

"Portions" shall have the meaning set forth in Section 5.6.

4

"Principals" shall mean Mark E. Ross, Bradley C. Baker and Philip S. Hill.

"Proceeding" shall have the meaning set forth in Section 7.3(a).

"Securities" shall mean shares of capital stock, limited partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities of whatever kind of any Person, whether readily marketable or not.

"Services Agreement" shall mean the Services Agreement, dated as of August 23, 2004, among the Managing Member, MRC and the Company.

"Tax Distribution" shall have the meaning set forth in Section 6.2(b).

"Term" shall have the meaning set forth in Section 2.7.

"Transfer" shall have the meaning set forth in Section 9.2(a).

"Treasury Regulations" shall mean the Regulations of the U.S. Treasury Department issued pursuant to the Code.

"Valuation Date" shall mean any Adjustment Date or any other date designated by the Managing Member in its sole discretion.

"Voting Percentage" shall mean the Voting Percentage set forth on Schedule A applicable to the date of determination of such Voting Percentage.

"XE Capital" shall mean XE Capital Management, LLC, a Delaware limited liability company.


# ARTICLE II

## ORGANIZATION, ETC.

2.1  Continuation, etc.

(a)  Amendment and Restatement of the Initial Agreement.  The Members hereby amend and restate the Initial Agreement in its entirety and agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act.  The rights, duties and obligations of the Members will be as provided in the Act, except as otherwise provided in this Agreement.

(b)  Name.  The name of the Company is "XE–R" or such other name or names as the Managing Member may from time to time designate upon at least 60 days' advance

5

notice to the Non-Managing Members and to which no Non-Managing Member reasonably objects during such 60-day period. The Company shall have the exclusive right, title and interest in and to the use of the name "XE–R" and any variation thereof, including any name to which the name of the Company is changed, until the termination of the Company. No value shall be placed upon the name or the goodwill attached thereto for the purpose of determining the value of any Member's Capital Account or interest in the Company.

(c) Schedule A. The name, mailing address, Capital Contribution, class of Interest, Membership Percentage and Voting Percentage of each Member shall be listed on Schedule A attached hereto. The Managing Member shall update Schedule A from time to time as necessary to accurately reflect the information therein. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

(d) Admissions. Upon the execution of this Agreement or a counterpart of this Agreement, R 2004, shall be the Managing Member and a Class A Member and XE Capital shall be an additional Class A Member of the Company. Additional Persons may be admitted as Class B Members of the Company as provided in Article IX at the time that this Agreement or a counterpart of this Agreement is executed by or on behalf of such Person and the Managing Member lists such Person as a Class B Member on Schedule A attached hereto.

2.2 Purpose and Powers.

(a) The Company is formed for the following purposes: (i) to originate loans collateralized by life insurance policies ("Loans") in exchange for a loan origination fee; (ii) to sell the Loans to investors; (iii) to service the Loans; (iv) to sell newly issued life insurance policies financed through the origination of new Loans and receive sales commissions of such policy sales; (v) to broker life settlements of policies and receive compensation related to such brokerage; (vi) to purchase in-force policies and "bank" them on a short-term basis to facilitate the life settlement of such policies to settlement companies or investment funds; and (vii) to transact the foregoing (except items specified in clauses (ii) and (iii)) with policy owners on a direct basis with MRC and the Company as co-brokers, and as a "wholesaler" for other life insurance brokers and intermediaries through the Company. The Company may engage in such other activities as the Managing Member deems necessary, advisable, convenient or incidental to the achievement of the foregoing.

(b) Subject to any provisions of this Agreement requiring the prior consent or approval of other Members for certain actions, or prior consultations with other Members before taking certain actions, the Company, and the Managing Member on behalf of the Company, shall have the power and authority to take any and all actions necessary,

6

appropriate, proper, advisable, incidental, or convenient, for the furtherance of the purposes set forth in Section 2.2(a), including, but not limited to, the power and authority:

(i) to establish, have, maintain or close one or more offices within or outside of the State of Delaware and in connection therewith to rent or acquire office space and to engage personnel;

(ii) to open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, mutual fund and similar accounts;

(iii) to hire consultants, custodians, attorneys, accountants and such other agents and employees for the Company as it may deem necessary or advisable, and authorize any such agent or employee to act for and on behalf of the Company;

(iv) to make and perform agreements and undertakings and execute documents as may be necessary or advisable to the carrying out of any of the foregoing powers, objects or purposes;

(v) to acquire, hold, manage, vote, Transfer and own Securities and any other assets held by the Company;

(vi) to set aside funds for reasonable reserves, anticipated contingencies and working capital;

(vii) to indemnify any Person in accordance with the Act and to obtain any and all types of insurance;

(viii) to have and exercise the powers granted to a limited liability company by the Act in any state of the United States that may be necessary, advisable, convenient or incidental to the accomplishment of the purposes of the Company as set forth in Section 2.2(a);

(ix) to invest and reinvest temporarily the Company's funds in (A) short term, interest bearing, investment grade securities, (B) certificates of deposit, (C) money market accounts, or (D) direct or guaranteed obligations of the United States government;

(x) to make and take all elections, filings, investigations, evaluations, decisions and other actions that may be necessary or appropriate for the business of the Company;

(xi) to enter into, deliver and exercise rights and perform obligations in respect of, or to take or omit to take such other actions in connection with,

7

agreements of any kind as may be necessary or advisable to further the purposes of the Company, including without limitation (A) contracts and agreements with Members, officers or employees of the Company and (B) insurance policies and related contracts and agreements;

(xii)  to incur and pay debts on behalf of the Company and to pay any taxes for which the Company may be liable;

(xiii)  to bring, defend, settle and compromise any Proceeding, and to pay, collect, compromise, or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

(xiv)  to file for and obtain registrations, licenses, or memberships and make other governmental or regulatory filings as may be necessary;

(xv)  to collect accounts receivable, income and other payments due to the Company or, to the extent the Managing Member is entitled to do so, to any corporation, partnership, limited liability company or other entity in which the Company has an investment;

(xvi)  to administer the financial affairs of the Company, make tax and accounting elections, including an election or elections under Section 754 of the Code, file all required tax returns relating to the Company, pay the liabilities of the Company and distribute the available cash of the Company to the Members; and

(xvii)  to carry on any other activities necessary to, in connection with or incidental to any of the foregoing or the business of the Company.

2.3  _Authorized Person_.  Nilima Muttana, as an authorized person within the meaning of the Act, has executed, delivered and filed the Certificate of Formation of the Company (the "Certificate").  As of the date of this Agreement, her powers as an authorized person ceased and the Managing Member is designated as an authorized person within the meaning of the Act and may execute, deliver and file any and all amendments to and restatements of the Certificate.

2.4  _Place of Business_.  The principal place of business of the Company shall be at c/o R 2004, LLC, 400 Park Avenue, 18th Floor, New York, New York 10022, or such other place or places in the United States as may be designated from time to time by the Managing Member upon 60 days' prior notice to the Members.

2.5  _Registered Agent and Office_.  The registered office of the Company in Delaware shall be located at c/o Corporation Trust Center, 1209 Orange Street,

8

Wilmington, New Castle County, Delaware, and the registered agent at such address shall be The Corporation Trust Company. At any time, the Managing Member may designate another nationally recognized registered agent and/or registered office in the State of Delaware for the Company upon 60 days' notice to all Members.

2.6 Fiscal Year. The fiscal year of the Company (the "Fiscal Year") shall end on the 31st day of December in each year. The Company shall have the same Fiscal Year for income tax and for financial and accounting purposes.

2.7 Term. The Company commenced upon the acceptance of the Certificate by the office of the Secretary of State of the State of Delaware and shall continue in existence until dissolved in accordance with Section 10.1 hereof (the "Term"). The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate in the manner required by the Act.

# ARTICLE III

## MANAGEMENT; CERTAIN MEMBERS' RIGHTS AND OBLIGATIONS

3.1 The Managing Member.

(a) General. In accordance with Section 18-402 of the Act and except as otherwise provided in this Article III (and, for the avoidance of doubt, the limitations set forth in this Section 3.1), the business and affairs of the Company shall be managed by or under the direction of the Managing Member. Other than rights and powers expressly reserved to the Members, or to a class of Members, by this Agreement and except as provided in this Agreement, the Managing Member shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company and to take all such actions as it deems necessary, appropriate, convenient or incidental to accomplish the purposes of the Company as set forth herein, provided that the Managing Member must at all times act in accordance with the law and in a good faith and commercially reasonable manner.

