**Section 5.7.    Governmental Authorizations, etc.**

No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Company of the Transaction Documents.

**Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders.**

(a) There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Company or any property of the Company in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b) The Company is not in default under any term of any agreement or instrument to which it is a party or by which it is bound, or any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority, which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.9.    Taxes.**

The Company is newly formed and has not been required to file tax returns in any jurisdiction.  No taxes or assessments have been levied upon it or its properties, assets, income or franchises.

**Section 5.10.    Title to Property.**

The Company is newly formed and has no properties or assets other than the proceeds of the Notes, the capital contributed by its members and the rights under the Transaction Documents and agreements contemplated thereby.

**Section 5.11.    Licenses, Permits, etc.**

The business activities of the Company will not require access to licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, other than as available to the Company under the Services Agreement or as are available to the Company on usual terms.

5

### Section 5.12.  Compliance with ERISA

The Company has no liability under Title IV of ERISA or Section 4975 of the Code.  No ERISA Affiliate of the Company has any liability under Title IV of ERISA or Section 4975 of the Code that would have a Material Adverse Effect on the Company.

### Section 5.13.  Private Offering by the Company.

Neither the Company nor anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Purchasers, each of which has been offered the Notes at a private sale for investment. Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

### Section 5.14.  Use of Proceeds; Margin Regulations.

The Company will apply the proceeds of the sale of the Notes to general limited liability company purposes.  No proceeds of any Note will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock.  The Company is not a "United States person" or a "foreign person controlled by a United States person" within the meaning of Regulation X and the Company is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

### Section 5.15.  Foreign Assets Control Regulations, etc.

(a) Neither the sale of the Notes by the Company hereunder nor its use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b) The Company (i) is not, and will not become, a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (ii) does not engage, and will not engage in any dealings or transactions, or is or will be otherwise associated, with any such Person.  The Company is in compliance, in all material respects, with the USA Patriot Act.

(c) No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for any payments to any governmental official or employee,

6

political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Company.

### Section 5.16.   Investment Company.

The Company is not an "investment company," or a Person "controlled by" an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act.

## Section 6.   REPRESENTATIONS OF THE PURCHASER

### Section 6.1.   Purchase for Investment.

Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control.  Each Purchaser understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

### Section 6.2.   Source of Funds.

Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "**Source**") to be used by such Purchaser to pay the purchase price of the Notes to be purchased by such Purchaser hereunder:

(a)   the Source is an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("**PTE**") 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the National Association of Insurance Commissioners (the "**NAIC Annual Statement**")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed 10% of the total reserves and liabilities of the general account (exclusive of

7

separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(b)    the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(c)    the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 and, except as disclosed by such Purchaser to the Company in writing pursuant to this clause (c), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(d)    the Source constitutes assets of an "investment fund" (within the meaning of Part V of PTE 84-14 (the "**QPAM Exemption**")) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Company and (i) the identity of such QPAM and (ii) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Company in writing pursuant to this clause (d); or

(e)    the Source constitutes assets of a "plan(s)" (within the meaning of Section IV of PTE 96-23 (the "**INHAM Exemption**")) managed by an "in-house assets manager" or "INHAM" (within the meaning of Part IV of the INHAM exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Section IV(d) of the INHAM exemption) owns a 5% or more interest in the Company and (i) the identity of such INHAM and (ii) the names(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Company in writing pursuant to this clause (e); or

(f)    the Source is a governmental plan; or

8

(g)    the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Company in writing pursuant to this clause (g); or

(h)    the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this Section 6.2, the terms **"employee benefit plan"**, **"governmental plan"**, and **"separate account"** shall have the respective meanings assigned to such terms in section 3 of ERISA.

### Section 6.3.    No Violation, etc.

The execution, delivery and performance by each Purchaser of this Agreement will not violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to such Purchaser, or any contract or agreement binding upon such Purchaser or its property.

## Section 7. INFORMATION AS TO COMPANY.

### Section 7.1.    Financial and Business Information.

The Company shall deliver to each Purchaser:

(a)    <u>Quarterly Statements</u> -- commencing with the calendar quarter in which the first anniversary of the date hereof falls, reports for each calendar quarter summarizing the Company's performance and prospects within 90 calendar days of the close of such calendar quarter;

(b)    <u>Annual Statements</u> -- financial statements for the Company (audited by an internationally recognized accounting firm) for each fiscal year of the Company within 120 calendar days of the close of such fiscal year;

(c)    <u>Other Reports</u> -- promptly upon their becoming available, one copy of each financial statement, report or notice sent by the Company or any Subsidiary to its principal bank lenders or to any other holder of indebtedness for money borrowed of the Company or any Subsidiaries (excluding information sent to such lenders or holders in the ordinary course of administration of a loan facility including information relating to determination of interest rate or borrowing availability);

(d)    <u>Notice of Default or Event of Default</u> -- promptly, and in any event within five days after a Responsible Person becoming aware of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11(f),

a written notice specifying the nature and period of existence thereof and what action the Company is taking or proposes to take with respect thereto;

(e) <u>Notices from Governmental Authority</u> -- promptly, and in any event within 30 days of receipt thereof, copies of any notice to the Company or any Subsidiary from any federal or state Governmental Authority relating to any order, ruling, statute or other law or regulation that could reasonably be expected to have a Material Adverse Effect; and

(f) <u>Requested Information</u> -- with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Company or any of its Subsidiaries or relating to the ability of the Company to perform its obligations hereunder and under the Notes as from time to time may be reasonably requested by any such holder of Notes.

**Section 7.2.   Inspection.**

The Company shall permit the representatives of each Purchaser:

(a) <u>No Default</u> -- if no Default or Event of Default then exists, at the expense of such holder and upon reasonable prior notice to the Company, to visit the principal executive office of the Company, to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the Company's officers, and (with the consent of the Company, which consent will not be unreasonably withheld) its independent public accountants, and (with the consent of the Company, which consent will not be unreasonably withheld) to visit the other offices and properties of the Company and each Subsidiary, all at such reasonable times and as often as may be reasonably requested in writing; provided that such visits shall not unduly interfere with the Company's conduct of its business; and

(b) <u>Default</u> -- if a Default or Event of Default then exists, at the expense of the Company to visit and inspect any of the offices or properties of the Company or any Subsidiary, to examine all their respective books of account, records, reports and other papers, to make copies and extracts therefrom, and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Company authorizes said accountants to discuss the affairs, finances and accounts of the Company and its Subsidiaries), all at such times and as often as may be requested.

## Section 8. PAYMENT AND PREPAYMENT OF THE NOTES.

### Section 8.1.    Maturity; Prepayment.

Subject to the terms and conditions set forth herein, the Company shall repay each Note, and each Note shall mature, on the Maturity Date.  The Notes may not be prepaid prior to the Maturity Date.

### Section 8.2.    Purchase of Notes.

The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except upon the payment of the Notes at Maturity in accordance with the terms of this Agreement and the Notes.

## Section 9. AFFIRMATIVE COVENANTS.

The Company covenants that so long as any of the Notes are outstanding:

### Section 9.1.    Compliance with Law.

The Company will, and will cause each of its Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, including, without limitation, ERISA, the USA Patriot Act, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 9.2.    Insurance.

The Company will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.

11

**Section 9.3.    Maintenance of Properties.**

The Company will, and will cause each of its Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times.

**Section 9.4.    Payment of Taxes and Claims.**

The Company will, and will cause each of its Subsidiaries to, file all tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies imposed on them or any of their properties, assets, income or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent and all claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Company or any Subsidiary, provided that neither the Company nor any Subsidiary need pay any such tax or assessment or claims if (i) the amount, applicability or validity thereof is contested by the Company or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary has established adequate reserves therefor in accordance with GAAP on the books of the Company or such Subsidiary or (ii) the nonpayment of all such taxes, assessments and claims in the aggregate could not reasonably be expected to have a Material Adverse Effect.

**Section 9.5.    Existence, etc.**

Subject to Section 10.2, the Company will at all times preserve and keep in full force and effect its limited liability company existence. Subject to Sections 10.2, the Company will at all times preserve and keep in full force and effect the limited liability company existence of each of its Subsidiaries (unless merged into the Company or a Wholly-Owned Subsidiary) and all rights and franchises of the Company and its Subsidiaries unless, in the good faith judgment of the Company, the termination of or failure to preserve and keep in full force and effect such limited liability company existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

**Section 9.6.    Books and Records.**

The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Company, or such Subsidiary, as the case may be.

**Section 9.7.    Separate Existence.**

The Company shall:

(a)    maintain one or more deposit accounts, each separate from the deposit accounts of any of its members or Affiliates, with commercial banking institutions and ensure that the funds of the Company will not be diverted to any other Person or for other than limited liability company uses of the Company, nor will such funds be commingled with the funds of any of its members or Affiliates;

(b)    to the extent that it shares the same officers or other employees as any of its members or Affiliates, allocate the salaries of and the expenses related to providing benefits to such officers and other employees fairly among such entities and ensure that each such entity will bear its fair share of the salary and benefit costs associated with all such common officers and employees, _provided_ that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of services provided to the Company or its Managing Member during the term of the Services Agreement by Mark Ross & Co., Inc. or any of its Affiliates;

(c)    to the extent that it jointly contracts with any of its members or Affiliates to do business with vendors or service providers or to share overhead expenses, allocate the costs incurred in so doing fairly among such entities and ensure that each such entity will bear its fair share of such costs and to the extent that it contracts or does business with vendors or service providers where the goods and services provided are partially for the benefit of any other Person, allocate the costs incurred in so doing fairly to or among such entities for whose benefit the goods or services are provided and ensure that each such entity will bear its fair share of such costs, _provided_ that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of such joint contracts during the term of the Services Agreement if the other party or parties thereto are Affiliates of Mark Ross & Co., Inc.;

(d)    enter into all material transactions between it and any of its members or Affiliates, whether currently existing or hereafter entered into, only on an arm's-length basis, it being understood and agreed that the transactions contemplated in the Transaction Documents meet the requirements of this paragraph (d);

(e)    to the extent that it and any of its members or Affiliates have offices in the same location, allocate the overhead costs fairly and appropriately to and among them and ensure that each such entity will bear its fair share of such expenses, _provided_ that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of any such offices during the term of the Services Agreement if any other occupant of such offices is an Affiliate of Mark Ross & Co., Inc.;

13

(f)    conduct its affairs strictly in accordance with its LLC Agreement and observe all necessary, appropriate and customary limited liability company formalities, including, but not limited to, holding all necessary directors' or members' meetings appropriate to authorize all limited liability company actions, keeping separate and accurate minutes of such meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, but not limited to, payroll and intercompany transaction accounts; and

(g)    not assume or guarantee any of the liabilities of any of its members or Affiliates except as provided in the Transaction Documents.

## Section 10.    NEGATIVE COVENANTS

The Company covenants that so long as any of the Notes are outstanding:

### Section 10.1.    Transactions with Affiliates.

The Company will not and will not permit any Subsidiary to enter into directly or indirectly any transaction or group of related transactions (including without limitation the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Affiliate (other than the Company or another Subsidiary), except for the Services Agreement (or substitute therefor with any Affiliate) and except in the ordinary course and pursuant to the reasonable requirements of the Company's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Company or such Subsidiary than would be expected to be obtainable in a comparable arm's-length transaction with a Person not an Affiliate.

### Section 10.2.    Merger, Consolidation, etc.

The Company will not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Company to any Person, except as contemplated in the LLC Agreement.

### Section 10.3.    Line of Business.

The Company will not and will not permit any Subsidiary to engage in any business if, as a result, the general nature of the business in which the Company and its Subsidiaries, taken as a whole, would then be engaged would be substantially changed from the general nature of the business in which the Company and its Subsidiaries, taken as a whole, are engaged on the date of this Agreement.