(b) Restrictions on the Managing Member. The Managing Member shall not: (i) do any act in contravention of any applicable law or regulation, or provision of this Agreement; (ii) misappropriate Company property; or (iii) admit any Person as a Member except as permitted in this Agreement and the Act.

(c) Managing Member as Agent. The Managing Member, to the extent of its powers set forth in this Agreement, is an agent of the Company for the purpose of the Company's business, and the actions of the Managing Member taken in accordance with this Agreement shall bind the Company.

9

(d) <u>Designation of Officers; Chief Executive Officer</u>.  The Managing Member may, but is not required to, appoint one or more officers of the Company.  The Managing Member may, in its discretion, delegate to any such officers, as agents, any portion or all of the Managing Member's rights hereunder to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company.  As of the date hereof, the Managing Member designates Mark E. Ross as the Chief Executive Officer of the Company.  The Chief Executive Officer shall, at the direction of the Managing Member, be responsible for general management, supervision, direction, and control of the business of the Company.  Except as otherwise decided from time to time by the Managing Member, the Chief Executive Officer shall make all decisions as to the day-to-day operations of the Company other than those specifically set forth in Section 3.1(e).  Any officer of the Company shall be removed as an officer at the discretion of the Managing Member, except that the Chief Executive Officer may be removed only with the consent of the Class A Members.

(e) <u>Actions of the Managing Member Requiring Unanimous Consent of the Class A Members</u>.  The following further actions may be taken under this Agreement only with the unanimous consent of the Class A Members:

(i)  to amend the constituent documents of the Company, including this Agreement;

(ii)  to dissolve the Company;

(iii)  to issue, transfer, redeem or repurchase any Interest in the Company other than the issuance of Class B Preferred Interests as contemplated by Section 4.1(b);

(iv)  to agree with Carriers upon the terms and conditions of the Class B Preferred Interests;

(v)  to enter into (or to amend or modify the terms of) any transactions, contracts or agreements with the Managing Member or its Affiliates or the Principals or their Affiliates, including, without limitation, the Services Agreement;

(vi)  to admit Class B Members to the Company;

(vii)  to file for bankruptcy with respect to the Company;

(viii)  to amend or renew the Services Agreement;

(ix)  to determine the amount of compensation for any officer of the Company; and

10

(x) to Transfer all or any part of its Interests in the Company, _provided_ that, following the second anniversary of the date hereof, the Class A Members will not unreasonably withhold consent to such Transfer if such Transfer applies to all Class A Interests of the Company on equal terms and conditions.

(f) Certain Undertakings of the Managing Member. The Managing Member undertakes to each Non-Managing Member that the Managing Member will not engage in any other activity other than serving in such capacity, nor will it negotiate with any Person to serve in any comparable capacity.

3.2 Reliance by Third Parties.

(a) Third parties dealing with the Company are entitled to rely exclusively upon the power and authority of the Managing Member as set forth in this Article III.

(b) In no event shall the Managing Member represent to any third party that any Non-Managing Member has any responsibility or liability for the day-to-day operations of the Company.

3.3 Non-Managing Members. Except as otherwise provided herein, no Non-Managing Member shall take part in the management or control of the Company's activities, transact any business in the Company's name or have the power to sign documents for or otherwise bind the Company.

3.4 Notice to Members. The Managing Member shall provide each Member notice upon the occurrence of: (a) the issuance of any license or permit to the Company to conduct business in a jurisdiction outside of the United States; or (b) the commencement of an investigation or lawsuit as to the Company by a regulatory or other governmental agency.

3.5 Key Person Provision. The Company shall acquire keyman life insurance on the Principals on the terms and conditions customary to keyman life insurance policies.

3.6 Representations and Warranties; Covenants.

(a) The Managing Member hereby represents, warrants and covenants as follows:

(i) In managing the Company through the Managing Member, the Principals will at all times act in accordance with applicable law.

(ii) In managing the Company, the Managing Member will at all times act in accordance with applicable law and in a good faith and commercially reasonable manner.

11

(iii)  In managing the Company, the Managing Member will not engage, without the consent of XE Capital, in any activity that would require the Company or any Member to register with the U.S. Securities and Exchange Commission or any other regulatory authority other than in connection with obtaining appropriate licenses and registrations pursuant to Section 3.6(a)(vi).

(iv)  The Company will be the exclusive means by which the Managing Member and its Affiliates transact as a wholesaler through other life insurance brokers and intermediaries as to the transactions listed in Section 2.2.

(v)  The Managing Member commits to provide the Company with participation in its retail (direct) transactions involving premium loans, life settlements and related sales of new life insurance.

(vi)  The Managing Member will obtain appropriate licenses and register with regulatory authorities as necessary for the Company to transact its business, including life insurance brokerage, loan transactions and life settlements.

(b)  XE Capital hereby represents, warrants and covenants as follows:

(i)  The Company will be the exclusive means by which XE Capital and its Affiliates transact in Loans as contemplated by Section 2.2(a); provided that XE Capital may transact in any Loans not originated by the Company with the consent of the Managing Member, which consent shall not be unreasonably withheld.

(ii)  XE Capital commits to provide the Company (a) its financial expertise to assist in the development and design of the transactions promoted by the Company, (b) evidence of the capital available to fund the transactions (e.g., loans, life settlements) to assist the Company in promoting the transactions in the marketplace, and (c) funds to complete the transactions.

(iii)  A fund sponsored by XE Capital will enter into the Note Purchase Agreement with the Company.

(c)  Each Member hereby represents and warrants as follows:

(i)  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance.

12

(ii) Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

(iii) All consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(iv) Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3.7 <u>Compensation of Officers</u>. No compensation will be paid to any officer of the Company during the Company's first year of operation.

## ARTICLE IV

## MEMBERSHIP INTERESTS AND CAPITAL

4.1 <u>Classes of Interests</u>. The Company will have two authorized classes of Interests: Class A Interests and Class B Preferred Interests.

(a) <u>Class A Interests</u>. As of the date hereof, Class A Interests will be held by the Managing Member and XE Capital. The Voting Percentage and the Membership Percentage of Class A Members shall be the percentage set forth opposite such Class A Member's name on Schedule A hereto.

(b) <u>Class B Preferred Interest</u>. Insurance carriers admitted as additional Members of the Company subsequent to the date hereof pursuant to Article IX (each, a "<u>Carrier</u>") will be issued Class B Preferred Interests. A holder of Class B Preferred Interests shall be entitled to a preferred return on its unreturned Capital Contribution (the "<u>Class B Preferred Return</u>"). The rate of return on, and any other terms and conditions of, the Class B Preferred Interests shall be consented to by each Class A Member, and shall be reflected in an amendment to this Agreement. The Voting Percentage and the Membership Percentage of the Class B Members shall equal zero.

13

## ARTICLE V

## CAPITAL CONTRIBUTIONS;
## CAPITAL ACCOUNTS; ALLOCATIONS

5.1 Capital Contributions. As of the Closing, each Member shall contribute as its Capital Contribution to the capital of the Company the amounts set forth under "Capital Contributions" opposite such Member's name on Schedule A hereto.

5.2 Capital and Memorandum Accounts.

(a) Each Member shall have a capital account ("Capital Account") to which shall be credited the amount of any Capital Contributions made by each such Member pursuant to Section 5.1. A Member's Capital Account shall be increased from time to time by the amount of any additional Capital Contributions to the Company made by such Member and decreased by the amount of any distribution made to such Member. A Member's Capital Account shall be increased from time to time by any Net Profit allocated to such Member in accordance with Section 5.3 and decreased by the amount of any Net Loss allocated to such Member in accordance with Section 5.3.

(b) Where appropriate or necessary, the Managing Member may use memoranda accounts and records to alter the allocations of Net Profit and Net Loss among the Members to equitably allocate Net Profit and Net Loss among the Members.