14

**Section 10.4.   [Intentionally Omitted.]**

**Section 10.5.   Compliance with ERISA.**

The Company will not (i) establish, maintain, contribute to, or incur an obligation to contribute to, or incur an obligation to contribute to any Plan or Multiemployer Plan, (ii) incur any liability with respect to retiree medical or death benefits other than as required by Section 4980B of the Code or (iii) incur any liability under Section 4975 of the Code.

**Section 10.6.   Compliance with Board Regulations.**

No part of the proceeds of the sale of the Notes will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to buy or carry (within the meaning of Regulation U) Margin Stock, or for any other purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board of Governors of the Federal Reserve System, including, to the extent applicable, Regulation U and Regulation X.

**Section 10.7.   Indebtedness.**

The Company will not, directly or indirectly, create, incur or suffer to exist any Indebtedness that is senior to the Notes.

**Section 10.8.   Limitation on Modification of Constituent Documents and Certain Other Agreements.**

The Company will not, directly or indirectly, except to the extent necessary to comply with law, amend, modify or change its LLC Agreement, or any agreement entered into by it with respect to its share capital or equity interests, or enter into any new agreement with respect to its share capital or equity interests; _provided_ that the Company may amend, modify or change such documents in connection with (i) an assignment of the share capital or equity interests of the Company or (ii) the issuance of Class B Interests (as defined in the LLC Agreement).

**Section 11.   EVENTS OF DEFAULT.**

An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:

(a)   the Company defaults in the payment of any principal on any Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; or

15

(b)    the Company defaults in the payment of any interest on any Note for more than five Business Days after the same becomes due and payable; or

(c)    the Company defaults in the performance of or compliance with any term contained in Sections 9.5, 9.7 or 10; or

(d)    the Company defaults in the performance of or compliance with any term contained herein (other than those referred to in Section 11(a), (b) and (c)) or in any other Transaction Document and such default is not remedied within 30 days after the earlier of (i) a Responsible Person obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from any holder of a Note (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 11(d)); or

(e)    any representation or warranty made in writing by or on behalf of the Company or by any officer of the Company in this Agreement or in any writing furnished in connection with the transactions contemplated hereby proves to have been false or incorrect in any material respect on the date as of which made; or

(f)    (i) the Company or any Subsidiary is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest on any Indebtedness that is outstanding in an aggregate principal amount of at least $500,000 beyond any period of grace provided with respect thereto, or (ii) the Company or any Subsidiary is in default in the performance of or compliance with any term of any evidence of any Indebtedness in an aggregate outstanding principal amount of at least $500,000 or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared, due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) the Company or any Subsidiary has become obligated to purchase or repay Indebtedness before its regular maturity or before its regularly scheduled dates of payment in an aggregate outstanding principal amount of at least $500,000; or

(g)    the Company or any Subsidiary (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (v) is adjudicated as

16

insolvent or to be liquidated, or (vi) takes limited liability company action for the purpose of any of the foregoing; or

(h)      a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company or any of its Subsidiaries, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company or any of its Subsidiaries, or any such petition shall be filed against the Company or any of its Subsidiaries and such petition shall not be dismissed within 60 days; or

(i)      a final judgment or judgments for the payment of money aggregating in excess of $500,000 are rendered against one or more of the Company and its Subsidiaries and which judgments are not, within 60 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 60 days after the expiration of such stay.

## Section 12.      REMEDIES ON DEFAULT, ETC.

### Section 12.1.   Acceleration.

(a)  If an Event of Default with respect to the Company described in Section 11(g) or (h) (other than an Event of Default described in clause (i) of Section 11(g) or described in clause (vi) of Section 11(g) by virtue of the fact that such clause encompasses clause (i) of Section 11(g)) has occurred, all the Notes then outstanding shall automatically become immediately due and payable.

(b)  If any other Event of Default has occurred and is continuing, any holder or holders of more than 50% in principal amount of the Notes at the time outstanding may at any time at its or their option, by notice or notices to the Company, declare all the Notes then outstanding to be immediately due and payable.

(c)  If any Event of Default described in Section 11(a) or (b) has occurred and is continuing, any holder or holders of Notes at the time outstanding affected by such Event of Default may at any time, at its or their option, by notice or notices to the Company, declare all the Notes held by it or them to be immediately due and payable.

Upon any Notes becoming due and payable under this Section 12.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) shall all be immediately due and payable, in each and every case without presentment, demand,

protest or further notice, all of which are hereby waived. The Company acknowledges, and the parties hereto agree, that each holder of a Note has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for).

### Section 12.2.  Other Remedies.

If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 12.1, the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

### Section 12.3.  Rescission.

At any time after any Notes have been declared due and payable pursuant to Section 12.1(b) or (c), the holders of not less than 75% in principal amount of the Notes then outstanding, by written notice to the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest and principal, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, at the Default Rate, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default and Defaults, other than nonpayment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 17, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes. No rescission and annulment under this Section 12.3 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

### Section 12.4.  No Waivers or Election of Remedies, Expenses, etc.

No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by any Note upon any holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. Without limiting the obligations of the Company under Section 15, the Company will pay to the holder of each Note on demand such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in

any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

## Section 13.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.

### Section 13.1.   Registration of Notes.

The Company shall keep at its principal executive office a register for the registration and registration of transfers of Notes. The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register. Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary. The Company shall give to any holder of a Note promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of Notes.

### Section 13.2.   Transfer and Exchange of Notes.

Upon surrender of any Note at the principal executive office of the Company for registration of transfer or exchange (and in the case of a surrender for registration of transfer, accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the address for notices of each transferee of such Note or part thereof), the Company shall, within five Business Days thereafter, execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note. Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit 1. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon. The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $100,000, provided that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $100,000. Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have (i) made the representation set forth in Section 6.2 and (ii) represented that the acquisition of such Note by such transferee will not violate any provision of any statute or other rule of regulation of any Governmental Authority applicable to such transferee.

19

### Section 13.3.  Replacement of Notes.

Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(a)   in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(b)   in the case of mutilation, upon surrender and cancellation thereof,

the Company at its own expense, within five Business Days there thereafter, shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

### Section 14.     PAYMENTS ON NOTES.

### Section 14.1.  Place of Payment.

Subject to Section 14.2, payments of principal and interest becoming due and payable on the Notes shall be made in New York, New York at the principal office of the Company in such jurisdiction.  The Company may at any time, by notice to each holder of a Note, change the place of payment of the Notes so long as such place of payment shall be either the principal office of the Company in such jurisdiction or the principal office of a bank or trust company in such jurisdiction.

### Section 14.2.  Home Office Payment.

So long as any Purchaser or its nominee shall be the holder of any Note, and notwithstanding anything contained in Section 14.1 or in such Note to the contrary, the Company will pay all sums becoming due on such Note for principal and interest by the method and at the address specified for such purpose below such Purchaser's name in Schedule A, or by such other method or at such other address as such Purchaser shall have from time to time specified to the Company in writing for such purpose, without the presentation or surrender of such Note or the making of any notation thereon, except that upon written request of the Company made concurrently with or reasonably promptly after payment or prepayment in full of any Note, such Purchaser shall surrender such Note for cancellation, reasonably promptly after any such request, to the Company at its principal executive office or at the place of payment most recently designated by the Company pursuant to Section 14.1.  Prior to any sale or other disposition of any Note held by a Purchaser or its nominee, such Purchaser will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Company in exchange for a new Note or Notes

20

pursuant to Section 13.2. The Company will afford the benefits of this Section 14.2 to any direct or indirect transferee of any Note purchased by a Purchaser under this Agreement and that has made the same agreement relating to such Note as the Purchasers have made in this Section 14.2.

## Section 15.     EXPENSES, ETC.

### Section 15.1.  Transaction Expenses.

Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses (including attorneys' fees) incurred by it in connection with the preparation, execution and delivery of this Agreement and consummation of the transactions contemplated hereby.

### Section 15.2.  Survival.

The obligations of the Company under this Section 15 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement or the Notes, and the termination of this Agreement.

## Section 16.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Notes, the purchase or transfer by any Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent holder of a Note, regardless of any investigation made at any time by or on behalf of such Purchaser or any other holder of a Note. All statements contained in any certificate or other instrument delivered by or on behalf of the Company pursuant to this Agreement shall be deemed representations and warranties of the Company under this Agreement. Subject to the preceding sentence, this Agreement and the Notes embody the entire agreement and understanding between each Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

## Section 17.    AMENDMENT AND WAIVER.

### Section 17.1.  Requirements.

This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Company and the Required Holders, except that (a) no amendment or waiver of any of the provisions of Section 1, 2, 3, 4, 5, 6 or 21 hereof, or any defined term (as it is used therein), will be effective as to any

21

Purchaser unless consented to by such Purchaser in writing and (<u>b</u>) no such amendment or waiver may, without the written consent of the holder of each Note at the time outstanding affected thereby, (<u>i</u>) subject to the provisions of Section 12 relating to acceleration or rescission, change the amount or time of any prepayment or payment of principal of, or reduce the rate or change the time of payment or method of computation of interest on the Notes, (<u>ii</u>) change the percentage of the principal amount of the Notes the holders of which are required to consent to any such amendment or waiver, or (<u>iii</u>) amend any of Sections 8, 11(a), 11(b), 12, 17 or 20.

Section 17.2.  **Solicitation of Holders of Notes.**

(a) <u>Solicitation</u>.  The Company will provide each holder of the Notes (irrespective of the amount of Notes then owned by it) with sufficient information, sufficiently far in advance of the date a decision is required, to enable such holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes.  The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 17 to each holder of outstanding Notes promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite holders of Notes.

(b) <u>Payment</u>.  The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as an inducement to the entering into by any holder of Notes of any waiver or amendment of any of the terms and provisions hereof unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver or amendment.

Section 17.3.  **Binding Effect, etc.**

Any amendment or waiver consented to as provided in this Section 17 applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and the holder of any Note nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.  As used herein, the term **"this Agreement"** and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

**Section 17.4.  Notes held by Company, etc.**

Solely for the purpose of determining whether the holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement or the Notes, or have directed the taking of any action provided herein or in the Notes to be taken upon the direction of the holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Company or any of its Affiliates shall be deemed not to be outstanding; provided that Arche Master Fund L.P. and its Affiliates as of the date hereof shall not be deemed "Affiliates" for any purposes of this paragraph until after such time as none of the Notes are held by Arche Master Fund, L.P. or any of its Affiliates.

**Section 18.     NOTICES.**

All notices and other communications provided for hereunder shall be in writing and mailed, delivered by overnight courier, telecopied or delivered by hand

(i)      if to any Purchaser or its nominee, to such Purchaser or nominee at the address specified for such communications in Schedule A, or at such other address as such Purchaser or nominee shall have specified to the Company in writing,

(ii)     if to any other holder of any Note, to such holder at such address as such other holder shall have specified to the Company in writing, or

(iii)    if to the Company, to the Company at its address set forth at the beginning hereof to the attention of Mark E. Ross, Chief Executive Officer, or at such other address as the Company shall have specified to the holder of each Note in writing,

or at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be deemed to have been duly given or made (i) in the case of hand deliveries, when delivered by hand, (ii) in the case of mailed notices, four Business Days after being deposited in the mail, first class airmail, postage prepaid, (iii) in the case of delivery by overnight courier, when actually delivered by such courier and (iv) in the case of telecopier notice, when transmitted and confirmed during normal business hours (or, if delivered after the close of normal business hours, at the beginning of business hours on the next Business Day).