5.3 Allocation of Net Profit and Net Loss.

(a) Allocation Priorities. Subject to the other provisions of this Section 5.3,

(i) any Net Profit for any Accounting Period shall first be allocated to the Class B Members in an amount equal to the sum of the amount that they are entitled to receive as Class B Preferred Return for such Accounting Period and the amount of any Net Loss previously allocated pursuant to clause (ii) of this subsection that has not previously been reversed by this clause, and the balance of such Net Profit shall be allocated to the Class A Members in accordance with their respective Membership Percentages for such Accounting Period, and

(ii) any Net Loss shall be allocated to the Class A Members in accordance with their respective Membership Percentages for such Accounting Period but only to the extent that such allocation does not create or increase a negative Capital Account Balance as of the close of such Accounting Period, and the balance of any such Net Loss shall be allocated to the Class B Members to the extent that they have positive Capital Account Balances as of the end of such Accounting Period.

14

(b)  After the close of each Accounting Period during a Fiscal Quarter, the Company shall tentatively allocate Net Profit and Net Loss for such Accounting Period to each Member and shall make such further allocations as provided in this Section 5.3.  As of the last day of each Fiscal Quarter, the Company shall reverse all such tentative allocations of Net Profit and Net Loss previously made to each Member for all Accounting Periods included within such Fiscal Quarter and shall thereafter determine the Net Profit or Net Loss for such Fiscal Quarter and allocate such Net Profit or Net Loss to each Member in accordance with this Section 5.3.

(c)  Any Net Loss tentatively allocated to any Member in accordance with this Section 5.3 with respect to any Accounting Period shall be allocated to such Member; provided that (i) no portion of such Net Loss shall be allocated to any Member if and to the extent that such allocation would create or increase a negative Capital Account Balance for such Member, and (ii) any Net Loss not allocated by reason of clause (i) shall be allocated among the other Members to the extent permitted by clause (i) in accordance with their respective Membership Percentages for Class A Members and their Capital Account Balances for Class B Members for such Accounting Period, and any balance remaining thereafter shall be allocated among the Members in accordance with their respective Membership Percentages for Class A Members and their Capital Account Balances for Class B Members.  Notwithstanding any other provision of this Section 5.3, any Net Profit that would otherwise be allocated to any Member who was not allocated any amount of Net Loss pursuant to clause (i) of this Section 5.3(c) shall be allocated to other Members by the Managing Member in an equitable manner to reverse the effect of clause (i) and achieve the objectives of this Section 5.3.

5.4  Tax Matters.

(a)  For U.S. federal, state and local income tax purposes, income, gains, loss and deduction (and items thereof) of the Company shall be allocated among the Members to the extent permitted under the Code and the Treasury Regulations, in accordance with the manner in which such items are allocated to the Members in accordance with Section 5.3; provided that, in the case of any Member withdrawing all or a portion of its interest in the Company, the Managing Member shall specially allocate such items to such Member in an amount not to exceed the amount by which the aggregate amount of the excess of Net Profit over Net Loss then or theretofore allocated to such Member with respect to such withdrawn interest exceeds the net amount of taxable income and gain over loss and deduction then or theretofore allocated to such Member with respect to such withdrawn interest.

(b)  The Managing Member shall equitably allocate tax credits among all Members.  Upon request by a Non-Managing Member, the Managing Member shall provide a written explanation of such allocations to all Members.

(c)  Notwithstanding any other provision of this Section 5.4, the Managing Member shall have the power to make such allocations for U.S. federal, state and local income tax purposes as may be necessary to maintain substantial economic effect, or to insure that such allocations are in accordance with the interests of the Members in the Company, in each case within the meaning of the Code and the Treasury Regulations. All matters concerning allocations for U.S. federal, state and local income tax purposes, including accounting procedures, not expressly provided for in this Agreement shall be equitably determined in good faith by the Managing Member.  The Managing Member shall not permit the Company to elect, and the Company shall not elect, to be treated as an association taxable as a corporation for U.S. federal, state or local income tax purposes under Treasury Regulations section 301.7701-3(a) or under any corresponding provision of state or local law.

5.5  Pro Rata Allocations.  Except as contemplated by Section 5.3 and Section 5.4, the Managing Member shall not make any allocation of Net Profit or Net Loss or any allocation of items of taxable income, gain, loss and deduction to a Member other than in accordance with such Member's Membership Percentage; provided that such allocations may be made with the consent of the affected Members.

5.6  Separate Computations.  The computations required to be made pursuant to this Article V may be made separately with respect to the investment of each Member in the Company, or with respect to separate contributions to or withdrawals from the Company of a particular Member, to reflect appropriately the different times at which different Members may have contributed capital to the Company or withdrawn capital from the Company and the Net Asset Values at such times.  Such separate computations may include, without limitation, separate determinations of Capital Accounts and all elements thereof with respect to each such Member's initial Capital Contributions and additional Capital Contributions or portions thereof ("Portions").

## ARTICLE VI

## SHARING OF DISTRIBUTABLE CASH;
## DISTRIBUTIONS; WITHHOLDING

6.1  Withdrawal of Capital.  Except as otherwise expressly provided in this Article VI or in Article X, no Member shall have the right to withdraw capital from the Company or to receive any distribution of or return on such Member's Capital Contributions.

6.2  Priority Distributions.  Except as provided in Section 6.3(b), the Company shall make distributions to the Class B Members equal to the Class B Preferred Return. Such distributions shall be made from Distributable Cash.  If Distributable Cash is insufficient to distribute any portion of the Class B Preferred Return due for the

16

applicable period, such obligation shall accrue nevertheless and be satisfied from the first Distributable Cash of the Company that after making any distributions pursuant to Section 6.3(b) are available for distributions to Class B Members.

6.3   Other Distributions.

(a)   Generally.  Except as provided in Section 6.3(b) and Section 6.2, Distributable Cash shall be distributed to the Class A Members *pro rata* in accordance with their Membership Percentages with respect to the year to which such distribution relates, at such times and in such amounts as deemed appropriate by the Managing Member.  For the avoidance of doubt: generally distributions shall be made pursuant to this subsection in accordance with the Membership Percentages in effect at the time that the amount of such distribution is determined; however, distributions made on or before April 15 of a year may be made in accordance with the Membership Percentages in effect on December 31 of the prior year.

(b)   Tax Distributions.  The Company may, at the discretion of the Managing Member, make distributions ("Tax Distributions") to the Class A Members (after making any distribution required by Section 6.2 and prior to making any other distribution pursuant to any other provision of this Agreement) in amounts sufficient to enable the Class A Members to discharge their respective United States federal, state and local income tax liabilities arising from the allocations made pursuant to this Agreement. Amounts, if any, distributable pursuant to this Section 6.3(b) shall be determined by the Managing Member in its reasonable discretion, taking into account the maximum combined United States federal, New York State and New York City tax rates applicable to the Members, and the deductibility of state and local taxes, to the extent allowable. The amount of any Tax Distribution shall reduce the amount distributable to such Member pursuant to Section 6.3(a), and shall be deemed to have been distributed to the extent of such reduction pursuant to such applicable Section.

6.4   Tax Withholding.  Each Member hereby authorizes the Company to withhold and pay over any withholding or other taxes payable by the Company as a result of such Member's status as a Member.  To the extent such tax is paid by the Company but not withheld from a distribution being made to a Member, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time each such withholding is paid by the Company, which payment shall be considered a loan from the Company to such Member.  Such loan shall bear interest at the then "applicable federal short-term rate" under the Code, and shall be repayable on demand or, at the election of the Company, discharged out of and deducted from distributions to which such Member would otherwise be entitled.  The withholdings referred to in this Section 6.4 shall be made at the maximum statutory rate under applicable laws unless the Company has received an opinion of counsel or other evidence, satisfactory to the Company, that a lower rate is applicable, or that no withholding is applicable.  The

provisions of this Section 6.4 shall survive the dissolution, winding up and termination of the Company and this Agreement.

6.5 <u>Final Distribution</u>. The final distributions following dissolution of the Company shall be made in accordance with the provisions of Sections 6.2 and 6.3.