## Section 19.     REPRODUCTION OF DOCUMENTS.

This Agreement and all documents relating thereto, including, without limitation, (<u>a</u>) consents, waivers and modifications that may hereafter be executed, (<u>b</u>) documents received by any Purchaser at the Closing (except the Notes themselves), and (<u>c</u>) financial statements, certificates and other information previously or hereafter furnished to any Purchaser, may be reproduced by such Purchaser by any photographic, photostatic, electronic, digital or other similar process and such Purchaser may destroy any original document so reproduced.  The Company agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Purchaser in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.  This Section 19 shall not prohibit the Company or any other holder of Notes from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

## Section 20.     CONFIDENTIAL INFORMATION.

For the purposes of this Section 20, **"Confidential Information"** means information delivered to any Purchaser by or on behalf of the Company or any Subsidiary in connection with the transactions contemplated by or otherwise pursuant to this Agreement that is proprietary in nature and that was clearly marked or labeled or otherwise adequately identified when received by such Purchaser as being confidential information of the Company or such Subsidiary, <u>provided</u> that such term does not include information that (<u>a</u>) was publicly known or otherwise known to such Purchaser prior to the time of such disclosure, (<u>b</u>) subsequently becomes publicly known through no act or omission by such Purchaser or any person acting on such Purchaser's behalf, (<u>c</u>) otherwise becomes known to such Purchaser other than through disclosure by the Company or any Subsidiary or (<u>d</u>) constitutes financial statements delivered to such Purchaser under Section 7.1 that are otherwise publicly available.  Each Purchaser will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Purchaser in good faith to protect confidential information of third parties delivered to such Purchaser, <u>provided</u> that such Purchaser may deliver or disclose Confidential Information to (<u>i</u>) its directors, officers, employees, agents, attorneys and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (<u>ii</u>) its financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 20, (<u>iii</u>) any other holder of any Note, (<u>iv</u>) any Person to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 20), (<u>v</u>) any

24

Person from which its offers to purchase any security of the Company (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 20), (vi) any federal or state regulatory authority having jurisdiction over such Purchaser, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such Purchaser's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Purchaser, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Purchaser is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Purchaser may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such Purchaser's Notes and this Agreement; so long as, in the case of clauses (w), (x) and (y) above, such Purchaser (A) gives the Company prompt notice of the existence, terms and circumstances surrounding such request, (B) consults with the Company on the advisability of taking legally available steps to resist or narrow such request and (C) assists the Company (at the cost and expense of the Company) in seeking a protective order or other appropriate remedy (unless the board of directors or similar body of such Purchaser shall have determined in good faith that participation of the Company in such effort would be materially adverse to the interests of such Purchaser). Each holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 20 as though it were a party to this Agreement. On reasonable request by the Company in connection with the delivery to any holder of a Note of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominee), such holder will enter into an agreement with the Company embodying the provisions of this Section 20.

**Section 21.    SUBSTITUTION OF PURCHASER.**

Each Purchaser shall have the right to substitute any one of its Affiliates as the purchaser of the Notes that it has agreed to purchase hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Affiliate, shall contain such Affiliate's agreement to be bound by this Agreement and shall contain a confirmation by such Affiliate of the accuracy with respect to it of the representations set forth in Section 6. Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 21), shall be deemed to refer to such Affiliate in lieu of such original Purchaser. In the event that such Affiliate is so substituted as a Purchaser hereunder and such Affiliate thereafter transfers to such original Purchaser all of the Notes then held by such Affiliate, upon receipt by the Company of notice of such transfer, any reference to such Affiliate as a "Purchaser" in this Agreement (other than in this Section 21) shall no longer be deemed to refer to such Affiliate, but shall refer to

such original Purchaser, and such original Purchaser shall again have all the rights of an original holder of the Notes under this Agreement.

### Section 22.  MISCELLANEOUS.

#### Section 22.1.  Successors and Assigns.

All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent holder of a Note) whether so expressed or not.

#### Section 22.2.  Payments Due on Non-Business Days.

Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed, in the computation of the interest payable on such next succeeding Business Day; _provided_ that if the maturity date of any Note is a date other than a Business Day, the payment otherwise due on such maturity date shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

#### Section 22.3.  Accounting Terms.

All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP. Except as otherwise specifically provided herein, all computations made pursuant to this Agreement shall be made in accordance with GAAP.  Except as otherwise specifically provided herein, any consolidated financial statement or financial computation shall be done in accordance with GAAP; and, if at the time that any such statement or computation is required to be made the Company shall not have any consolidated Subsidiary, such terms shall mean a financial statement or a financial computation, as the case may be, with respect to the Company only.

#### Section 22.4.  Severability.

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 22.5.  Construction, etc.**

Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

For the avoidance of doubt, all Schedules and Exhibits attached to this Agreement shall be deemed to be part hereof.

**Section 22.6.  Counterparts.**

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

**Section 22.7.  Governing Law.**

This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York.

**Section 22.8.  Jurisdiction and Process; Waiver of Jury Trial.**

(a)  The Company irrevocably submits to the non-exclusive jurisdiction of any New York State or federal state court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or the Notes.  To the fullest extent permitted by applicable law, the Company irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)  The Company consents to process being served by or on behalf of any holder of Notes in any suit, action or proceeding of the nature referred to in Section 22.8(a) by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 18 or at such other address of which such holder shall then have been notified pursuant to said Section or, in the case of the Company, to Corporation Service Company, as its agent for the purpose of accepting service of any

27

process. The Company agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it. Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c) Nothing in this Section 22.8 shall affect the right of any holder of a Note to serve process in any manner permitted by law, or limit any right that the holders of any of the Notes may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(d) The Company hereby irrevocably appoints Corporation Service Company to receive for it, and on its behalf, service of process.

(e) THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

*     *     *     *     *

21779630v8

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

XE-R, LLC

By: R 2004, LLC, its managing member

By: _____

    Name: Mark E. Ross
    Title: Manager

This Agreement is hereby accepted
and agreed to as of the date thereof.

ARCHE MASTER FUND, LP

By: Arche GP, LLC, its general partner,
by XE Capital Management, LLC,
its sole member, by XE Partners, LLC,
its managing member

By: _____

    Name: Terence S. Leighton
    Title: Managing Member

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

XE-R, LLC

By: R 2004, LLC, its managing member

By: _____
     Name: Mark E. Ross
     Title: Manager

This Agreement is hereby accepted
and agreed to as of the date thereof.

ARCHE MASTER FUND, LP

By: Arche GP, LLC, its general partner,
by XE Capital Management, LLC,
its sole member, by XE Partners, LLC,
its managing member

By: _____
     Name: Terence S. Leighton
     Title: Managing Member

# EXHIBIT C

ORIGINAL 



1  David J. McMahon (120891), dmcmahon@barwol.com
   Randall A. Doctor (130215), rdoctor@barwol.com
2  Travis R. Wall (191662), twall@barwol.com
   BARGER & WOLEN LLP
3  650 California Street, 9th Floor
   San Francisco, California 94108-2713
4  Telephone: (415) 434-2800
   Facsimile: (415) 434-2533
5
   Attorneys for Plaintiffs
6  TONI Y. JONES, in her capacity as Investment Trustee
   for the HARRY L. JENKINS IRREVOCABLE
7  INSURANCE TRUST, MARK ROSS & CO., INC. and
   XE-R, LLC
8
9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              IN AND FOR THE COUNTY OF ORANGE

11
   TONI Y. JONES, in her capacity as Investment )   CASE NO. 07CC01223
12 Trustee for the HARRY L. JENKINS          )
   IRREVOCABLE INSURANCE TRUST,           )   COMPLAINT FOR BREACH OF
13 MARK ROSS & CO., INC. and XE-R, LLC,     )   CONTRACT, BREACH OF THE IMPLIED
                                            )   COVENANT OF GOOD FAITH AND FAIR
14          Plaintiffs,                     )   DEALING, INTENTIONAL
                                            )   INTERFERENCE WITH CONTRACT,
15     vs.                                  )   INTENTIONAL INTERFERENCE WITH
                                            )   PROSPECTIVE ECONOMIC ADVANTAGE,
16 MUTUAL CREDIT CORPORATION,             )   FRAUD BY MISREPRESENTATION,
   SPURLING GROUP, LLC, MICHAEL            )   FRAUD BY CONCEALMENT, NEGLIGENT
17 BROWN, ANTHONY JACOBSON, and          )   MISREPRESENTATION, UNFAIR
   DOES 1 through 100, inclusive,           )   COMPETITION, RESTITUTION AND
18                                          )   DECLARATORY RELIEF
            Defendants.                     )
19                                          )

20

21                                          JUDGE RONALD L. BAUER
                                                  DEPT. CX103
22

23

24

25

26

27                          E-FILING ORDER ISSUED TO FILING PARTY

28

                              COMPLAINT

1    Plaintiff Toni Y. Jones, in her capacity as the Investment Trustee for the Harry L. Jenkins

2    Irrevocable Insurance Trust, and plaintiffs Mark Ross & Co., Inc. and XE-R, LLC complain of the

3    above-named defendants as follows:

4                                    **NATURE OF ACTION**

5        1.    This is an action for breach of contract, breach of the implied covenant of good faith

6    and fair dealing, interference with prospective economic advantage, fraud by misrepresentation,

7    fraud by concealment, negligent misrepresentation, unfair business practices and declaratory relief

8    arising out of a predatory loan scheme designed and operated by defendants Mutual Credit

9    Corporation and Spurling Group, LLC ("Spurling") (Mutual Credit Corporation and Spurling shall

10   be referred to collectively as "MCC"). MCC created a deceptive premium financing "program"

11   through which seniors purchased life insurance policies. MCC failed to make critical disclosures

12   and misrepresented the economic benefits of the transactions in an attempt to overstate the value of

13   the policies by failing to disclose material valuation criteria. MCC's entire program was designed

14   and intended to be operated from inception, and is being operated in an increasingly egregious

15   fashion, in a premeditated attempt to defraud seniors of their insurance policies.

16       2.    Nonrecourse premium financing, when structured and used properly, is a legitimate

17   financial and estate planning tool for seniors and their families. MCC, however, operates its

18   program not to provide legitimate financial planning tools for seniors, but to defraud seniors out of

19   their life insurance policies. The MCC loan documents are contracts of adhesion. The amount of

20   interest charged for MCC's financing depends, in large part, on the amount of contingent interest

21   owing under the loans. The contingent interest amount is calculated based on the "fair market

22   value" of the life insurance policies, as that term is defined in the MCC loan documents. MCC's

23   contracts provide a specific procedure for determining the policies' "fair market value." Depending

24   upon this valuation, the contingent interest could be as low as zero or as high as ten percent of the

25   face value of the applicable policies. At its higher points, the contingent interest component could

26   be greater than the principal loan amount, resulting in "interest" of over 100 percent. MCC never

27   intended to accept valuations that would result in no contingent interest or a small contingent

28   interest. Rather, MCC unfairly manipulates the valuation process so that the contingent interest

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-6900

1  component is always as high as possible, effectively precluding seniors from repaying the loan

2  before the maturity date and maintaining ownership of the policies.

3                                    **PARTIES**

4       3.   The Harry L. Jenkins Irrevocable Insurance Trust u/a/d December 23, 2004 is and

5  was an irrevocable trust created by Harry L. Jenkins on or about December 23, 2004 ("plaintiff" or

6  the "Trust"). The situs of the Trust is California. Plaintiff Toni Y. Jones is the investment trustee

7  for the Trust.

8       4.   Plaintiff Mark Ross & Co., Inc. is a Florida corporation with its principal place of

9  business in New York.

10      5.   Plaintiff XE-R, LLC ("XE-R") is a Delaware limited liability company with its

11  principal place of business in New York.

12      6.   Defendant Mutual Credit Corporation is a premium finance agency that is

13  incorporated in California. Its principal place of business is in Irvine, California. Plaintiffs are

14  informed and believe that Mutual Credit Corporation was established by the principals of Sierra

15  Life Solutions, LLC, a California insurance broker ("Sierra") and that KBC Financial Products UK

16  Ltd. ("KBC") currently owns Mutual Credit Corporation or certain of its servicing assets.

17      7.   Plaintiffs are informed and believe that defendant Spurling Group, LLC is a

18  Delaware limited liability company with its principal place of business in Irvine, California.

19  Spurling Group, LLC, however, is not listed on the California Secretary of State's website as a

20  company registered to do business in California. Plaintiffs are informed and believe that Spurling

21  was established by the principals of Sierra and that Spurling's original interest holders included

22  XE Capital Management, LLC ("XE Capital") and Arche Master Fund, LLC, which at all relevant

23  times was dominated and controlled by XE Capital. XE-R and XE Capital are separate and distinct

24  entities which do not share common ownership or control. Although XE-R has been involved in a

25  separate joint venture with XE Capital, all of the improper actions of MCC and Spurling were

26  undertaken without XE-R's knowledge or consent. Plaintiffs are further informed and believe that

27  XE Capital and Arche Master Fund, LLC helped implement the MCC financing program and had

28  the authority to approve each transaction that Spurling funded, including the Jenkins Trust

1    transaction. Plaintiffs are further informed and believe that KBC currently owns Spurling or certain

2    of its assets and/or interests.