6.6 <u>Overriding Provision</u>. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of available assets of the Company. Any distribution by the Company to the Person shown on the Company's records as a Member or to such Member's legal representatives, or to the transferee of such Person's right to receive such distributions as provided herein, shall acquit the Company of any liability to any other Person that may be interested in such distribution by reason of any Transfer of such Person's Interests in the Company for any reason (including a Transfer of such Interests by reason of the death, incompetence, bankruptcy or liquidation of such Person).

6.7 <u>Distributions in Kind</u>.

(a) In the event that a distribution of Securities is made, such Securities shall be deemed to have been sold at their fair market value and the proceeds of such sale shall be deemed to have been distributed in cash to the Members for all purposes of this Agreement. Distributions of Securities or other property shall be made in proportion to the aggregate amounts that would be distributed to each Member pursuant to this Section 6.7, as determined by the Managing Member. The Managing Member may cause certificates evidencing any Securities to be distributed and to be imprinted with legends as to such restrictions on Transfer as it may determine are necessary or appropriate, including legends as to applicable U.S. federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Member to which Securities are to be distributed, as a condition to such distribution, to agree in writing (i) that such Member will not Transfer such Securities except in compliance with such restrictions and (ii) to such other matters as the Managing Member may determine are necessary or appropriate.

(b) Prior to making a distribution in-kind, the Managing Member shall inform all Non-Managing Members, and any Non-Managing Members may instruct the Managing Member to retain the Securities which would otherwise have been distributed to such Non-Managing Members and to liquidate them on behalf of such Non-Managing Members.

6.8 <u>Determination of Asset Values</u>. The Managing Member from time to time shall determine the Net Asset Value of the Company in accordance with this section and may appoint one or more Persons to assist it in the determination of the value of Securities and to make the actual calculations pursuant to its directions. The Net Asset Value shall be determined by or under the direction of the Managing Member in

18

accordance with the following: (a) Securities shall be valued in good faith by or under the direction of the Managing Member at their fair market value; (b) in determining the value on a given date of marketable Securities for which market quotations are readily available and which are available for immediate sale, (i) Securities (other than listed options) that are listed on a national securities exchange or quoted on NASDAQ will be valued on the basis of the closing price on the primary exchange on which such Securities are traded or on NASDAQ, provided that if the Managing Member in good faith determines that the closing price does not reflect the fair value of any such Security, such Security shall be valued at the arithmetic average of the last "bid" and last "ask" prices, (ii) over-the-counter Securities not quoted on NASDAQ (other than options) will be valued at the last "bid" price on that date or, in the case of short positions, at the last "ask" price and (iii) a Security traded in non-U.S. markets will normally be valued on the basis of the closing price quoted in its principal market or, if there are no trades in such market, at the last "bid" price or, in the case of short positions, at the last "ask" price, provided that if the Managing Member in good faith determines that the last sale price does not reflect the fair value of any such Security, such Security shall be valued at the arithmetic average of the last "bid" and last "ask" prices; (c) the value of a Security, the resale of which is restricted or limited, shall be the lesser of (i) the value thereof based on reported quotations in common use and (ii) such percentage of the market value of Securities of the same class, the trading of which is not restricted or limited by reason of any representation, undertaking or agreement or by law, as determined by the Managing Member in a good faith and commercially reasonable manner, provided that the Managing Member may in its sole discretion take into account the actual value of the Security when the date on which such restriction will cease to exist is known; (d) a listed option shall be valued on the primary exchange on which such option is traded at the last "bid" price on that date, or, in the case of short positions, at the last "ask" price, provided that if the Managing Member in good faith determines that the last "bid" price, or last "ask" price in case of short positions, does not reflect the fair value of any such option, the Managing Member may obtain prices in its sole discretion from one or more brokers and the option will be valued based on the last "bid" price or "ask" price (as the case may be) of the broker in the case of one broker or on the arithmetic average of the last "bid" price and the last "ask" price as reported by more than one broker; (e) over-the-counter options for which representative brokers' quotations are available shall be valued at the last "bid" price on that date, or in the case of short positions, at the last "ask" price as reported by any such broker; provided that if the Managing Member in good faith determines that the prices reported by such broker do not reflect the fair value of any such option, the Managing Member may obtain prices in its sole discretion from one or more brokers and the option will be valued based on the last "bid" price or "ask" price (as the case may be) of the broker in the case of one broker or on the arithmetic average of the last "bid" price and the last "ask" price as reported by more than one broker; (f) the amount of unrealized gain or loss on any open futures contract shall be recorded by taking the difference between the contract price as of the trade date and the settlement price reported on the primary exchange on which such contract is traded; (g) all margins

19

paid or deposited in respect of futures, forward and other derivatives contracts shall be reflected as accounts receivable and margins consisting of assets other than cash shall be noted as held as margins; (h) all other derivatives contracts shall be valued at their current market value on the Valuation Date as determined by or under the direction of the Managing Member; (i) the value of any illiquid Securities and any marketable Securities for which reliable quotations are not available, will be their fair value as determined in good faith by or under the direction of the Managing Member, and such determination shall take into account all factors, information and data deemed to be pertinent; (j) holdings of shares of other investment funds, if any, will generally be calculated at the net asset value as determined by those funds; (k) all assets valued or denominated in a foreign currency and all liabilities and obligations payable in a foreign currency shall be converted into U.S. dollars by applying the rate of exchange determined by or under the direction of the Managing Member as existing on the Valuation Date; and (l) all expenses and liabilities shall be calculated on an accrual basis. The value of any Security shall reflect any unrealized gains and losses with respect to such Security. Intangible assets will be valued at book value. The fair value of any Security or other asset, which the Managing Member determines in a good faith and commercially reasonable manner cannot be determined in accordance with the above, shall be determined by or under the direction of the Managing Member in a manner which the Managing Member in a good faith and commercially reasonable manner deems appropriate. Notwithstanding anything in this Agreement, the value of a set of two or more Securities which the Managing Member in a good faith and commercially reasonable manner determines to constitute a single arbitrage or hedged position shall be determined by the Managing Member, taking into account the net effect of such arbitrage or hedge. All Members acknowledge that the process of valuing assets for which no published market exists is based on inherent uncertainties and the resulting values may differ from values that would have been used had a ready market existed for such assets and may differ from the prices at which such assets may be sold.

## ARTICLE VII

## LIABILITY, EXCULPATION AND INDEMNIFICATION

7.1 Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company. Except as otherwise expressly required by law, a Member, in its capacity as such, shall have no liability in excess of (i) its share of any undistributed profits and assets of the Company, (ii) its obligation to make other payments expressly provided for in this Agreement, subject to the terms and conditions herein and (iii) the amount of any distributions wrongfully distributed to it and required by the Act to be returned to the Company.

7.2 Exculpation.

(a) General. No Covered Person shall be liable to the Company or any Member for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, provided that such act or omission does not constitute Disabling Conduct of such Covered Person. No Member shall be liable to the Company or any Member for any action taken by any other Member. To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, any Covered Person acting under this Agreement shall not be liable to the Company or any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) Reliance. A Covered Person shall incur no liability in acting in good faith upon any signature or writing believed by such Covered Person to be genuine, may rely on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely on an opinion of counsel selected by such Covered Person with respect to legal matters. Each Covered Person may act directly or through such Covered Person's agents or attorneys. Each Covered Person may consult with counsel, appraisers, engineers, accountants and other skilled Persons selected by such Covered Person with reasonable care, and shall not be liable for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons. No Covered Person shall be liable to the Company or any Member for any error of judgment made in good faith by an officer or employee of such Covered Person, provided that such error does not constitute Disabling Conduct of such Covered Person.

(c) Not Liable for Return of Capital Contributions. No Covered Person shall be liable for the return of the Capital Contribution or Capital Account of any Member, and such return shall be made solely from available Company assets, if any, and each Member hereby waives any and all claims it may have against each Covered Person in this regard.