3            8.   Defendant Michael Brown is an individual. He is a licensed insurance agent whose

4    principal place of business is in Orange County, California. At all relevant times, defendant Brown

5    was an officer or employee of Mutual Credit Corporation and/or Spurling and acted as a life agent

6    with respect to the insurance policy that the Trust purchased in this case. Brown is also a principal

7    of Sierra whose investment equity in Spurling was used to fund the MCC premium loan program.

8    Pursuant to California Insurance Code section 785, all insurers, brokers, agents, and others engaged

9    in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of

10   honesty, good faith, and fair dealing. This duty is in addition to any other duty, whether express or

11   implied, that may exist.

12           9.   Defendant Anthony Jacobson is an individual. He is a licensed insurance agent

13   whose principal place of business is in Orange County, California. At all relevant times, defendant

14   Jacobson was an officer or employee of Mutual Credit Corporation and/or Spurling. Pursuant to

15   California Insurance Code section 785, all insurers, brokers, agents, and others engaged in the

16   transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of

17   honesty, good faith, and fair dealing. This duty is in addition to any other duty, whether express or

18   implied, that may exist. On information and belief, plaintiffs allege that defendant Jacobson had a

19   commission sharing agreement with defendant Brown, which included the sharing of a commission

20   on the life insurance policy that the Trust purchased.

21          10.  The true names and capacities, whether individual, corporate, associate or

22   otherwise, of defendants Does 1 to 100, inclusive, are unknown to plaintiffs at this time, and

23   therefore plaintiffs sue said defendants under section 474 of the California Code of Civil Procedure

24   by such fictitious names, and when the true names of said defendants are ascertained, plaintiffs will

25   move this court for leave to amend this complaint accordingly. These Doe defendants could include

26   major distributors and financial institutions in the insurance and life settlement industries. Plaintiffs

27   are informed and believe and thereon allege that each of the defendants designated herein as Doe is

28   responsible in some manner for the events and happenings referred to herein, and proximately

BARGER & WOLEN LLP
555 CALIFORNIA STREET
JMMGH FLOOR
SAN FRANCISCO, CA 94105
(415) 434-2800

-4-

COMPLAINT

1  caused injuries and damages to the plaintiffs as alleged herein.

2      11.  Plaintiffs, on information and belief, allege that all times mentioned herein, each

3  defendant was acting as an agent, servant, or employee of each other defendant, and was acting

4  within the course and scope of said agency and/or employment.

5      12.  Each defendant, with full knowledge, expressly and impliedly ratified the acts of

6  each other defendant in all respects and adopted as his or its own acts the acts of the other

7  defendants and each of them as set forth in detail hereinafter.

8                              **VENUE**

9      13.  The Trust obtained nonrecourse financing from MCC relating to the purchase of a

10  life insurance policy.  The loan documents provide that any legal proceeding related to this

11  financing arrangement shall be brought and litigated in the United States District Court for the

12  Central District of California, to the extent it has subject matter jurisdiction, and otherwise in the

13  superior courts in Orange County, California.  Defendants Mutual Credit Corporation and Spurling

14  also have headquarters in Orange County, and defendants Jacobson and Brown work in Orange

15  County.

16                        **GENERAL ALLEGATIONS**

17      14.  The following allegations are made upon information and belief.  Due to the

18  deceptive nature of the program, plaintiffs reserve the right to modify or supplement these

19  allegations.

20              **MCC's PREDATORY PREMIUM FINANCING SCHEME**

21      15.  MCC provides nonrecourse loans to fund the purchase of life insurance policies.

22  The security for the loans is the policies themselves.  MCC specifically structures and operates its

23  premium financing program to create economic disincentives for borrowers to repay the loans.

24  MCC's intent from the program's inception was to cause the accrual of exorbitant interest, leaving

25  the borrower with no option but to relinquish the policy to MCC to discharge the enormous debt.

26  MCC expects to reap enormous profits through the scheme.

27      16.  MCC's financing program is directed towards seniors and their families.  MCC

28  initially lends money for the purchase of a life insurance policy to an irrevocable life insurance trust

COMPLAINT

1  created by the senior insured or the senior insured's relatives. The loan amount is comprised of

2  funds equal to the policy premiums for the first two years, an origination fee of five percent of the

3  total loan, and a "premium reserve account" equal to one to three percent of the face amount of the

4  applicable life insurance policy. The so-called "premium reserve account" can be managed by the

5  trust or distributed to trust beneficiaries. The loan is secured by the policy itself, and a collateral

6  assignment in favor of Mutual Credit Corporation is executed and filed with the insurance company

7  as evidence of that security interest.

8      17.  MCC charges very high rates of interest for its financing, including a five percent

9  origination fee, which is added to the principal, a ten percent fixed interest per annum on the

10  principal loan amount and contingent interest as high as ten percent of the face value of the life

11  insurance policy. The contingent interest amount is calculated based on the life insurance policy's

12  "fair market value" as that term is defined in the promissory note. Thus, if the principal loan

13  amount was $800,000 and the policy purchased had a face value of $10,000,000, the contingent

14  interest alone could be as high as $1,000,000 (i.e., ten percent of the face value), or more than the

15  total principal loan. The nonrecourse promissory notes are due and payable in two years. In other

16  words, MCC devised a financing program in which the potential "interest" charged on a two-year

17  loan could be greater than 100 percent of the principal loan amount.

18      18.  After the two-year maturity date, the trust's indebtedness, including any fixed

19  interest and contingent interest, then bears an additional default interest of 15 percent per annum.

20  The borrower-trust has the option of repaying the promissory note with fixed interest and contingent

21  interest prior to the note's maturity date, at which time the collateral assignment of the life insurance

22  policy should be released and the note should be returned to the trust marked as paid. If the

23  insurance trust is unable or unwilling to repay MCC's loan with interest, the trust can elect to

24  relinquish the policy to MCC in complete satisfaction of the debt. A high contingent interest makes

25  it prohibitively expensive to repay MCC's loan and maintain ownership of the policy.

26      19.  The MCC loan documents provide that the contingent interest could be zero if the

27  "fair market" value of the life insurance policy is equal to or less than the principal loan amount

28  plus the fixed ten percent interest. The promissory note sets forth a specific procedure for

COMPLAINT

1     determining the "fair market value" of the policies. The valuation procedure involves the use of

2     "life settlement" providers. "Life settlements" are a financial option for life insurance policyowners

3     who are unable to maintain or no longer want to own a life policy. Rather than surrender the policy

4     to the life insurance carrier for the policy's cash surrender value (if any), policyowners are

5     sometimes eligible to sell their policy to third-party life settlement providers which might offer to

6     purchase policies for amounts that materially exceed the cash surrender value. In the life

7     settlement industry, a "life settlement provider" is an entity that purchases policies from

8     policyowners.

9         20. MCC's contracts instruct a trust to obtain at least two purchase bids from licensed

10    life settlement providers. In the event the trust and MCC do not agree that the higher of the

11    purchase bids provides a true indication of value, the loan documents require the trust to obtain an

12    "independent third-party valuation" from a specified independent company that is in the business of

13    life settlements and related businesses (referred to herein as the "Independent Valuator") to

14    establish the value for the policy. The Independent Valuator also is a licensed life settlement

15    provider. The Independent Valuator's valuation sets the "fair market value" of the policies for

16    determining the contingent interest amount.

17         21. MCC, however, will only accept valuations that would result in the greatest

18    contingent interest amount. Even when a trust follows the procedure MCC dictates in its own

19    contracts of adhesion, MCC has refused to accept valuations from the Independent Valuator that

20    would result in a contingent interest less than the full ten percent of face value. Instead, MCC

21    attempts to manipulate the valuation process. MCC's intent is to ensure that contingent interest

22    component is so substantial that a borrower-trust does not have the ability or the economic incentive

23    to repay the loan and instead relinquishes the policy to MCC to satisfy the debt. Once MCC obtains

24    complete ownership of the policy, it can continue to pay premiums on the policy and collect the

25    death benefits when the insured dies, or it can sell the policy on the secondary market through a life

26    settlement.

27         22. MCC's entire program was designed and intended to be operated from its inception,

28    and is being operated in an increasingly egregious fashion, in a premeditated attempt to defraud

1  elder policyholders of their insurance policies. After wresting ownership of these assets from the

2  trusts, MCC expects to sell the policies on the secondary market at considerable profits. Plaintiff is

3  informed and believes that MCC has financed the purchase of approximately $3.5 billion in

4  insurance coverage through its premium financing and that the program could result in hundreds of

5  millions of dollars in monetary losses to seniors.

6                    **MCC OFFERS PREMIUM FINANCING TO MR. JENKINS**

7          23.    MCC presented its premium financing program to Harry Jenkins in late 2004.

8  Mr. Jenkins was 78 at the time. On December 23, 2004, he created an irrevocable insurance trust

9  entitled the "Harry L. Jenkins Irrevocable Insurance Trust" for the benefit of his spouse and

10 children. His daughter, Toni Y. Jones, was nominated as the investment trustee for the Trust. As

11 investment trustee, Ms. Jones has authority to make all investment and discretionary decisions with

12 respect to the Trust.

13         24.    The trust instrument also provides for an administrative trustee. The administrative

14 trustee maintains the books and records of the trust, prepares and files tax returns, and performs

15 other administrative tasks. The administrative trustee is the Trust's fiduciary. As a fiduciary, the

16 trustee is obligated to act in the utmost good faith vis-à-vis the Trust. On December 23, 2004,

17 Ms. Jones signed an engagement letter appointing David F. Doten, a California professional

18 fiduciary, as the original administrative trustee. This appointment lasted for two years. Mr. Doten

19 was introduced to the transaction by MCC, and acted in this capacity for many if not all of the MCC

20 cases.

21         25.    As administrative trustee, Mr. Doten submitted an application to MCC for premium

22 financing on January 13, 2005. On February 4, 2005, Mr. Jenkins and his wife signed a Consent

23 and Acknowledgement Agreement in which they unconditionally and irrevocably consented to the

24 application for and purchase by the Trust of an insurance policy on Mr. Jenkins's life through a

25 nonrecourse loan obtained from MCC. The applicable life policy was issued by Pacific Life

26 Insurance Company with a death benefit of $10,000,000 (the "Policy"). Defendant Brown acted as

27 a life insurance agent for Pacific Life with respect to the purchase of the Policy. On information

28 and belief, he received a commission on this transaction and shared that commission with defendant

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

-8-
COMPLAINT

1  Jacobson. At the same time, Brown and Jacobson represented MCC in the financing of the loan to

2  purchase the Policy. Pursuant to California Insurance Code section 785, Brown and Jacobson, as

3  life insurance agents regulated under California law, owed Mr. Jenkins a duty of honesty, good

4  faith, and fair dealing. This duty is in addition to any other duty, whether express or implied, that

5  may exist by law.

6      26.  On February 11, 2005, David F. Doten, in his capacity as administrative trustee for

7  the Trust, executed an Agreement Relating to Nonrecourse Financing, a Secured Nonrecourse

8  Promissory Note (the "Note"), and an Assignment of Life Insurance Policy (the "Assignment") in

9  favor of Mutual Credit Corporation. Unbeknownst to the Trust, Mutual Credit Corporation

10 simultaneously assigned all rights in the Policy and loan to Spurling, which had funded the

11 transaction. The assignment from Mutual Credit Corporation to Spurling occurred

12 contemporaneously with the closing of the loan with the Trust. Mutual Credit Corporation

13 nevertheless continued to service the loan.