7.3 Indemnification.

(a) Indemnification Generally. The Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify, hold harmless and release (and each Member does hereby release) each Covered Person from and against, and shall pay or reimburse each Covered Person for, all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative,

investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise. or with which any Covered Person may be threatened, relating to or arising out of the business and affairs of, or activities undertaken in connection with, the Company, or otherwise relating to or arising out of this Agreement, including, amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal, and whether or not resulting from third party claims, (all of such Claims and amounts covered by this Section 7.3 are referred to collectively as "Damages"), except to the extent that (i) it shall have been determined ultimately by a court of competent jurisdiction that such Damages arose from Disabling Conduct of such Covered Person; provided, however, that irrespective of such adjudication of liability, such court, in view of all the circumstances, may, upon application, indemnify such Covered Persons as it deems fair, reasonable and proper, or (ii) such Damages arise out of a Claim brought by the Company or an Affiliate of the Company against any Covered Person. Notwithstanding the foregoing, a Covered Person will only be eligible for indemnification pursuant to this Section 7.3 for Claims relating to or arising out of transactions or actions that took place during the time such Covered Person was a shareholder, officer, director, employee, partner, member, manager or agent of any of the Company or its Affiliates. Any termination of a Proceeding by settlement shall require the prior written consent of the Managing Member, and any settlement entered into without such consent shall not be subject to indemnification hereunder. Any termination of a Proceeding by settlement shall require a release or a waiver of all claims against the Company by the parties to such settlement. The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement arose from a material violation of this Agreement by, or the Disabling Conduct of, any Covered Person.

(b) No Direct Member Indemnity. Members shall not be required directly to indemnify any Covered Person.

(c) Expenses. etc. To the fullest extent permitted by law, the reasonable expenses incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Company to such Covered Person prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified hereunder. The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns and legal representatives.

22

(d) Notices of Claims, etc. Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of the commencement of such Proceeding, provided that the failure of any Covered Person to give notice as provided herein shall not relieve the Company of its obligations under this Section 7.3, except to the extent that the Company is actually prejudiced by such failure to give notice. In case any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Company), the Company will be entitled to participate in and to assume the defense thereof to the extent that the Company may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Company to such Covered Person of the Company's election to assume the defense thereof, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Company will not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Claim.

(e) No Waiver. Nothing contained in this Section 7.3 shall constitute a waiver by any Member of any right that it may have against any party under United States federal or state securities laws.

## ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO MEMBERS

8.1 Books and Records. The Company shall keep or cause to be kept full and accurate accounts of the transactions of the Company in proper books and records of account which shall set forth all information required by the Act. Such books and records shall be maintained on the basis utilized in preparing the Company's United States income tax returns. Each Class A Member shall be entitled to inspect or copy the books and records of the Company at any time during normal business hours at the principal place of business of the Company. Upon the reasonable request of any Class A Member, the Principals shall hold a meeting or conference call open to representatives of all Class A Members at which the performance and prospects of the Company shall be discussed.

8.2 United States Federal Income Tax Information. As soon as reasonably practicable after the end of each Fiscal Year, the Company shall send to each Member copies of federal and reasonable state equivalents of Schedule K-1, "Partner's Share of Income, Credits, Deductions, Etc.", or any successor schedule or form, with respect to such Member.

8.3 Reports to Members. Commencing with the calendar quarter in which the first anniversary of the date hereof falls, the Company shall provide to each Member

23

reports for each calendar quarter summarizing the Company's performance and prospects within 90 calendar days of the close of such calendar quarter. The Company shall provide to each Member financial statements for the Company (audited by an internationally recognized accounting firm) for each Fiscal Year within 120 calendar days of the close of such Fiscal Year. Except as otherwise provided in this Agreement or required by applicable law, the Company shall send to each Class A Member only such other financial reports as such Class A Member may reasonably request pursuant to due notice. The Principals shall be available to discuss the Company's performance and prospects at any time upon the reasonable request of a Class A Member.

## ARTICLE IX

## ADMISSION OF ADDITIONAL MEMBERS; TRANSFERS

9.1 <u>Admission of Additional Members</u>. The Managing Member may from time to time admit one or more Carriers to the Company as Class B Members, subject to the prior written unanimous consent of the Class A Members. Upon its admission as a Class B Member of the Company, a Carrier will be issued Class B Preferred Interests in accordance with Section 4.1(b). Each such Carrier shall be admitted as a Class B Member of the Company at the time such Carrier (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto.

9.2 <u>Transfer by Members</u>.

(a) <u>General</u>. No Member other than the Managing Member may assign, sell, convey, pledge, mortgage, encumber, hypothecate or otherwise transfer in any manner whatsoever ("<u>Transfer</u>") all or any part of its Interest in the Company without the express prior written consent of the Managing Member, which consent will not unreasonably be withheld.

(b) <u>Transfer by Managing Member</u>. The Managing Member may Transfer all or any portion of its Interest in the Company only with the prior unanimous written consent of the Class A Members, <u>provided</u> that, following the second anniversary of the date hereof, the Class A Members will not unreasonably withhold consent to such Transfer if such Transfer applies to all Class A Interests of the Company on equal terms and conditions.

(c) <u>Transfers in Violation of Agreement Not Recognized</u>. No attempted Transfer or substitution shall be recognized by the Company unless effected in accordance with and as permitted by this Agreement.

9.3 <u>Further Actions</u>. The Members shall cause this Agreement with the unanimous consent of the Class A Members to be amended so as reasonably to reflect the

24

occurrence of any of the transactions referred to in this Article IX as promptly as is practicable after such occurrence.

## ARTICLE X

## DURATION AND TERMINATION OF THE COMPANY

10.1 Dissolution. There will be a dissolution of the Company, and its affairs shall be wound up, upon the first to occur of any of the following events:

(a) a decision by the Managing Member to dissolve the Company with the consent of the Members holding 100% of the Voting Percentages;

(b) the entry of a decree of judicial dissolution pursuant to section 18-802 of the Act;

(c) a reasonable determination by the Managing Member that the actions of XE Capital constitute Cause, provided that (i) the Managing Member shall previously have notified XE Capital in writing of the alleged Cause in reasonable detail and afforded XE Capital an opportunity to respond to the allegation within five Business Days after receipt of such notice and (ii) a dissolution of the Company pursuant to this Section 10.1(c) shall be at the option of the Managing Member;

(d) a reasonable determination by XE Capital that the actions of the Managing Member constitute Cause, provided that (i) XE Capital shall previously have notified the Managing Member in writing of the alleged Cause in reasonable detail and afforded the Managing Member an opportunity to respond to the allegation within five Business Days after receipt of such notice and (ii) a dissolution of the Company pursuant to this Section 10.1(d) shall be at the option of XE Capital; or

(e) the bankruptcy of XE Capital or the Managing Member.

10.2 Distribution Upon Dissolution. Upon the dissolution of the Company, a duly elected liquidating trustee of the Company or other representative shall proceed, subject to the provisions of this Article X, to liquidate the Company and apply the proceeds of such liquidation, or in its sole discretion to distribute Company assets, in the following order of priority:

*First*, to creditors in satisfaction of debts and liabilities of the Company, whether by payment or the making of reasonable provision for payment (other than any loans or advances that may have been made by any of the Members to

the Company); to the expenses of liquidation, whether by payment or the making of reasonable provision for payment; and to the establishment of any other reasonable reserves (which may be funded by a liquidating trust) in amounts deemed by the Managing Member (or any duly elected liquidating trustee or other duly designated representative) to be reasonably necessary for the payment of the Company expenses, liabilities and other obligations (whether fixed or contingent or conditional or unmatured);

*Second*, to the Members in satisfaction of any loans or advances that may have been made by any of the Members to the Company, whether by payment or the making of reasonable provision for payment; and

*Third*, to the Members in accordance with Article VI and Section 12.9.

10.3 <u>Distributions in Cash or in Kind</u>.

(a)  Upon the dissolution of the Company, the liquidating trustee or other duly designated representative shall use all commercially reasonable efforts to liquidate all of the Company assets in an orderly manner and apply the proceeds of such liquidation as set forth in Section 10.2, <u>provided</u> that if in the good faith judgment of such liquidating trustee or other representative a Company asset should not be liquidated, such liquidating trustee or other representative shall allocate, on the basis of the value (determined in the good faith judgment of the Managing Member) of any Company assets not sold or otherwise disposed of, any unrealized gain or loss based on such value to the Members' Capital Accounts as though the assets in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in accordance with Section 10.2, subject to the priorities set forth in Section 10.2, and <u>provided</u>, <u>further</u>, that such liquidating trustee or other representative will in good faith attempt to liquidate sufficient Company assets to satisfy in cash (or make reasonable provision for) the debts and liabilities referred to in paragraphs *First* and *Second* of Section 10.2.