14     27.  On August 31, 2005, Mutual Credit Corporation recorded a document with

15 Pacific Life releasing Mutual Credit Corporation's collateral assignment of the Policy. Spurling

16 recorded a collateral assignment of the Policy with Pacific Life on that same day. On information

17 and belief, David Doten executed the collateral assignment in favor of Spurling. Although the

18 assignment to Spurling occurred at the time the loan was made, the new collateral assignment in

19 favor of Spurling was not filed with Pacific Life until several months later, thereby obscuring

20 Spurling's involvement in the transaction from its inception.

21     28.  The initial loan amount was $737,905. This amount included $500,000 in

22 premiums for the first two years, a five percent origination fee of $36,895, and a $201,010 payment

23 to the Trust to establish the "premium reserve account".

24     29.  The Note had a maturity date of February 10, 2007. Pursuant to the loan

25 documents, the Trust had the option of repaying the loan with interest prior to the Note's maturity

26 date. The Note provides for ten percent interest per annum on the principal amount, plus any

27 applicable contingent interest.  The Note describes the mechanism for determining the amount of

28 contingent interest owing (if any) as follows:

As used herein, the term "Contingent Interest" means an amount equal to the lesser
of (x) $1,000,000 and (y) the amount, if any, by which the fair market value of the
Policy (defined below) as of the Maturity Date exceeds the outstanding principal and
accrued interest (other than the Contingent Interest) under this Note.  For the
purposes of calculating the Contingent Interest, the Trust shall obtain at least two
purchase "bids" from licensed life settlement providers or, in the event the Trust and
Lender do not agree that the higher of such "bids" provides a true indication of
value, the Trust shall obtain an independent third-party valuation from [the
Independent Valuator] to establish the value for this purpose.  If [the Independent
Valuator] does not provide this service, the Trust and Lender will find another
mutually agreeable independent third-party appraiser.

      30.  The investment trustee determined that she wanted to maintain ownership of the
Policy and continue the life insurance for the benefit of the Jenkins family by refinancing the MCC
loan through XE-R.  In order to value the contingent interest for the purposes of making repayment,
the Trust followed the procedures set forth in the Note.  The Trust obtained bids on the Policy from
two licensed settlement providers: Financial Life Services offered $700,000, and Secondary Life
Capital offered $609,000.  The Trust also obtained an independent third-party valuation of the
Policy from the Independent Valuator indicating a value of $850,000 for the Policy.  Pursuant to the
procedures provided in the Note, the Policy thus has a "fair market value" of less than the principal
loan amount plus ten percent fixed interest per annum.  Because the "fair market value" is less than
the principal plus fixed interest, the contingent interest owing under the Note is zero.

      31.  On February 8, 2007, two days prior to the Note's maturity date, the Trust exercised
its right to repay the full amount due under the Note.  The Trust tendered to MCC a check for
$891,032, which represented the principal plus interest at ten percent per annum and a
contingent interest of zero.  XE-R provided the funds for the payment.  In consideration of its
provision of valuation and other services, the Trust agreed to appoint Mark Ross & Co., Inc. as the
broker of record in the event that the Trust later decided to sell the Policy on the secondary market
through a life settlement.

BARGER & WOLEN LLP
SAN FRANCISCO, CA 94111

32. Pursuant to the MCC loan documents, MCC was obligated to release the collateral assignment of the Policy, to return the Note marked as paid in full, and return any other documents as required by the Note and other loan documents. MCC refused to release the collateral assignment and return the Note, and instead returned the check.

33. After learning that the Trust intended to refinance its loan through XE-R, on February 8, 2007, MCC wrote a letter to the Independent Valuator regarding the valuation of insurance policies in the MCC program. MCC did not notify the Trust that it was sending this letter to the Independent Valuator. A copy of this letter is attached to this complaint as Exhibit A and is incorporated by reference. MCC's letter makes false representations regarding the procedures for determining the Policy's "fair market value" within the meaning of the applicable promissory notes:

> We have requested in the past that you provide … valuation services. The services
> would include determining the "fair market value" for the policies, meaning "the
> highest price on the date of valuation that would be agreed to by a seller, being
> willing to sell but under no particular or urgent necessity for so doing, nor obligated
> to sell, and a buyer, being ready, willing, and able to buy but under no particular
> necessity for so doing, each dealing with the other with full knowledge of all the uses
> and purposes for which the property is reasonably adaptable and available." [citation
> omitted] Please note, that [the Independent Valuator] would not be requested to
> make a "bid" of what it would be willing to pay, but would be requested to state
> what the highest price in the marketplace would be.

34. The Loan Documents do not contain any terms suggesting that the valuation should be determined through the "highest price" procedure that MCC described. MCC derived this language after the fact from California's eminent domain statute, which is not germane to the interpretation of a promissory note related to an insurance contract. The only valuation procedure in the loan documents is that outlined above in paragraph 29. Nonetheless, MCC threatened to sue the Independent Valuator if it would not agree to follow MCC's false guidelines. MCC's previous communications with the Independent Valuator about the valuation process, its February 8, 2007 letter, and its threat to sue the Independent Valuator were designed unfairly to rig the valuation in

1  favor of MCC in contravention to the procedures provided in the Note. This action by MCC was an

2  attempt to usurp the role of the trustee to obtain the bids that establish the fair market value, as well

3  as an improper attempt to influence the Independent Valuator first, through the implied promise of

4  large volumes of business, and then, through intimidation in its threats of legal action. The

5  Independent Valuator did not accede to MCC's threats or repeated attempts to manipulate the

6  valuation process.

7      35. MCC wrote a letter to the Trust on February 22, 2007. A copy of the letter is

8  attached to this complaint as Exhibit B and incorporated by reference. MCC indicated that it

9  refused to accept the Trust's February 8, 2007 payment, in part, on the ground that the principal

10  amount increased by $65,500 due to the "payment of additional premiums as allowed in the

11  Collateral Pledge Agreement." MCC first sent notice of this alleged premium payment on

12  February 8, 2007, two days before the maturity date. This notice was not received by the

13  investment trustee until after the Trust had already tendered the total amount due under the Note.

14      36. MCC asserted that the $65,500 premium payment was due and owing in order to

15  prevent the policy from going into a grace period prior to the loan maturity date. This contention

16  was false; the premium payment was not due and owing and there was no need to make the

17  payment to prevent the Policy from entering a grace period prior to the loan maturity date. On

18  information and belief, MCC knew that the premium payment was not due and owing before the

19  maturity date and made the additional premium payment in order to increase the amount due and

20  manufacture an alleged default on behalf of the Trust. Further, even if the payment had been due,

21  MCC never gave the Trust the opportunity to utilize the "premium reserve account" which had been

22  established precisely for this purpose.

23      37. MCC also indicated in its February 22 letter that it would not accept the

24  Independent Valuator's independent valuation that the Policy had a value of approximately

25  $850,000. Despite the fact that the Independent Valuator's valuation resulted in a contingent

26  interest of zero, MCC asserted that the total amount due under the Note was $1,956,514, which

27  included $737,905 for the original principal loan amount, $65,500 for the additional alleged

28  premium payment, $153,109 in accrued fixed interest, and contingent interest of $1,000,000. In

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1   other words, the sum MCC demanded included a combined fixed and contingent interest of over

2   150 percent of the original loan amount on a two-year loan. The February 22 letter also improperly

3   threatened to disqualify the Independent Valuator.

4       38. The Trust responded by letter dated February 28, 2007. Without acknowledging

5   that the additional $65,500 premium payment was properly added to the amount due, the Trust

6   agreed to include that additional amount in the funds paid in satisfaction of the loan. The Trust

7   indicated that it had no obligation to include any contingent interest. The Trust obtained a separate

8   loan from XE-R to repay the MCC loan. By wire transfer that same day, XE-R, on behalf of the

9   Trust, re-tendered a payment to MCC in the amount of $956,532, which comprised the $891,032 the

10   Trust previously tendered plus the additional $65,500 amount. This payment was made in full

11   satisfaction of the Trust's obligations under the Note. MCC accepted this wire transfer and has not

12   returned the funds to the Trust. MCC nevertheless has not released the collateral assignment of the

13   Policy nor returned the Note marked as paid in full, as required by the loan documents.

14       39. MCC had no intention of accepting a contingent interest of zero, even if no

15   contingent interest was owed under the Note. MCC designed a predatory premium financing

16   scheme that includes exorbitant rates of interest. These high interest rates are specifically designed

17   to prevent borrower-trusts from attempting to repay the loans before the maturity date and maintain

18   ownership of the policies. When the Jenkins Trust tendered the full payment of loan pursuant to

19   the valuation procedures in MCC's own contracts, MCC wrongfully refused to accept the payment

20   and attempted to interfere with and rig the valuation process so that it could claim an artificially

21   high contingent interest. MCC's intention was to make it impossible for the Trust to maintain

22   ownership of the Policy. The Trust has fully performed its obligations under the loan documents

23   and is entitled to a release of the collateral assignment of the Policy and a return of the Note marked

24   paid in full.

25                    **FIRST CAUSE OF ACTION**

26   **(Breach of Contract -- By the Trust against Mutual Credit Corporation and Spurling Only)**

27       40. The Trust realleges and incorporates herein by reference each and every allegation

28   contained in paragraphs 1 through 39, above, with the same force and effect as though set forth

1  herein in full.

2     41.  The Trust and Mutual Credit Corporation entered into a written Agreement Relating

3  to Nonrecourse Financing, Secured Nonrecourse Promissory Note, and Assignment of Life

4  Insurance Policy.  These written agreements shall be referred to collectively as the "contract."  As

5  Mutual Credit Corporation's assignee, Spurling is bound by the contract as well.

6     42.  The Trust has at all times performed the terms of the contract in the manner

7  specified by the loan documents.

8     43.  MCC failed and refused, and continues to refuse, to tender its performance as

9  required by the contract.  This includes MCC's refusal to release the collateral assignment of the

10  Policy and to return the Note marked as paid upon the Trust's tender of funds on February 8, 2007,

11  and on March 1, 2007.

12     44.  MCC's failure and refusal to perform its obligations under the contract has directly

13  damaged the Trust by preventing it from taking ownership of the Policy free of MCC's collateral

14  assignment.  This prevents the Trust from maintaining the insurance policy for the benefit of the

15  Jenkins family, free from MCC's security interest or selling the Policy on the secondary market, if it

16  so chooses.  As a direct and proximate result of MCC's breaches of the contract, the Trust has

17  sustained damages in an amount to be proven at the trial, but in no event less than the jurisdictional

18  minimum of this court.

19     Wherefore, the Trust prays judgment against Mutual Credit Corporation and Spurling, and

20  each of them, as hereinafter set forth.

21              **SECOND CAUSE OF ACTION**

22         (Breach of the Implied Covenant – By the Trust against

23              Mutual Credit Corporation and Spurling Only)

24     45.  The Trust realleges and incorporates herein by reference each and every allegation

25  contained in paragraphs 1 through 44, above, with the same force and effect as though set forth

26  herein in full.

27     46.  In every contract there is an implied covenant of good faith and fair dealing by each

28  party not to do anything that will deprive the other parties of the benefits of the contract.

1   47.  MCC breached duties to act in good faith by, among other things, making an

2  additional premium payment that was not due and owing in order to unfairly increase the amount

3  due and thereby manufacture an alleged default on behalf of the Trust.  MCC also breached the

4  implied covenant by interfering with the valuation process of the Policy and refusing to accept the

5  Independent Valuator's independent valuation.

6   48.  As a direct and proximate result of MCC's breaches of the implied covenant of good

7  faith and fair dealing and statutory obligations to act in good faith, the Trust has sustained damages

8  in an amount to be proven at the trial, but in no event less than the jurisdictional minimum of this

9  court.

10   Wherefore, the Trust prays judgment against Mutual Credit Corporation and Spurling, and

11  each of them, as hereinafter set forth.