(b)  Any distributions in-kind upon dissolution shall be subject to the same procedures as set forth in Section 6.7(b) in the case of distributions while the Company is operating.

10.4 <u>Termination</u>.  Upon completion of the foregoing, the Managing Member (or any duly elected liquidating trustee or other duly designated representative) shall execute, acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of Delaware.

10.5 <u>Bankruptcy of a Member</u>.  Upon the bankruptcy (as defined in section 18-101(1) of the Act) of a Member (other than XE Capital or the Managing Member) the business of the Company shall continue without dissolution.

10.6 <u>Time for Liquidation, etc</u>. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Managing Member to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the Certificate with the Secretary of State of the State of Delaware.

## ARTICLE XI

## SEPARATE LEGAL ENTITY

11.1 <u>Separate Legal Entity</u>. The Company shall be operated in such a manner that it would not be substantively consolidated in the estate of any Person in the event of a bankruptcy or insolvency of such Person and in such regard, the Company shall:

(a) not engage in any business unrelated to the purposes described in Section 2.2;

(b) not have any assets other than for the purposes described in Section 2.2;

(c) remain solvent, which shall mean the ability to pay its debts and liabilities from its assets and available credit as such debts and liabilities shall become due, and maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(d) observe all limited liability company formalities;

(e) comply with all of the terms and provisions contained in this Agreement and any other constituent documents;

(f) correct any known misunderstanding regarding its separate identity;

(g) not become involved in the day-to-day management of any other Person;

(h) not identify any Member, or any Affiliate of any of them, as a division or part of it, and not identify itself as a division of any other Person;

(i) not enter into or be a party to any transaction with any Member or Affiliate thereof except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (ii) in connection with the Services Agreement and the Note Purchase Agreement;

27

(j)  not engage in transactions with any other Person except as expressly set forth herein, the Services Agreement and the Note Purchase Agreement and matters necessarily incident thereto;

(k)  maintain its bank accounts, books, records, resolutions and agreements separate from any other Person and file its own tax returns;

(l)  maintain its financial statements, accounting records and other entity documents separate from any other Person and not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP;

(m)  hold its assets in its own name;

(n)  not commingle its assets with those of any other Person, and maintain its assets in such a manner as will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(o)  not participate in any cash management system with any other Person and maintain its own deposit account or accounts, separate from those of any Member or Affiliate, with commercial banking institutions other than as provided in the Security Documents referred to in the Note Purchase Agreement;

(p)  conduct its business in its own name, except for services rendered under the Services Agreement, so long as each of the Managing Member or Mark Ross & Co., Inc., as appropriate, hold itself out as an agent of the Company;

(q)  use only its own stationery, invoices, and checks that bear its own name and not the name of any other entity unless such entity is clearly designated as being the Company's agent and conduct all business correspondence of the Company and other communication in the Company's own name, in its own stationery, through a separately listed telephone number and through its own authorized officers and/or agents;

(r)  at all times maintain and conduct its business from an office or offices separate and apart from those of any Member, _provided_ to the extent that such office or offices are located within the office or offices of any Member, the Company shall pay fair market rent and its fair share of any overhead costs with respect to such office or offices, or as otherwise provided in the Services Agreement;

(s)  except as contemplated in the Services Agreement, pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and maintain a sufficient number of employees (which employees need not be full-time employees) or independent contractors in light of its contemplated business operations;

(t)  not pay, assume or guarantee from its assets any obligations, liabilities or indebtedness of any Member or any other Person or hold itself or its credit out as being available to satisfy the obligations of any Member or any other Person;

(u)  not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(v)  not acquire obligations or securities of any Member or any Affiliate thereof or, except as otherwise provided in the Note Purchase Agreement, pledge its assets for the benefit of any other Person; and

(w)  not have any of its obligations guaranteed by any Member or Affiliate thereof.

## ARTICLE XII

## MISCELLANEOUS

12.1  Notices.  All notices, requests, demands and other communications relating to this Agreement shall be in writing and shall be deemed to have been duly given if delivered or mailed, registered mail, first-class postage paid, if to the Members, at the addresses set forth on Schedule A hereto or to such other address as any Member shall have last designated by notice to the Company, and if to the Company, at its principal office. Any notice to a Member shall be effective only if and when received by such Member and any notice to the Company shall be effective only if and when received by the Managing Member.

12.2  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original and together shall constitute a single agreement.

12.3  Table of Contents and Headings.  The table of contents and the headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

12.4  Successors and Assigns.  Except as otherwise specifically provided herein, this Agreement shall be binding upon and inure to the benefit of the Members and their legal representatives, successors, heirs and permitted assigns.

12.5  Severability.  Every term and provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in

21776096v8

any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

12.6 <u>Further Actions</u>. Each Member shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the Company in connection with the achievement of the purposes of the Company or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the Managing Member determines to be necessary or appropriate to form, qualify or continue the Company as a limited liability company in all jurisdictions in which the Company conducts or plans to conduct its investment and other activities and all such agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Company.

12.7 <u>Determinations of the Managing Member</u>. Unless otherwise specified in this Agreement, any determination, decision, consent, vote or judgment of, or exercise of discretion by, or action taken or omitted to be taken by, the Managing Member under this Agreement shall be made, given, exercised, taken or omitted as the Managing Member shall determine in its sole and absolute discretion. In connection with the foregoing, the Managing Member shall be entitled to consider only such interests and factors as the Managing Member deems appropriate, including the Managing Member's own interests, and shall act in good faith.

12.8 <u>Non-Waiver</u>. No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

12.9 <u>Intellectual Property</u>. Each of the Members hereby agrees that the Company shall have exclusive right, title and interest in and to all Intellectual Property developed at the expense of or in connection with the business of the Company and that any other Person using such Intellectual Property shall pay commercially reasonable licensing fees to the Company for use thereof. Upon the dissolution of the Company, each Class A Member other than the Managing Member shall receive a perpetual, non-transferable (except to its Affiliates at the time of the dissolution) royalty-free license to the use of all such Intellectual Property, and the Managing Member shall receive all right, title and interest in and to such Intellectual Property, subject to such licenses. The respective values of such licenses and such right, title and interest shall be taken into account in the final distribution of the assets of the Company in accordance with Article VI hereof. Intellectual Property owned by the Managing Member, a Non-Managing Member or their respective Affiliates but used in the business of the Company shall remain the property of the Managing Member, a Non-Managing Member or their respective Affiliates, as the case may be, irrespective of whether such Intellectual Property relates to one or more activities of the Company or is used in the business of the Company.

12.10  <u>Governing Law</u>.

(a)  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.

(b)  Interests in the Company are securities governed by Article 8 of the Uniform Commercial Code, as provided for by Section 8-103(c) of the Uniform Commercial Code.

12.11  <u>Waiver of Partition</u>.  Except as may be otherwise provided by law in connection with the dissolution, winding up and liquidation of the Company, each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's property.

12.12  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

12.13  <u>Arbitration</u>.  Each of the parties hereto agrees that any dispute, controversy or claim arising out of or related to this Agreement, or any transactions contemplated herein, including, without limitation, whether such controversy or claim is subject to arbitration, shall be finally resolved by binding arbitration held in New York, New York, in accordance with the domestic arbitration rules of the American Arbitration Association, except as may be modified by this Section 12.13 or by mutual agreement of the parties to such dispute, claim or controversy.  Arbitration proceedings shall be conducted by a panel of three persons selected as follows:  the party or parties initiating arbitration shall select one arbitrator and the other party or parties shall select a second arbitrator.  The two arbitrators so selected shall select a third arbitrator as soon as possible.  Each party shall provide prompt written notice of the arbitrator selected by it in accordance with the terms of this Agreement.  No arbitrator shall have or previously have had any significant relationship with any of the parties.  Notwithstanding Section 12.10, the arbitration and this clause shall be governed by Title 9 (Arbitration) of the United States Code.