12  **THIRD CAUSE OF ACTION**

13  **(Intentional Interference with Contract – By the Trust against All Defendants)**

14   49.  The Trust realleges and incorporates herein by reference each and every allegation

15  contained in paragraphs 1 through 48, above, with the same force and effect as though set forth

16  herein in full.

17   50.  Defendants, and each of them, knew that there was an existing contract and business

18  relationship between XE-R, Mark Ross & Co., Inc. and the Trust, through which XE-R would help

19  the Trust repay the MCC loan and obtain a release of MCC's collateral assignment.  The Trust,

20  through XE-R's financing, would be able to maintain ownership of the Policy.  In the event that the

21  Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary

22  market using Mark Ross & Co., Inc. as the broker.

23   51.  Defendants intentionally interfered with these contract and business relationships by

24  committing the wrongful acts alleged herein.  Defendants intended to prevent the Trust from

25  obtaining ownership of the Policy free of any liens or other security by MCC or from selling the

26  Policy to a third party through a life settlement.  As a direct result of defendants' actions and

27  omissions, the Trust has been damaged in an amount according to proof, but in no event less than

28  the jurisdictional minimum of this court.

-15-
COMPLAINT

1    52.  Defendants' actions were undertaken with fraud, malice or oppression, or with a

2 conscious disregard of the rights of the Trust, and, therefore, the Trust is entitled to an award of

3 exemplary and punitive damages against defendants, and each of them, in an amount according to

4 proof.

5    Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter

6 set forth.

### FOURTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage –**

**By the Trust against All Defendants)**

10    53.  The Trust realleges and incorporates herein by reference each and every allegation

11 contained in paragraphs 1 through 52, above, with the same force and effect as though set forth

12 herein in full.

13    54.  Defendants, and each of them, knew that the Trust intended to repay the MCC loan

14 and obtain a release of MCC's collateral assignment through financing from XE-R.  The Trust then

15 would be able to maintain ownership of the Policy for the benefit of the Jenkins family.  In the

16 event that the Trust later decided to sell the Policy, the Trust could negotiate a life settlement on the

17 secondary market using Mark Ross & Co., Inc. as the broker.

18    55.  Defendants willfully and deliberately interfered with the Trust's prospective

19 economic advantage by committing the wrongful acts alleged herein.  Defendants intended to

20 prevent the Trust from obtaining ownership of the Policy free of any liens or other security by MCC

21 or from selling the Policy through a life settlement.  As a direct result of defendants' actions and

22 omissions, the Trust has been damaged in an amount according to proof, but in no event less than

23 the jurisdictional minimum of this court.

24    56.  Defendants' actions were undertaken with fraud, malice or oppression, or with a

25 conscious disregard of the rights of the Trust, and, therefore, the Trust is entitled to an award of

26 exemplary and punitive damages against defendants, and each of them, in an amount according to

27 proof.

28    Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter

BARGER & WOLEN LLP
601 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

set forth.

## FIFTH CAUSE OF ACTION

### (Fraudulent Misrepresentation – By the Trust against All Defendants)

57.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 56, above, with the same force and effect as though set forth herein in full.

58.   Defendants made the following representations and promises to the Trust:

    (a)    That the Trust could repay the nonrecourse loan with interest before the Note's maturity date and that, upon this payment, MCC would release all collateral assignment in the Policy and return the Note marked as paid.

    (b)    That MCC would accept a contingent interest of zero if the "fair market value" of the Policy as defined in the Note was equal to or less than the principal loan amount plus fixed interest.

59.   These representations were false when made.  Defendants knew that the MCC premium financing program was structured and intended to be operated from the beginning, and is being operated, so that the Trust would have no economic incentive or ability to repay the loan and exorbitant interest and thereby maintain ownership of the policies.

60.   Defendants also knew that MCC, or its assignees, had no intention of ever accepting a contingent interest of zero and complying with its obligation to release the collateral assignment, even if a borrower-trust followed the valuation procedures in the loan documents and the Policy's "fair market value" resulted in a contingent interest of zero.

61.   Defendants intended the Trust to rely upon the representations, and the Trust did in fact rely on these representations.

62.   The Trust's reliance was justifiable.

63.   Mutual Credit Corporation is a licensed premium finance company.  In addition to breaching general duties to avoid making fraudulent misrepresentations, defendants' actions and omissions violated statutory duties under California Financial Code section 18500. That section provides that "[n]o person shall advertise, print, display, publish, distribute, or broadcast, or cause

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO CA 94108
(415) 434-2800

1   or permit to be advertised, printed, displayed, published, distributed, or broadcast, in any manner in

2   connection with the business of an [premium finance company] any statement or representation

3   with regard to the rates, terms, or conditions for making or negotiating loans, or with regard to

4   investment certificates, which is false, misleading, or deceptive." Defendants' deceptive and

5   misleading acts or omissions in connection with Mutual Credit Corporation violated section 18500.

6       64.  As a direct result of defendants' actions and omissions, the Trust has been damaged

7   in an amount according to proof, but in no event less than the jurisdictional minimum of this court.

8   The Trust's reliance on defendants' misrepresentations was a substantial factor in causing its

9   damage.

10      65.  Defendants' actions were undertaken with fraud, malice or oppression, or with a

11  conscious disregard of the rights of the Trust, and, therefore, plaintiff is entitled to an award of

12  exemplary and punitive damages against defendants, and each of them, in an amount according to

13  proof.

14      Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter

15  set forth.

16  ## SIXTH CAUSE OF ACTION

17  ### (Fraudulent Concealment – By the Trust against All Defendants)

18      66.  The Trust realleges and incorporates herein by reference each and every allegation

19  contained in paragraphs 1 through 65, above, with the same force and effect as though set forth

20  herein in full.

21      67.  Defendants disclosed some facts to the Trust, but intentionally failed to disclose

22  other important facts, making the disclosures deceptive.  In the alternative, defendants intentionally

23  failed to disclose a fact or facts that were known to defendants and that the Trust could not have

24  discovered.

25      68.  The Trust did not know of the concealed facts.

26      69.  Defendants intended to deceive the Trust by concealing facts.

27      70.  Plaintiff justifiably relied on defendants' deception.

28      71.  As a direct result of defendants' deception, the Trust has been damaged in an

-18-
COMPLAINT

1  amount according to proof, but in no event less than the jurisdictional minimum of this court. The

2  Trust's reliance on defendants' deception was a substantial factor in causing its damage.

3      72.  Defendants' actions were undertaken with fraud, malice or oppression, or with a

4  conscious disregard of the rights of the Trust, and, therefore, the Trust is entitled to an award of

5  exemplary and punitive damages against defendants, and each of them, in an amount according to

6  proof.

7      Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter

8  set forth.

9                  SEVENTH CAUSE OF ACTION.

10        (Negligent Misrepresentation – By the Trust against All Defendants)

11      73.  The Trust realleges and incorporates herein by reference, each and every allegation

12  contained in paragraphs 1 through 72, above, with the same force and effect as though set forth

13  herein in full.

14      74.  In making representations as herein alleged, defendants had no reasonable basis to

15  believe that they were true.

16      75.  These representations were false.

17      76.  Defendants intended the Trust to rely upon the representations, and plaintiff did in

18  fact rely on these representations.

19      77.  The Trust's reliance was justifiable.

20      78.  As a direct result of defendants' actions and omissions, the Trust has been damaged

21  in an amount according to proof, but in no event less than the jurisdictional minimum of this court.

22  The Trust's reliance on defendants' misrepresentations was a substantial factor in causing its

23  damage.

24      Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter set

25  forth.

26                  EIGHTH CAUSE OF ACTION

27        (Bus. & Prof. § 17200 et seq. – By the Trust against All Defendants)

28      79.  The Trust realleges and incorporates herein by reference, each and every allegation

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1  contained in paragraphs 1 through 78, above, with the same force and effect as though set forth

2  herein in full.

3     80.  Defendants have engaged in an unlawful, unfair or fraudulent business acts or

4  practices and unfair, deceptive untrue or misleading advertising within the meaning of Business and

5  Professions Code section 17200 et. seq.

6     81.  The Trust has suffered an injury in fact and has lost money or property as result of

7  defendants' business acts, omissions, misrepresentation and practices alleged herein.

8     82.  Accordingly, the Trust is entitled to equitable relief, including injunctive relief.

9     Wherefore, the Trust prays judgment against defendants, and each of them, as hereinafter set

10  forth.

11              NINTH CAUSE OF ACTION

12     (Intentional Interference with Contract – By XE-R against All Defendants)

13     83.  XE-R realleges and incorporates herein by reference each and every allegation

14  contained in paragraphs 1 through 82, above, with the same force and effect as though set forth

15  herein in full.

16     84.  Defendants, and each of them, knew that there was an existing contract and business

17  relationship between XE-R and the Trust, through which and XE-R loaned money to the Trust to

18  repay the MCC loan.  Defendants further knew that the Trust would repay the XE-R loan with

19  interest.

20     85.  Defendants intentionally interfered with this contract and business relationship by

21  committing the wrongful acts alleged herein.  As a direct result of defendants' actions and

22  omissions, XE-R has been damaged in an amount according to proof, but in no event less than the

23  jurisdictional minimum of this court.

24     86.  Defendants' actions were undertaken with fraud, malice or oppression, or with a

25  conscious disregard of the rights of XE-R, and, therefore, XE-R is entitled to an award of exemplary

26  and punitive damages against defendants, and each of them, in an amount according to proof.

27     Wherefore, XE-R prays judgment against defendants, and each of them, as hereinafter set

28  forth.

-20-
COMPLAINT

## TENTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage –

### By XE-R against All Defendants)

87.  XE-R realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 86, above, with the same force and effect as though set forth herein in full.

88.  Defendants, and each of them, knew that XE-R had loaned funds to the Trust to repay the MCC loan. Defendants further knew that the Trust would repay the XE-R loan with interest.

89.  Defendants willfully and deliberately interfered with this prospective economic advantage by committing the wrongful acts alleged herein. As a direct result of defendants' actions and omissions, XE-R has been damaged in an amount according to proof, but in no event less than the jurisdictional minimum of this court.

90.  Defendants' actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of XE-R, and, therefore, XE-R is entitled to an award of exemplary and punitive damages against defendants, and each of them, in an amount according to proof.

Wherefore, XE-R prays judgment against defendants, and each of them, as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION

### (Bus. & Prof. § 17200 et seq. – By XE-R against All Defendants)

91.  XE-R realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 90, above, with the same force and effect as though set forth herein in full.

92.  Defendants have engaged in an unlawful, unfair or fraudulent business acts or practices and unfair, deceptive untrue or misleading advertising within the meaning of Business and Professions Code section 17200 et. seq.

93.  XE-R has suffered an injury in fact and has lost money or property as result of defendants' business acts, omissions, misrepresentation and practices alleged herein.

HANSON & MOLINA
OSS CALIFORNIA STREET
SIXTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2999

94. Accordingly, XE-R is entitled to equitable relief, including injunctive relief.

Wherefore, XE-R prays judgment against defendants, and each of them, as hereinafter set forth.

## TWELFTH CAUSE OF ACTION

### (Restitution – By XE-R against All Defendants)

95. XE-R realleges and incorporates herein by reference, each and every allegation contained in paragraphs 1 through 94, above, with the same force and effect as though set forth herein in full.

96. XE-R is entitled to recover the $956,532 it paid to defendants on March 1, 2007, plus interest. Defendants would be unjustly enriched if they retained those funds.

Wherefore, XE-R prays for judgment against defendants, and each of them, as hereinafter set forth.

## THIRTEENTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage –

### By Mark Ross & Co., Inc. against All Defendants)

97. Mark Ross & Co., Inc. realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 96, above, with the same force and effect as though set forth herein in full.

98. Defendants, and each of them, knew that XE-R had loaned funds to the Trust to repay the MCC loan. Defendants further knew that in exchange for the provision of valuation and other services, the Trust agreed to appoint Mark Ross & Co., Inc. as the broker of record in the event that the Trust later decided to sell the Policy on the secondary market through a life settlement. Mark Ross & Co., Inc. would receive a commission on this transaction.