12.14  <u>Expenses</u>.  Upon Closing, the Company shall reimburse all expenses (including legal, accounting and applicable licensing fees) incurred by the Members in connection with the organization and formation of the Company and the transactions contemplated by the Note Purchase Agreement prior to the date hereof; <u>provided</u> that, the Company will not reimburse (<u>i</u>) the Managing Member for such fees and expenses to the extent such fees and expenses were incurred internally by the Managing Member and (<u>ii</u>)

31

any Member to the extent any fees and expenses incurred by such Member are specific to such Member's Interest in the Company.

    12.15 <u>Provisions Relating to Loans</u>. The Managing Member will promptly deliver to XE Capital a notice containing information relating to the terms and conditions of any portfolio of Loans originated by the Company that the Company expects to market. Subject to the last sentence of this Section, XE Capital or any of its Affiliates will have 5 Business Days from the date such notice is received in which to notify the Managing Member whether XE Capital or any of its Affiliates has elected to purchase such Loan portfolio. If, and only if, XE Capital or any of its Affiliates does not elect to purchase such Loan portfolio during such period, the Managing Member may take such actions with respect to such Loan portfolio as it deems appropriate pursuant to this Agreement (including, without limitation, selling such Loan portfolio to investors). The right of XE Capital or any of its Affiliates to purchase Loans pursuant to this Section 12.5 is limited to 50% of the aggregate value of the Loans originated by the Company, <u>provided</u> that the Company will use reasonable efforts to structure Loan portfolio sales to permit XE Capital or its Affiliates to participate in the purchase of a Loan portfolio if the purchase by XE Capital or one or more of its Affiliates of the entire Loan portfolio would cause such limit to be exceeded.

**ARTICLE XIII**

**POWER OF ATTORNEY**

    13.1 <u>Power of Attorney</u>. Each Member hereby constitutes and appoints the Managing Member as such Member's true and lawful representative and attorney-in-fact (the "<u>Attorney-in-Fact</u>") in such Member's name, place and stead to make, execute, acknowledge, record and file the following:

    (a) any amendment to the Certificate which may be required by the laws of the State of Delaware because of:

        (i) any duly made amendment to this Agreement, or

        (ii) any change in the information contained in such Certificate, or any amendment thereto;

    (b) any other certificate or instrument which may be required to be filed by the Company under the laws of the State of Delaware or under the applicable laws of any other jurisdiction in which counsel to the Company determines that it is advisable to file;

32

(c)  any certificate or other instrument which the Attorney-in-Fact deems necessary or desirable to effect a termination and dissolution of the Company which is authorized under this Agreement;

(d)  any amendments to this Agreement, duly adopted in accordance with the terms of this Agreement; and

(e)  any other instruments that the Attorney-in-Fact may deem necessary or desirable to carry out fully the provisions of this Agreement; provided, however, that any action taken pursuant to this power shall not, in any way, increase the liability of the Members beyond the liability expressly set forth in this Agreement, and provided further that where action by consent of the Members is required, such consent shall have been obtained.

Such Attorney-in-Fact is not by the provisions of this Section 13.1 granted any authority on behalf of the undersigned to amend this Agreement, except as provided for in this Agreement.  Such power of attorney is coupled with an interest and shall continue in full force and effect notwithstanding the subsequent bankruptcy or dissolution of the Member granting such power of attorney.

21776096v8

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Liability Company Agreement of XE–R, LLC as of the day and year first above written.

MANAGING MEMBER:

R 2004 LLC

By:

Name:  Mark E. Ross
Title:  Manager

MEMBER:

XE CAPITAL MANAGEMENT, LLC

By: XE Partners, LLC,
    its managing member

By:

Name:  Terence S. Leighton
Title:  Managing Member

IN WITNESS WHEREOF, the undersigned have duly executed this Amended and Restated Limited Liability Company Agreement of XE–R, LLC as of the day and year first above written.

**MANAGING MEMBER:**

R 2004, LLC

By: _____
    Name:  Mark E. Ross
    Title:  Manager

**MEMBER:**

XE CAPITAL MANAGEMENT, LLC

By: XE Partners, LLC,
    its managing member

By: _____
    Name:  Terence S. Leighton
    Title:  Managing Member

<u>**Schedule A**</u>

**<u>Managing Member</u>**

| Member Name | Capital Contribution | Class of Interest | Membership Percentage | Voting Percentage |
|---|---|---|---|---|
| R 2004, LLC c/o Mark Ross & Co., Inc. 400 Park Avenue, 18th Floor New York, New York 10022 | $500,000 | Class A | 55.56% | 55.56% |

**<u>Non-Managing Members</u>**

| Member Name | Capital Contribution | Class of Interest | Membership Percentage | Voting Percentage |
|---|---|---|---|---|
| XE Capital Management, LLC 24 West 40 Street, 3rd Floor New York, New York 10018 | $400,000 | Class A | 44.44% | 44.44% |
| TOTAL: | $900,000 | | 100% | 100% |

# EXHIBIT B

EXECUTION VERSION

XE-R, LLC

$2,850,000

15% Senior Notes due August 21, 2009

NOTE PURCHASE AGREEMENT

Dated August 23, 2004

# TABLE OF CONTENTS

<u>Section</u>

<u>Page</u>

Section 1.     Authorization of Notes.................................................................1

Section 2.     Sale and Purchase of Notes...........................................................1

Section 3.     Closing.-...................................................................................1

Section 4.     Conditions to Closing. ................................................................2

    Section 4.1.     Representations and Warranties................................2
    Section 4.2.     Performance; No Default. .......................................2
    Section 4.3.     Compliance Certificate. .........................................2
    Section 4.4.     Other Agreements..................................................2
    Section 4.5.     Good Standing. .....................................................3
    Section 4.6.     Proceedings and Documents.....................................3

Section 5.     Representations and Warranties of the Company. ...........................3

    Section 5.1.     Organization; Power and Authority. ..........................3
    Section 5.2.     Authorization, etc....................................................3
    Section 5.3.     Disclosure. ...........................................................4
    Section 5.4.     Subsidiaries. .........................................................4
    Section 5.5.     Liabilities. ............................................................4
    Section 5.6.     Compliance with Laws, Other Instruments, etc..............4
    Section 5.7.     Governmental Authorizations, etc. ............................5
    Section 5.8.     Litigation; Observance of Agreements, Statutes and Orders....5
    Section 5.9.     Taxes....................................................................5
    Section 5.10.    Title to Property...................................................5
    Section 5.11.    Licenses, Permits, etc............................................5
    Section 5.12.    Compliance with ERISA.........................................6
    Section 5.13.    Private Offering by the Company................................6
    Section 5.14.    Use of Proceeds; Margin Regulations..........................6
    Section 5.15.    Foreign Assets Control Regulations, etc......................6
    Section 5.16.    Investment Company. .............................................7

Section 6.     Representations of the Purchaser ..................................................7

    Section 6.1.     Purchase for Investment...........................................7
    Section 6.2.     Source of Funds. ...................................................7
    Section 6.3.     No Violation, etc....................................................9

Section 7.     Information as to Company. .........................................................9

    Section 7.1.     Financial and Business Information.............................9
    Section 7.2.     Inspection.............................................................10

i

Section 8.       Payment and Prepayment of the Notes. .................................................11

    Section 8.1.   Maturity; Prepayment. .................................................................11
    Section 8.2.   Purchase of Notes. .....................................................................11

Section 9.       Affirmative Covenants. ...............................................................................11

    Section 9.1.   Compliance with Law. .................................................................11
    Section 9.2.   Insurance. ....................................................................................11
    Section 9.3.   Maintenance of Properties. .........................................................12
    Section 9.4.   Payment of Taxes and Claims .....................................................12
    Section 9.5.   Existence, etc. .............................................................................12
    Section 9.6.   Books and Records. .....................................................................12
    Section 9.7.   Separate Existence. .....................................................................13

Section 10.      Negative Covenants ....................................................................................14

    Section 10.1.  Transactions with Affiliates. .......................................................14
    Section 10.2.  Merger, Consolidation, etc. .........................................................14
    Section 10.3.  Line of Business. .........................................................................14
    Section 10.4.  [Intentionally Omitted.] ..............................................................15
    Section 10.5.  Compliance with ERISA ..............................................................15
    Section 10.6.  Compliance with Board Regulations. ..........................................15
    Section 10.7.  Indebtedness. ...............................................................................15
    Section 10.8.  Limitation on Modification of Constituent Documents and
                   Certain Other Agreements. .........................................................15