99. Defendants willfully and deliberately interfered with this prospective economic advantage by committing the wrongful acts alleged herein. As a direct result of defendants' actions and omissions, Mark Ross & Co., Inc. has been damaged in an amount according to proof, but in no event less than the jurisdictional minimum of this court.

100. Defendants' actions were undertaken with fraud, malice or oppression, or with a

-22-
COMPLAINT

1  conscious disregard of the rights of Mark Ross & Co., Inc., and, therefore, Mark Ross & Co., Inc. is

2  entitled to an award of exemplary and punitive damages against defendants, and each of them, in an

3  amount according to proof.

4      Wherefore, Mark Ross & Co., Inc. prays judgment against defendants, and each of them, as

5  hereinafter set forth.

6                        FOURTEENTH CAUSE OF ACTION

7      (Bus. & Prof. § 17200 et seq. – By Mark Ross & Co., Inc. against All Defendants)

8      101. Mark Ross & Co., Inc. realleges and incorporates herein by reference, each and

9  every allegation contained in paragraphs 1 through 100, above, with the same force and effect as

10  though set forth herein in full.

11      102. Defendants have engaged in an unlawful, unfair or fraudulent business acts or

12  practices and unfair, deceptive untrue or misleading advertising within the meaning of Business and

13  Professions Code section 17200 et. seq.

14      103. Mark Ross & Co., Inc. has suffered an injury in fact and has lost money or property

15  as result of defendants' business acts, omissions, misrepresentation and practices alleged herein.

16      104. Accordingly, Mark Ross & Co., Inc. is entitled to equitable relief, including

17  injunctive relief.

18      Wherefore, Mark Ross & Co., Inc. prays judgment against defendants, and each of them, as

19  hereinafter set forth.

20                        FIFTEENTH CAUSE OF ACTION

21      (Declaratory Relief – By Plaintiffs against Mutual Credit Corporation and Spurling)

22      105. Plaintiffs reallege and incorporate herein by reference, each and every allegation

23  contained in paragraphs 1 through 104, above, with the same force and effect as though set forth

24  herein in full.

25      106. Plaintiffs seek a judicial determination pursuant to section 1060 of the California

26  Code of Civil Procedure of the rights and duties of the respective parties with respect to an actual

27  controversy arising under the various contracts at issue.

28      107. An actual controversy exists between plaintiffs and MCC as the Trust has performed

BARGER & WOLEN LLP
650 CALIFORNIA STREET
NINTH FLOOR
SAN FRANCISCO, CA 94108
(415) 434-2800

1  all obligations and duties under the relevant contract yet defendants have failed and refused and

2  continue to fail and refuse to release the collateral assignment of the Policy and to return the Note

3  marked as paid in full.  On information and belief, MCC disputes that they are required to release

4  all security interests and return the Note.

5      108.  Plaintiffs contend and desire a judicial determination that MCC has no right, title or

6  interest in the Policy and that they must release all collateral assignments of the Policy and return

7  the Note to the Trust marked as paid in full.

8      Wherefore, plaintiffs, and each of them, pray judgment against Mutual Credit Corporation

9  and Spurling, and each of them, as hereinafter set forth.

10      WHEREFORE, plaintiffs pray for judgment as follows:

11  For the First and Second Causes of Action against MCC:

12      1.    For general damages according to proof;

13      2.    For special damages according to proof; and

14      3.    For prejudgment interest.

15  For the Third, Fourth, Fifth, and Sixth Causes of Action against all defendants:

16      1.    For general damages according to proof;

17      2.    For special damages according to proof;

18      3.    For prejudgment interest; and

19      4.    For punitive and exemplary damages in an unspecified sum.

20  For the Seventh Cause of Action against all defendants, jointly and severally:

21      1.    For general damages according to proof;

22      2.    For special damages according to proof; and

23      3.    For prejudgment interest.

24  For the Eighth Cause of Action against all defendants:

25      1.    For a court order enjoining defendants from engaging in any unlawful, unfair or

26          fraudulent business acts or practices and unfair, deceptive untrue or misleading

27          advertising within the meaning of Business and Professions Code section 17200

28          et seq.

For the Ninth and Tenth Causes of Action against all defendants:

1. For general damages according to proof;

2. For special damages according to proof;

3. For prejudgment interest; and

4. For punitive and exemplary damages in an unspecified sum.

For the Eleventh Cause of Action against all defendants:

1. For a court order enjoining defendants from engaging in any unlawful, unfair or fraudulent business acts or practices and unfair, deceptive untrue or misleading advertising within the meaning of Business and Professions Code section 17200 et seq.

For the Twelfth Cause of Action against all defendants:

1. For restitution of the $956,532 paid by XE-R;

2. For prejudgment interest.

For the Thirteenth Causes of Action against all defendants:

1. For general damages according to proof;

2. For special damages according to proof;

3. For prejudgment interest;

4. For punitive and exemplary damages in an unspecified sum.

Fourteenth Cause of Action against all defendants:

1. For a court order enjoining defendants from engaging in any unlawful, unfair or fraudulent business acts or practices and unfair, deceptive untrue or misleading advertising within the meaning of Business and Professions Code section 17200 et seq.

Fifteenth Cause of Action for declaratory relief against MCC:

1. That the court adjudicate and declare that the Trust has at all times performed the terms of the loan contract in the manner specified by the loan documents;

2. That the court adjudicate and declare that MCC have breached their obligations under the loan contract;

3.   That the court adjudicate and declare that MCC, and each of them, have no rights whatsoever with respect to the Policy and that they must release the collateral assignment of the Policy and return the Note marked as paid in full.

For All Causes of Action:

1.   For costs herein incurred;

2.   For attorney fees incurred in pursue of this matter;

3.   And for such other and further relief as the court may deem just and proper.

DATE: May 13, 2007                          BARGER & WOLEN LLP

By: _____
David J. McMahon
Randall A. Doctor
Travis R. Wall
Attorneys for plaintiffs
TONI Y. JONES, in her capacity as
Investment Trustee for the HARRY L.
JENKINS IRREVOCABLE INSURANCE
TRUST, MARK ROSS & CO., INC. and
XE-R, LLC

-26-
COMPLAINT

# EXHIBIT
## A



**MUTUAL CREDIT CORPORATION**

*Via Email & UPS Overnight*

February 8, 2007

REDACTED

Re:    Valuation Services of

Dear

As you have discussed with Michael Brown in the past, Mutual Credit Corporation, a licensed California premium finance company ("MCC") engages in the premium finance business.   MCC offers nonrecourse financing, secured by life insurance policies. Because of the risk taken by MCC in its nonrecourse financing, MCC charges very high rates of interest, including contingent interest which is calculated based upon the fair market value of the underlying security (i.e. the policies).

In determining the amount of contingent interest, it is necessary to determine the fair market value of the policies.  Our loan documents provide:

> "As used herein, the term "Contingent Interest" means an amount equal to the *lesser of* (x) $ _____ and (y) the amount, if any, by which the fair market value of the Policy (defined below) as of the Maturity Date exceeds the outstanding principal and accrued Fixed Interest (and excluding any Contingent Interest) under this Note.  For the purposes of calculating the Contingent Interest, the Trust shall obtain at least two purchase "bids" from licensed life settlement providers or, in the event the Trust and Lender do not agree that the higher of such "bids" provides a true indication of value, the Trust shall obtain an independent third-party valuation from _____ to establish the value for this purpose.  If _____ does not provide this service, the Trust and Lender will find another mutually agreeable independent third-party appraiser."

                                                                                            REDACTED

We have requested in the past that you provide the above-described valuation services. The services would include determining the "fair market value" for the policies, meaning "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell,

and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."[1] Please note, that would not be requested to make a "bid" of what it would be willing to pay, but would be requested to state what the highest price in the marketplace would be.    As an "independent third-party," you would be called upon to take into account actual market bids received by MCC and the client.

We have received information that certain individuals at _____ have contacted various agents who have done business with MCC in the past and offered to make artificially low valuations of their clients policies' to defraud MCC out of its profits.  We certainly hope that this is not true, and trust that if it is true that you will take steps to stop such activities.  If these activities are confirmed by us and continue to occur, we will not hesitate to take all action legally available to us to protect our ongoing business and recoup any damages caused by such activities.

If you are interested in providing bona fide valuation services, please contact me immediately at 949.265.0260.  If you are not interested in providing these services, please sign the attached letter and return it to me via facsimile (949.265.0279) or email (ajacobson@amutualcreditcorp.com) within 24 hours.

Sincerely,

Anthony Jacobson
President

---

[1] City of San Diego v. Neumann, 6 Cal.4th 738; Pacific States Sav. & L. CO. v. HISR, 25 Cal.2d 822; Sacramento So. R.R. Co. v. Heilbroh, 156 Cal. 408; Oakland v. Pacific Coast Lbr. & M. Co., 171 Cal. 392, 399; City of Napa v. Navoni, 56 Cal.App.2d 289, 299.

Valuation Services Statement

To Whom It May Concern:

          has been requested to provide valuation services for certain life insurance policies that provide collateral for loans made by Mutual Credit Corporation. While          may participate in the bidding process for such policies from time to time,          does not provide the type of valuation services required under the loan documents for the determination of "contingent interest" as defined in such loan documents.

REDACTED

By: _____
Name: _____
Title: _____

# EXHIBIT
## B

# MUTUAL CREDIT CORPORATION

February 22, 2007

Toni Y. Jones
195 Monte Vista
Aptos, CA 95003

Re:   Secured Nonrecourse Promissory Note dated February 11, 2005

Dear Toni:

Enclosed herewith is your check submitted to us as payment in full of the above-referenced note (the "Note"). The check is being returned to you because it is not in the correct amount to repay the Note in full. The correct amount due is the sum of the following:

| | |
|---|---|
| Original Principal Amount: | $737,906 |
| Additional Principal Amount:[1] | $65,500 |
| Accrued Fixed Interest: | $153,109 |
| Contingent Interest: | $1,000,000 |
| | |
| Total Amount Due: | $1,956,515 |

The primary difference in the amount due relates to the contingent interest amount. You have indicated that the contingent interest should be zero based upon a letter you received from _____ The Note requires that ( _____ ) provide an "independent third-party valuation" to determine the fair market value of the life insurance policy that secures the Note (the "Policy"). **REDACTED**

It is widely accepted that "fair market value" means the highest price on the date of valuation that would be agreed to by a willing seller and a willing buyer, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.[2] We have been trying to discuss the letter you received with _____ to ensure that they took all factors into account in providing their valuation, but they do not appear to be willing to discuss their valuation with us. In any event, we do not believe that the letter provided to you by _____ meets the requirements of an independent third party valuation to determine the fair market value of the Policy based upon the following two factors:

---

[1] This amount was advanced on behalf of the Trust for the payment of additional premiums as allowed in the Collateral Pledge Agreement.
[2] City of San Diego v. Neumann, 6 Cal.4th 738; Pacific States Sav. & L. CO. v. HISE, 25 Cal.2d 822; Sacramento So. R.R. Co. v. Heilbron, 156 Cal. 408; Oakland v. Pacific Coast Lbr. & M. Co., 171 Cal. 392, 399; City of Napa v. Navoni, 56 Cal.App.2d 289, 299.

114 PACIFICA SUITE 120, IRVINE, CA 92618
TEL 949.263.0200   FAX 949.263.0269
CREDITDEPT@MUTUALCREDITCORP.COM
PREMIUM FINANCE COMPANY LIC ENSE NO. 2198 CA DFI

1. Based upon an updated HIPAA form submitted to us by Harry Jenkins in August of 2006, we updated Mr. Jenkins medical information so that we could perform our own determination with respect to the value of the policy. We submitted this information to a number of settlement providers to determine what a willing buyer would pay for the Policy. During that process we received two offers for the Policy, one in the amount of $2,200,000 and another in the amount of $2,450,000.00. We would be happy to put you in touch with these buyers. You will not be charged with any settlement commissions or broker fees in connection with these offers should you decide to sell the Policy. If you elect to retain the Policy, which we believe would be an excellent investment for the trust, your payoff amount would be as set forth above. This is clearly what a willing buyer would pay, and it would be difficult to argue that an independent third-party valuation would ignore such an offer in making a determination as to fair market value.