Section 11.      Events of Default. .......................................................................................15

Section 12.      Remedies on Default, Etc. ..........................................................................17

    Section 12.1.  Acceleration.. ..............................................................................17
    Section 12.2.  Other Remedies. ..........................................................................18
    Section 12.3.  Rescission. ...................................................................................18
    Section 12.4.  No Waivers or Election of Remedies, Expenses, etc. ...................18

Section 13.      Registration; Exchange; Substitution of Notes. ..........................................19

    Section 13.1.  Registration of Notes. .................................................................19
    Section 13.2.  Transfer and Exchange of Notes. .................................................19
    Section 13.3.  Replacement of Notes. .................................................................20

Section 14.      Payments on Notes. .....................................................................................20

    Section 14.1.  Place of Payment. ........................................................................20

ii

Section 14.2.   Home Office Payment...................................................................20

Section 15.      Expenses, etc...........................................................................................21

Section 15.1.   Transaction Expenses...............................................................21
Section 15.2.   Survival....................................................................................21

Section 16.      Survival of Representations and Warranties; Entire Agreement. ...............21

Section 17.      Amendment and Waiver. .......................................................................21

Section 17.1.   Requirements. ...........................................................................21
Section 17.2.   Solicitation of Holders of Notes. .............................................22
Section 17.3.   Binding Effect, etc. ..................................................................22
Section 17.4.   Notes held by Company, etc.....................................................23

Section 18.      Notices. ...................................................................................................23

Section 19.      Reproduction of Documents. .................................................................24

Section 20.      Confidential Information. ......................................................................24

Section 21.      Substitution of Purchaser. .....................................................................25

Section 22.      Miscellaneous. ........................................................................................26

Section 22.1.   Successors and Assigns.............................................................26
Section 22.2.   Payments Due on Non-Business Days......................................26
Section 22.3.   Accounting Terms.....................................................................26
Section 22.4.   Severability...............................................................................26
Section 22.5.   Construction, etc. .....................................................................27
Section 22.6.   Counterparts..............................................................................27
Section 22.7.   Governing Law. ........................................................................27
Section 22.8.   Jurisdiction and Process; Waiver of Jury Trial. .......................27


SCHEDULE A     –   INFORMATION RELATING TO PURCHASERS

SCHEDULE B     –   DEFINED TERMS

EXHIBIT 1        –   Form of 15% Senior Note due August 21, 2009

XE-R, LLC
c/o Mark Ross & Co., Inc.
400 Park Avenue, 18th Floor
New York, NY 10022

15% Senior Notes due August 21, 2009

August 23, 2004

TO THE PURCHASERS LISTED IN
    SCHEDULE A HERETO:

Ladies and Gentlemen:

XE-R, LLC, a Delaware limited liability company (the "**Company**"), agrees with each of the purchasers whose names appear at the end hereof (each, a "**Purchaser**" and, collectively, the "**Purchasers**") as follows:

**Section 1. AUTHORIZATION OF NOTES.**

The Company will authorize the issuance and sale of $2,850,000 aggregate principal amount of its 15% Senior Notes due August 21, 2009 (the "**Notes**", such term to include any such notes issued in substitution therefor pursuant to Section 13). The Notes shall be substantially in the form set out in Exhibit 1. Certain capitalized and other terms used in this Agreement are defined in Schedule B; and references to a "**Schedule**" or an "**Exhibit**" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.

**Section 2. SALE AND PURCHASE OF NOTES.**

Subject to the terms and conditions of this Agreement, the Company will issue and sell to each Purchaser and each Purchaser will purchase from the Company, at the Closing provided for in Section 3, Notes in the principal amount specified opposite such Purchaser's name in Schedule A at the purchase price of 100% of the principal amount thereof. The Purchasers' obligations hereunder are several and not joint obligations; and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

**Section 3. CLOSING.**

The sale and purchase of the Notes to be purchased by each Purchaser shall occur at such location and time as may be agreed upon by the Company and the Purchasers (the "**Closing**"), <u>provided</u> that the Closing shall occur no later than Friday,

August 27, 2004.  At the Closing the Company will deliver to each Purchaser the Note to be purchased by such Purchaser in the form of a single Note dated the date of the Closing and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Company or its order of immediately available funds in the amount of the purchase price therefor by wire transfer of immediately available funds for the account of the Company to account number 469502643865 at JPMorgan Chase Bank, 410 Park Avenue, New York, New York  10022, ABA Number 021000021.  If at the Closing the Company shall fail to tender such Notes to any Purchaser as provided above in this Section 3, or any of the conditions specified in Section 4 shall not have been fulfilled to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may have by reason of such failure or such nonfulfillment.

## Section 4.  CONDITIONS TO CLOSING.

Each Purchaser's obligation to purchase and pay for the Notes to be sold to such Purchaser at the Closing is subject to the fulfillment to such Purchaser's satisfaction, prior to or at the Closing, of the following conditions:

### Section 4.1.    Representations and Warranties.

The representations and warranties of the Company in this Agreement shall be correct when made and at the time of the Closing.

### Section 4.2.    Performance; No Default.

The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing and after giving effect to the issue and sale of the Notes (and the application of the proceeds thereof as contemplated by Section 5.14) no Default or Event of Default shall have occurred and be continuing.

### Section 4.3.    Compliance Certificate.

The Company shall have delivered to such Purchaser an Officer's Certificate, dated the date of the Closing, certifying that the conditions specified in Sections 4.1, and 4.2 have been fulfilled, and as to the limited liability company proceedings relating to the authorization, execution and delivery of the Notes, this Agreement and the other Transaction Documents.

### Section 4.4.    Other Agreements.

Each of the LLC Agreement and the Services Agreement (together with this Agreement and the Notes, the "**Transaction Documents**") has been duly executed

and delivered by the parties thereto, in each case, in form and substance satisfactory to each Purchaser and is in full force and effect. Each of the conditions precedent to the effectiveness of each of the Transaction Documents as set forth therein shall have been satisfied or waived.

### Section 4.5.    Good Standing.

A certificate of the Secretary of State of the State of Delaware, dated a date not earlier than ten Business Days prior to the Closing Date, as to the good standing of the Company.

### Section 4.6.    Proceedings and Documents.

All limited liability company and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to such Purchaser and its special counsel, and such Purchaser and its special counsel shall have received all such counterpart originals or certified or other copies of such documents as such Purchaser or such special counsel may reasonably request.

## Section 5. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each Purchaser that:

### Section 5.1.    Organization; Power and Authority.

The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware, and is duly qualified as a foreign company and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company has the power and authority and legal right to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver this Agreement, the Notes and the other Transaction Documents and to perform the provisions hereof and thereof.

### Section 5.2.    Authorization, etc.

This Agreement, the Notes and the other Transaction Documents have been duly authorized by all necessary limited liability company action on the part of the Company, and each Transaction Document (other than the Notes) constitutes, and upon execution and delivery thereof each Note will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its

3

terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.3.    Disclosure.

All information provided with respect to the Company and its Affiliates delivered to each Purchaser by or on behalf of the Company and its Affiliates for purposes of or in connection with this Agreement or any other Transaction Document, or the transactions contemplated hereby and thereby, including, without limitation, any financial statements of the Company, was, on or as of the applicable date of provision thereof, true, complete and correct in all material respects and did not contain any untrue statement of a material fact or omit to state any fact necessary to make the statements therein taken as a whole, in light of the time and circumstances under which they were made, not misleading.

Section 5.4.    Subsidiaries.

The Company has no Subsidiaries.

Section 5.5.    Liabilities.

The Company is newly formed and has no liabilities other than organizational costs and costs contemplated by or incurred under the Transaction Documents.

Section 5.6.    Compliance with Laws, Other Instruments, etc.

The execution, delivery and performance by the Company of the Transaction Documents will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Company under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, certificate of incorporation or by-laws, or any other agreement or instrument to which the Company is bound or by which the Company or any of its properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Company or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company.

4