2. As you may be aware,                     among others, has been sued by the Attorney General of the State of New York for colluding with life settlement brokers to bid for life insurance policies being settled in the market at prices lower than their fair value.[3] In addition to being accused of not offering fair value to policy sellers, officers of                     are alleged to have paid life settlement brokers not to submit bids or to withdraw bids for policies which                     was actively pursuing. As a result, unless                     is cleared of such activities, we do not believe that it is appropriate for                     to continue to serve as a source of independent third-party valuations.

REDACTED

Your loan is currently in default, but because of the confusion over the valuation process, we have decided to waive any default interest. Please remit payment to us no later than March 1, 2007. We have enclosed a postage-paid return envelope for your convenience. If we do not receive payment by March 1, 2007, we will be forced to foreclose on the Policy in accord with California's Uniform Commercial Code.

If you have any questions, please contact me at 949.265.0620.

Sincerely,

Anthony Jacobson
President

cc:    Harry L. Jenkins
       David Doten, Administrative Trustee

---

[3] The October 26, 2006 complaint and related press release may be found on the New York Attorney General website at www.oag.state.ny.us/press/2006/oct/oct26a_06.html .

ORIGINAL

ORIGINAL

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| David J. McMahon (120891); Randall A. Doctor (130215); Travis R. Wall (191662) Berger & Wolen LLP 650 California Street, 9th Floor, San Francisco, CA 94108 TELEPHONE NO.: 415-434-2800    FAX NO.: 415-434-2533 | |

ATTORNEY FOR (Name): Plaintiffs Toni Y. Jones, et al

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West - Civil Complex Center
MAILING ADDRESS: 751 W. Santa Ana Blvd.
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center - Santa Ana, CA 92701

Clerk of the Superior Court
Civil Complex Center

CASE NAME:
Toni Y. Jones, et al. v. Mutual Credit Corporation, et al.

**07CC01223**

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: **JUDGE RONALD L. BAUER** DEPT: **CX103** |

Items 1–5 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel   e. ☑ Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☑ Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive

4. Number of causes of action (specify): 15

5. This case ☐ is ☑ is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 5/13/07

Randall A. Doctor
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

**SUM-100**

# ORIGINAL SUMMONS
## (CITACION JUDICIAL)

**JH**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAR 13 2007

ALAN SLATER, Clerk of the Court
By J. HAINES

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
MUTUAL CREDIT CORPORATION, SPURLING GROUP, LLC,
MICHAEL BROWN, ANTHONY JACOBSON, and DOES 1 through
100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
TONI Y. JONES, in her capacity as Investment Trustee for the HARRY
L. JENKINS IRREVOCABLE INSURANCE TRUST, MARK ROSS &
CO., INC. and XE-R, LLC,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| | |
|---|---|
| The name and address of the court is: (El nombre y dirección de la corte es): SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE 700 Civic Center Drive West Santa Ana, California 92701 | **CASE NUMBER (Número del Caso):** 07CC01223 |

Clerk of the Superior Court
Central Justice Center
751 W. Santa Ana Blvd.
Santa Ana, Ca 92701

JUDGE RONALD L. BAUER
DEPT. CX103

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Randall A. Doctor, Esq. / BARGER & WOLEN LLP
650 California Street, 9th Floor, San Francisco, California 94108-2713   (415)434-2800/(415)434-2533-Fax

DATE:  MAR 13 2007    ALAN SLATER Clerk, by _____ , Deputy
(Fecha)                            (Secretario)  J. HAINES  (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

          ☐ other (specify):

4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. January 1, 2004)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

**ORIGINAL**

3  JH

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE | FILED |
|---|---|
| Civil Complex Center<br>751 West Santa Ana Blvd.<br>Santa Ana, CA  92701-4512 | SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE<br>CENTRAL JUSTICE CENTER<br><br>MAR 1 3 2007<br><br>ALAN SLATER, Clerk of the Court<br>J. Heiser<br>BY J. HAINES |

07 CC 01223

### ELECTRONIC FILING ORDER
### Complex Civil Litigation

**NOTICE: FULL ENFORCEMENT OF THIS ORDER SHALL BE IMPLEMENTED**
**EFFECTIVE APRIL 1, 2007.  JUDGE RONALD L. BAUER**
**DEPT. CX103**

The Orange County Superior Court has established a system for electronic filing (e-filing) in accordance with *Code of Civil Procedure §1010.6* and *California Rules of Court, Rules 2.250 et seq.* All papers in this action shall be electronically filed with the Court unless the party has been specifically excused by the Court from the requirement to electronically file his or her papers.

Parties are hereby ordered to register for electronic filing by completing the Electronic Filing Registration form at:  https://efile1.occourts.org/registration/registration.pdf. Additional electronic filing information is available at:  http://www.occourts.org/complexcivil/eflismat.pdf.

Parties may request Electronic Filing training by calling the Clerk's Office at:  (714) 568-4710 or (714) 568-4711.

All electronically filed papers shall be in Portable Document Format (PDF).  All papers initially captured as a scanned image from a hard-copy format will be scanned at a resolution of between 200 and 400 dpi (dots per inch) and converted to PDF format.  *Documents must be clearly legible.*  A party seeking to electronically file papers in a format other than PDF will have his or her papers rejected for filing as defective.

Hard copies of oversized documents may be filed with the court; provided, a Notice of Filing Oversized Document is filed. An oversized document means a document which is too large to scan and be depicted on a single 8½ inch by 11 inch sheet, or documents that exceed the maximum file size of 10 megabytes. However, documents exceeding 10 megabytes may be broken down and transmitted over multiple electronic submissions.

Electronic service of documents is approved for this litigation in accordance with *Code of Civil Procedure §1010.6(a)(6)* and *California Rules of Court, Rule 2.260.*

For good cause shown, a party may apply to the Court to be excused from the requirement to electronically file his or her papers.  Such an application shall be in writing and may be made by ex parte motion.

Plaintiff is hereby ordered to serve a copy of this order with the summons and complaint.

Date: January 19, 2007

David C. Velasquez
HON. DAVID C. VELASQUEZ
Supervising Judge, Complex Civil Panel

Court Use Only
Form #29

ELECTRONIC FILING ORDER

Code of Civil Procedure 1010.6
California Rule of Court 2.260

# EXHIBIT D

**quinn emanuel** trial lawyers · new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212 849-7000 FAX 212 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7171**

WRITER'S INTERNET ADDRESS
**petercalamari@quinnemanuel.com**

April 12, 2007

**BY HAND AND BY REGISTERED MAIL**

XE–R, LLC
c/o Mark Ross & Co., Inc.
400 Park Avenue, 18th Floor
New York, NY 10022

R 2004, LLC
c/o Mark Ross & Co., Inc.
400 Park Avenue, 18th Floor
New York, NY 10022

Attention:  Mark E. Ross

Re:    **Notice of Default**

Dear Mark:

> We write on behalf of Arche Master Fund, L.P. ("Arche") and refer to (i) the XE–R, LLC Note Purchase Agreement, dated August 23, 2004 (the "Note Purchase Agreement"), among XE–R, LLC ("XE–R" or the "Company") and the note purchasers party thereto (the "Purchasers") and (ii) the XE–R Second Amended and Restated Limited Liability Company Agreement (the "XE–R Agreement"), dated as of December 31, 2004, among R 2004, LLC, as the managing member of the Company and XE Capital Management, LLC ("XE Capital"), as the non–managing member.  Terms used herein without definition shall have the meanings set forth in the Note Purchase Agreement or the XE–R Agreement, as applicable.

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213 443-3000 FAX 213 443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415 875-6600 FAX 415 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650 801-5000 FAX 650 801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858 812-3800 FAX 858 812-3801

As you know, the Note Purchase Agreement expressly governs XE–R's transactions with its affiliates. §10.1. Pursuant to §10.1, XE–R covenants that "so long as any of the Notes are outstanding[,]" it "will not ... enter into directly or indirectly any transaction or group of related transactions ... with any Affiliate ... except for the Services Agreement ... and except in the ordinary course and pursuant to the reasonable requirements of the Company's ... business and upon fair and reasonable terms no less favorable to the Company ... than would be expected to be obtainable in a comparable arm's–length transaction with a Person not an Affiliate."

As you also know, Section 2.2(a)(v)–(vi) of the XE–R Agreement provides that the Company was formed "to broker life settlements of policies and receive compensation related to such brokerage" and to "purchase in–force policies and 'bank' them on a short–term basis to facilitate life settlement of such policies to settlement companies or investment funds." Section 3.6(a)(iv) of the XE–R Agreement therefore provides that "the Company will be the *exclusive means* by which the Managing Member and its Affiliates transact as a wholesaler through other life insurance brokers and intermediaries as to the transactions listed in Section 2.2" (emphasis added). Indeed, you have invoked a comparable exclusivity provision in the XE–R Agreement on behalf of XE–R in a pending litigation against XE Capital and XE L.I.F.E., LLC.

Notwithstanding these covenants in the Note Purchase Agreement and the XE–R Agreement, Arche has learned that you are expending XE–R's capital to refinance premium finance notes secured by life insurance policies in exchange for granting Mark Ross & Co., Inc. the right to broker any future settlement of those policies. *See* Complaint in *Toni Y. Jones et al. vs. Mutual Credit Corporation et al.*, Case No. 07–CC01223 (Cal. Sup. Ct. 2007) (the "MCC Complaint"). Specifically, in the MCC Complaint, you allege that:

> XE–R provided [to the Trust] the funds for the payment [of the principal plus interest on the premium finance loan]. In consideration of its provision of valuation and other services, the Trust agreed to appoint Mark Ross & Co., Inc. as the broker of record in the event that the Trust later decided to sell the Policy on the secondary market through a life settlement, (*id.* ¶ 31);

> Defendants ... knew that there was an existing contract and business relationship between XE–R, Mark Ross & Co., Inc. and the Trust, through which XE–R would help the Trust repay the MCC loan and obtain a release of MCC's collateral assignment. The Trust, through XE–R's refinancing, would be able to maintain ownership of the Policy. In the event that the Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary market using Mark Ross & Co., Inc. as the broker, (*id.* ¶ 50); and

> Defendants ... knew that the Trust intended to repay the MCC loan and obtain a release of MCC's collateral assignment through financing from XE–R ... In the event that the Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary market using Mark Ross & Co., Inc. as the broker, (*id.* at ¶ 54).

2

You are hereby notified that by virtue of the actions admitted above in paragraphs 31, 50, and 54, XE–R is engaged in prohibited transactions with an Affiliate in violation of §10.1 of the Note Purchase Agreement and has thereby triggered an immediate Event of Default under §11(c) of that agreement.

In addition, by extending XE–R funds in exchange for securing business opportunities for Mark Ross & Co., Inc., you are in violation of your covenant to use XE–R as the exclusive vehicle for brokering the life settlements of policies in the secondary market as well as your covenant to act in a good faith and commercially reasonable manner. *See* XE–R Agreement §3.6(a)(iv), §3.6(a)(ii). Your failure to comply with the XE–R Agreement will trigger a separate Event of Default under §11(d) of the Note Purchase Agreement if not cured within thirty days.

Please be advised that based on an Event of Default having occurred under §11(c), Arche, as holder of 100% of the outstanding Notes issued by the Company as of the date hereof, hereby declares all outstanding Notes immediately due and payable under §12.1(b) of the Note Purchase Agreement and demands immediate payment of the total amount due and owing on such Notes. In addition, Arche intends to exercise any and all rights available to it under §12.2 of the Note Purchase Agreement.

Sincerely,

*Peter Calamari*

Peter Calamari

cc:     Harry C. Beatty, Esq. (By facsimile)
        Michael A. Lynn, Esq. (By facsimile)