# Exhibit B

XE–R, LLC

SECOND AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of December 31, 2004

# TABLE OF CONTENTS

**Section**                                                                 **Page**

## ARTICLE I

### DEFINITIONS

## ARTICLE II

### ORGANIZATION, ETC.

| | | |
|---|---|---|
| 2.1 | Continuation, etc. | 5 |
| 2.2 | Purpose and Powers. | 6 |
| 2.3 | Authorized Person | 8 |
| 2.4 | Place of Business | 8 |
| 2.5 | Registered Agent and Office | 8 |
| 2.6 | Fiscal Year | 8 |
| 2.7 | Term | 9 |

## ARTICLE III

### MANAGEMENT; CERTAIN MEMBERS' RIGHTS AND OBLIGATIONS

| | | |
|---|---|---|
| 3.1 | The Managing Member | 9 |
| 3.2 | Reliance by Third Parties | 11 |
| 3.3 | Non-Managing Members | 11 |
| 3.4 | Notice to Members | 11 |
| 3.5 | Key Person Provision | 11 |
| 3.6 | Representations and Warranties; Covenants | 11 |
| 3.7 | Compensation of Officers | 13 |

## ARTICLE IV

### MEMBERSHIP INTERESTS AND WARRANT

| | | |
|---|---|---|
| 4.1 | Classes of Interests | 13 |
| 4.2 | Warrants | 13 |

## ARTICLE V

### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; ALLOCATIONS

| | | |
|---|---|---|
| 5.1 | Capital Contributions | 14 |
| 5.2 | Capital Accounts | 14 |



i

**Section**                                                                                                          **Page**

5.3   Tax Matters.................................................................................................................14

# ARTICLE VI

## SHARING OF DISTRIBUTABLE CASH; DISTRIBUTIONS; WITHHOLDING

6.1   Withdrawal of Capital.................................................................................15
6.2   Distributions...............................................................................................15
6.3   Tax Distributions........................................................................................16
6.4   Tax Withholding.........................................................................................16
6.5   Final Distribution.......................................................................................16
6.6   Overriding Provision...................................................................................16
6.7   Distributions in Kind..................................................................................17

# ARTICLE VII

## LIABILITY, EXCULPATION AND INDEMNIFICATION

7.1   Liability......................................................................................................17
7.2   Exculpation................................................................................................18
7.3   Indemnification..........................................................................................18

# ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO MEMBERS

8.1   Books and Records .....................................................................................20
8.2   United States Federal Income Tax Information............................................20
8.3   Reports to Members....................................................................................21

# ARTICLE IX

## ADMISSION OF ADDITIONAL MEMBERS; TRANSFERS

9.1   Admission of Additional Members...............................................................21
9.2   Transfer by Members..................................................................................21
9.3   Further Actions ..........................................................................................22

# ARTICLE X

## DURATION AND TERMINATION OF THE COMPANY

10.1   Dissolution................................................................................................22
10.2   Distribution Upon Dissolution...................................................................22

ii

**Section**                                                                          **Page**

10.3    Distributions in Cash or in Kind........................................................23
10.4    Termination............................................................................23
10.5    Bankruptcy of a Member ..............................................................24
10.6    Time for Liquidation, etc ..............................................................24

## ARTICLE XI

## SEPARATE LEGAL ENTITY

11.1    Separate Legal Entity..................................................................24

## ARTICLE XII

## MISCELLANEOUS

12.1    Notices ..................................................................................26
12.2    Counterparts............................................................................26
12.3    Table of Contents and Headings......................................................26
12.4    Successors and Assigns................................................................27
12.5    Severability ............................................................................27
12.6    Further Actions ........................................................................27
12.7    Determinations of the Managing Member............................................27
12.8    Non-Waiver............................................................................27
12.9    Intellectual Property...................................................................27
12.10   Governing Law. .......................................................................28
12.11   Waiver of Partition.....................................................................28
12.12   Entire Agreement......................................................................28
12.13   Arbitration..............................................................................28
12.14   Expenses ...............................................................................29
12.15   Provisions Relating to Loans..........................................................29

## ARTICLE XIII

## POWER OF ATTORNEY

13.1    Power of Attorney......................................................................29

Schedule A     Members

Exhibit I       Form of Warrant



21786933v10

This Second Amended and Restated Limited Liability Company Agreement of XE–R, LLC (the "Company") is entered into as of December 31, 2004, among R 2004, LLC, a New York limited liability company, as the managing member of the Company ("R 2004" or the "Managing Member"), XE Capital Management, LLC, a Delaware limited liability company ("XE Capital"), and the Persons listed on Schedule A hereto (as such Schedule may be amended or supplemented from time to time as provided herein), as the other members of the Company (each of XE Capital and such other Persons, a "Non-Managing Member" and collectively, together with the Managing Member, the "Members"), for the purpose of amending and restating the Amended and Restated Limited Liability Company Agreement, dated August 23, 2004, of the Company (the "First Amended Agreement") to provide for the issuance by the Company of certain warrants for the purchase of the Class A Interests in the Company. Certain capitalized terms used herein without definition have the meanings specified in Article I.

In consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I

## DEFINITIONS

"Act" shall mean the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as amended from time to time, and any successor to such statute.

"Affiliate" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.

"Agreement" shall mean this Second Amended and Restated Limited Liability Company Agreement of the Company, as from time to time amended, supplemented or restated.

"Business Day" shall mean any day on which banks are generally open for business in New York, New York.

"Capital Account" shall have the meaning set forth in Section 5.2.

"Capital Contribution" shall mean, with respect to any Member, the aggregate amount of any cash that such Member shall have contributed from time to time to the capital of the Company as provided in Section 5.1 hereof.

"Carrier" shall have the meaning set forth in Section 4.1(b).

21786933v10



"Cause" shall mean (i) a conviction of a felony or the entering of a plea of *nolo contendere* as to a felony that would have a material adverse effect on the business of the Company, (ii) a breach of any law, regulation or rule that would have a material adverse effect on the business of the Company, or (iii) fraud, willful misfeasance or a breach of this Agreement by a Member, which breach either is incurable or, if curable, is not cured within 30 days of written notice thereof given by the Company to such Member and would have a material adverse effect on the business of the Company.

"Certificate" shall have the meaning set forth in Section 2.3.

"Claims" shall have the meaning set forth in Section 7.3(a).

"Class A Interests" shall have the meaning set forth in Section 4.1(a).

"Class A Member" shall mean a Member holding Class A Interests.

"Class B Member" shall mean a Member holding Class B Preferred Interests.

"Class B Preferred Interests" shall have the meaning set forth in Section 4.1(b).

"Class B Preferred Return" shall have the meaning set forth in Section 4.1(b).

"Closing" shall mean the date of this Agreement.

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Company" shall have the meaning set forth in the preamble of this Agreement.

"Covered Person" shall mean each Member and its Affiliates; the Managing Member and its Affiliates; each of the shareholders, officers, directors, employees, partners, members, managers and agents of any Member, the Managing Member and each of their respective Affiliates; any officer, employee or agent of the Company or any of its Affiliates; or any Person who was, at the time of the act or omission in question, such a Person.

"Damages" shall have the meaning set forth in Section 7.3(a).

"Disabling Conduct" shall mean, with respect to any Person, fraud, willful misfeasance, a material violation of this Agreement or any other agreement relating to the business of the Company or any of its Affiliates that, if curable, is not cured within 30 days after a written notice describing such violation has been given to such Person, conviction of a felony or the entering of a plea of *nolo contendere* as to a felony, a breach of law or regulation that would have a material adverse effect on the business of the



2



Company or any of its Affiliates, or reckless disregard of duties in the conduct of such Person's office.

"<u>Distributable Cash</u>" shall mean the excess of the sum of cash receipts (excluding Capital Contributions) of the Company over cash disbursements and additions to reserves of the Company determined by the Managing Member, in its sole discretion, to be available for distribution to the Members.

"<u>First Amended Agreement</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Fiscal Quarter</u>" shall mean for the first Fiscal Quarter, a period beginning on the date of the First Amended Agreement and ending on September 30, 2004, and thereafter, a three-month period ending on December 31, March 31, June 30 or September 30.

"<u>Fiscal Year</u>" shall have the meaning set forth in Section 2.6.

"<u>GAAP</u>" shall mean generally accepted accounting principles as in effect in the United States from time to time.

"<u>Initial Agreement</u>" shall mean that certain Limited Liability Company Agreement of the Company dated August 5, 2004.

"<u>Intellectual Property</u>" shall mean (<u>i</u>) patents and patent applications, (<u>ii</u>) copyrights, trademarks, trade names and service marks, including registrations and applications for registration thereof, (<u>iii</u>) confidential and proprietary information, including trade secrets, data models, technology, and processes, and (<u>iv</u>) other intellectual property rights of any type.

"<u>Interest</u>" shall mean a limited liability company interest in the Company.

"<u>Liabilities</u>" shall mean the liabilities of the Company, including: (<u>i</u>) all bills and accounts payable; (<u>ii</u>) all administrative expenses accrued and unpaid; (<u>iii</u>) all contractual obligations for the payment of money or property, including any amount that the Managing Member has determined is distributable but that has not yet been distributed to the Members; (<u>iv</u>) all reserves authorized or approved by the Managing Member for taxes or contingencies; and (<u>v</u>) all other liabilities of whatsoever kind and nature.

"<u>Liquidating Event</u>" shall mean the earlier of (<u>i</u>) the liquidation date (if any) set forth in the amendment to this Agreement relating to the terms of the Class B Preferred Interests as contemplated by Section 4.1(b), (<u>ii</u>) the commencement of dissolution of the Company in accordance with Article X or (<u>iii</u>) the sale of (or entry into an agreement to sell) substantially all of the Company's assets.

"<u>Loans</u>" shall have the meaning set forth in Section 2.2(a).

3

"Managing Member" shall mean R 2004, LLC in its capacity as a Member of the Company. The Managing Member shall be a "manager" within the meaning of the Act.

"Members" shall mean the members listed on Schedule A from time to time, in their capacities as members of the Company and shall mean the Managing Member and the Non-Managing Members.

"Membership Percentage" with respect to each Class A Member, shall be equal to its percentage holding of the total Class A Interests as set forth on Schedule A as of the date of determination, and with respect to each Class B Member, shall equal zero.

"MRC" shall mean Mark Ross & Co., Inc., a Florida corporation.

"Non-Managing Member" shall mean any Member other than the Managing Member.

"Note Purchase Agreement" shall mean the Note Purchase Agreement, dated as of August 23, 2004, between the Company and a fund sponsored by XE Capital, as from time to time amended, modified or supplemented.

"Person" shall mean any individual or entity, including a corporation, partnership, association, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, government or governmental agency or authority.

"Principals" shall mean Mark E. Ross, Bradley C. Baker and Philip S. Hill.

"Proceeding" shall have the meaning set forth in Section 7.3(a).

"Securities" shall mean shares of capital stock, limited partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities of whatever kind of any Person, whether readily marketable or not.

"Services Agreement" shall mean the Services Agreement, dated as of August 23, 2004, among the Managing Member, MRC and the Company.

"Tax Distribution" shall have the meaning set forth in Section 6.3(b).

"Term" shall have the meaning set forth in Section 2.7.

"Transfer" shall have the meaning set forth in Section 9.2(a).

"Treasury Regulations" shall mean the Regulations of the U.S. Treasury Department issued pursuant to the Code.

4

"Voting Percentage" with respect to each Class A Member, shall be equal to its percentage holding of the total Class A Interests as set forth on Schedule A as of the date of determination of such Voting Percentage, and with respect to each Class B Member, shall equal zero.

"Warrants" shall mean warrants substantially in the form set forth in Exhibit I attached hereto.

"XE Capital" shall mean XE Capital Management, LLC, a Delaware limited liability company.

## ARTICLE II

## ORGANIZATION, ETC.

2.1  Continuation, etc.

(a)  Amendment and Restatement of the First Amended Agreement.  The Members hereby amend and restate the First Amended Agreement in its entirety and agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act.  The rights, duties and obligations of the Members will be as provided in the Act, except as otherwise provided in this Agreement.

(b)  Name.  The name of the Company is "XE–R" or such other name or names as the Managing Member may from time to time designate upon at least 60 days' advance notice to the Non-Managing Members and to which no Non-Managing Member reasonably objects during such 60-day period.  The Company shall have the exclusive right, title and interest in and to the use of the name "XE–R" and any variation thereof, including any name to which the name of the Company is changed, until the termination of the Company.  No value shall be placed upon the name or the goodwill attached thereto for the purpose of determining the value of any Member's Capital Account or interest in the Company.

(c)  Schedule A.  The name and mailing address of, the class or classes of Interest held by, the percentage of each such class of Interest held by, and the Capital Contribution with respect to each holding of any class of Interest made by, each Member shall be listed on Schedule A attached hereto.  Schedule A shall also identify the name and mailing address of each holder of, and the percentage of the Class A Interests covered by, each Warrant then outstanding and unexercised.  The Managing Member shall update Schedule A from time to time as necessary to reflect accurately the information therein including any changes attributable to the exercise of any Warrant and the resulting issuance of Class A Interests.  Any reference in this Agreement to Schedule

5

A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

(d) _Admissions._ Upon the execution of the First Amended Agreement, R 2004 became the Managing Member and a Class A Member and XE Capital became an additional Class A Member of the Company. Additional persons may be admitted as Class A Members upon the exercise of the Warrants in accordance with their terms and the terms of this Agreement. Additional Persons may be admitted as Class B Members of the Company as provided in Article IX at the time that this Agreement or a counterpart of this Agreement is executed by or on behalf of such Person and the Managing Member lists such Person as a Class B Member on Schedule A attached hereto.

2.2 _Purpose and Powers._

(a) The Company is formed for the following purposes: (i) to originate loans collateralized by life insurance policies ("Loans") in exchange for a loan origination fee; (ii) to sell the Loans to investors; (iii) to service the Loans; (iv) to sell newly issued life insurance policies financed through the origination of new Loans and receive sales commissions of such policy sales; (v) to broker life settlements of policies and receive compensation related to such brokerage; (vi) to purchase in-force policies and "bank" them on a short-term basis to facilitate the life settlement of such policies to settlement companies or investment funds; and (vii) to transact the foregoing (except items specified in clauses (ii) and (iii)) with policy owners on a direct basis with MRC and the Company as co-brokers, and as a "wholesaler" for other life insurance brokers and intermediaries through the Company. The Company may engage in such other activities as the Managing Member deems necessary, advisable, convenient or incidental to the achievement of the foregoing.

(b) Subject to any provisions of this Agreement requiring the prior consent or approval of other Members for certain actions, or prior consultations with other Members before taking certain actions, the Company, and the Managing Member on behalf of the Company, shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental, or convenient, for the furtherance of the purposes set forth in Section 2.2(a), including, but not limited to, the power and authority:

(i) to establish, have, maintain or close one or more offices within or outside of the State of Delaware and in connection therewith to rent or acquire office space and to engage personnel;

(ii) to open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, mutual fund and similar accounts;

6

21786933v10

(iii) to hire consultants, custodians, attorneys, accountants and such other agents and employees for the Company as it may deem necessary or advisable, and authorize any such agent or employee to act for and on behalf of the Company;

(iv) to make and perform agreements and undertakings and execute documents as may be necessary or advisable to the carrying out of any of the foregoing powers, objects or purposes;

(v) to acquire, hold, manage, vote, Transfer and own Securities and any other assets held by the Company;

(vi) to set aside funds for reasonable reserves, anticipated contingencies and working capital;

(vii) to indemnify any Person in accordance with the Act and to obtain any and all types of insurance;

(viii) to have and exercise the powers granted to a limited liability company by the Act in any state of the United States that may be necessary, advisable, convenient or incidental to the accomplishment of the purposes of the Company as set forth in Section 2.2(a);

(ix) to invest and reinvest temporarily the Company's funds in (A) short term, interest bearing, investment grade securities, (B) certificates of deposit, (C) money market accounts, or (D) direct or guaranteed obligations of the United States government;

(x) to make and take all elections, filings, investigations, evaluations, decisions and other actions that may be necessary or appropriate for the business of the Company;

(xi) to enter into, deliver and exercise rights and perform obligations in respect of, or to take or omit to take such other actions in connection with, agreements of any kind as may be necessary or advisable to further the purposes of the Company, including without limitation (A) contracts and agreements with Members, officers or employees of the Company and (B) insurance policies and related contracts and agreements;

(xii) to incur and pay debts on behalf of the Company and to pay any taxes for which the Company may be liable;

(xiii) to bring, defend, settle and compromise any Proceeding, and to pay, collect, compromise, or otherwise adjust or settle any and all other claims or



demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

(xiv) to file for and obtain registrations, licenses, or memberships and make other governmental or regulatory filings as may be necessary;

(xv) to collect accounts receivable, income and other payments due to the Company or, to the extent the Managing Member is entitled to do so, to any corporation, partnership, limited liability company or other entity in which the Company has an investment;

(xvi) to administer the financial affairs of the Company, make tax and accounting elections, including an election or elections under Section 754 of the Code, file all required tax returns relating to the Company, pay the liabilities of the Company and distribute the available cash of the Company to the Members; and

(xvii) to carry on any other activities necessary to, in connection with or incidental to any of the foregoing or the business of the Company.

2.3 <u>Authorized Person</u>. Nilima Muttana, as an authorized person within the meaning of the Act, has executed, delivered and filed the Certificate of Formation of the Company (the "<u>Certificate</u>"). As of the date of the First Amended Agreement, her powers as an authorized person ceased and the Managing Member was designated as an authorized person within the meaning of the Act and authorized to execute, deliver and file any and all amendments to and restatements of the Certificate.

2.4 <u>Place of Business</u>. The principal place of business of the Company shall be at c/o R 2004, LLC, 400 Park Avenue, 18th Floor, New York, New York 10022, or such other place or places in the United States as may be designated from time to time by the Managing Member upon 60 days' prior notice to the Members.

2.5 <u>Registered Agent and Office</u>. The registered office of the Company in Delaware shall be located at c/o Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware, and the registered agent at such address shall be The Corporation Trust Company. At any time, the Managing Member may designate another nationally recognized registered agent and/or registered office in the State of Delaware for the Company upon 60 days' notice to all Members.

2.6 <u>Fiscal Year</u>. The fiscal year of the Company (the "<u>Fiscal Year</u>") shall end on the 31st day of December in each year. The Company shall have the same Fiscal Year for income tax and for financial and accounting purposes.

8



2.7 <u>Term</u>. The Company commenced upon the acceptance of the Certificate by the office of the Secretary of State of the State of Delaware and shall continue in existence until dissolved in accordance with Section 10.1 hereof (the "<u>Term</u>"). The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate in the manner required by the Act.

**ARTICLE III**

**MANAGEMENT; CERTAIN MEMBERS' RIGHTS AND OBLIGATIONS**

3.1 <u>The Managing Member</u>.

(a) <u>General</u>. In accordance with Section 18-402 of the Act and except as otherwise provided in this Article III (and, for the avoidance of doubt, the limitations set forth in this Section 3.1), the business and affairs of the Company shall be managed by or under the direction of the Managing Member. Other than rights and powers expressly reserved to the Members, or to a class of Members, by this Agreement and except as provided in this Agreement, the Managing Member shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company and to take all such actions as it deems necessary, appropriate, convenient or incidental to accomplish the purposes of the Company as set forth herein, <u>provided</u> that the Managing Member must at all times act in accordance with the law and in a good faith and commercially reasonable manner.

(b) <u>Restrictions on the Managing Member</u>. The Managing Member shall not: (i) do any act in contravention of any applicable law or regulation, or provision of this Agreement; (ii) misappropriate Company property; or (iii) admit any Person as a Member except as permitted in this Agreement and the Act.

(c) <u>Managing Member as Agent</u>. The Managing Member, to the extent of its powers set forth in this Agreement, is an agent of the Company for the purpose of the Company's business, and the actions of the Managing Member taken in accordance with this Agreement shall bind the Company.

(d) <u>Designation of Officers; Chief Executive Officer</u>. The Managing Member may, but is not required to, appoint one or more officers of the Company. The Managing Member may, in its discretion, delegate to any such officers, as agents, any portion or all of the Managing Member's rights hereunder to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company. As of the date of the First Amended Agreement, the Managing Member designated Mark E. Ross as the Chief Executive Officer of the Company. The Chief Executive Officer shall, at the direction of the Managing Member, be responsible for general management, supervision, direction, and control of the business of the Company. Except as otherwise decided from

9

time to time by the Managing Member, the Chief Executive Officer shall make all decisions as to the day-to-day operations of the Company other than those specifically set forth in Section 3.1(e). Any officer of the Company shall be removed as an officer at the discretion of the Managing Member, except that the Chief Executive Officer may be removed only with the consent of the Class A Members.

(e)  Actions of the Managing Member Requiring Unanimous Consent of the Class A Members.  The following further actions may be taken under this Agreement only with the unanimous consent of the Class A Members:

(i)  to amend the constituent documents of the Company, including this Agreement;

(ii)  to dissolve the Company;

(iii)  to issue, Transfer, redeem or repurchase any Interest in the Company (other than to issue the Class B Preferred Interests as contemplated by Section 4.1(b), the Warrants to XE Capital on the date hereof, the Class A Interests upon the valid exercise of the Warrants, and other than as provided in Section 9.2);

(iv)  to agree with Carriers upon the terms and conditions of the Class B Preferred Interests;

(v)  to amend, change, waive or modify any terms of the Warrants or grant or make any agreement, consent or settlement thereunder or with respect thereto (except as the Company may be contractually bound with respect to the Warrants);

(vi)  to enter into (or to amend or modify the terms of) any transactions, contracts or agreements with the Managing Member or its Affiliates or the Principals or their Affiliates, including, without limitation, the Services Agreement;

(vii)  to admit Class B Members to the Company;

(viii)  to file for bankruptcy with respect to the Company;

(ix)  to amend or renew the Services Agreement; and

(x)  to determine the amount of compensation for any officer of the Company.

(f)  Certain Undertakings of the Managing Member.  The Managing Member undertakes to each Non-Managing Member that the Managing Member will not engage

10

in any other activity other than serving in such capacity, nor will it negotiate with any Person to serve in any comparable capacity.

3.2 <u>Reliance by Third Parties</u>.

(a) Third parties dealing with the Company are entitled to rely exclusively upon the power and authority of the Managing Member as set forth in this Article III.

(b) In no event shall the Managing Member represent to any third party that any Non-Managing Member has any responsibility or liability for the day-to-day operations of the Company.

3.3 <u>Non-Managing Members</u>. Except as otherwise provided herein, no Non-Managing Member shall take part in the management or control of the Company's activities, transact any business in the Company's name or have the power to sign documents for or otherwise bind the Company.

3.4 <u>Notice to Members</u>. The Managing Member shall provide each Member notice upon the occurrence of: (a) the issuance of any license or permit to the Company to conduct business in a jurisdiction outside of the United States; or (b) the commencement of an investigation or lawsuit as to the Company <u>by a regulatory or other governmental agency</u>.

3.5 <u>Key Person Provision</u>. The Company shall acquire keyman life insurance on the Principals on the terms and conditions customary to keyman life insurance policies.

3.6 <u>Representations and Warranties; Covenants</u>.

(a) The Managing Member hereby represents, warrants and covenants as follows:

(i) In managing the Company through the Managing Member, the Principals will at all times act in accordance with applicable law.

(ii) In managing the Company, the Managing Member will at all times act in accordance with applicable law and in a good faith and commercially reasonable manner.

(iii) In managing the Company, the Managing Member will not engage, without the consent of XE Capital, in any activity that would require the Company or any Member to register with the U.S. Securities and Exchange Commission or any other regulatory authority other than in connection with obtaining appropriate licenses and registrations pursuant to Section 3.6(a)(vi).

11

(iv) The Company will be the exclusive means by which the Managing Member and its Affiliates transact as a wholesaler through other life insurance brokers and intermediaries as to the transactions listed in Section 2.2.

(v) The Managing Member commits to provide the Company with participation in its retail (direct) transactions involving premium loans, life settlements and related sales of new life insurance.

(vi) The Managing Member will obtain appropriate licenses and register with regulatory authorities as necessary for the Company to transact its business, including life insurance brokerage, loan transactions and life settlements.

(b) XE Capital hereby represents, warrants and covenants as follows:

(i) The Company will be the exclusive means by which XE Capital and its Affiliates transact in Loans as contemplated by Section 2.2(a); provided that XE Capital may transact in any Loans not originated by the Company with the consent of the Managing Member, which consent shall not be unreasonably withheld.

(ii) XE Capital commits to provide the Company (a) its financial expertise to assist in the development and design of the transactions promoted by the Company, (b) evidence of the capital available to fund the transactions (e.g., loans, life settlements) to assist the Company in promoting the transactions in the marketplace, and (c) funds to complete the transactions.

(iii) A fund sponsored by XE Capital will enter into the Note Purchase Agreement with the Company.

(c) Each Member hereby represents and warrants as follows:

(i) It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance.

(ii) Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

12

21786933v10

(iii) All consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(iv) Its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3.7 <u>Compensation of Officers</u>. No compensation will be paid to any officer of the Company during the Company's first year of operation.

## ARTICLE IV

## MEMBERSHIP INTERESTS AND WARRANT

4.1 <u>Classes of Interests</u>. The Company will have two authorized classes of Interests: Class A Interests and Class B Preferred Interests.

(a) <u>Class A Interests</u>. As of the date hereof, Class A Interests will be held by the Managing Member and XE Capital. Schedule A hereto sets forth the percentage of the total Class A Interests held by each Class A Member.

(b) <u>Class B Preferred Interest</u>. Insurance carriers admitted as additional Members of the Company subsequent to the date hereof pursuant to Article IX (each, a "<u>Carrier</u>") will be issued Class B Preferred Interests and shall become Class B Members. A holder of Class B Preferred Interests shall be entitled to a preferred return with respect to its unreturned Capital Contribution (the "<u>Class B Preferred Return</u>"). The rate of return on and any other terms and conditions of the Class B Preferred Interests, any other provisions applicable to Class B Members, and any related changes to any provision of this Agreement, shall be consented to by each Class A Member, and shall be reflected in an amendment to this Agreement. The Voting Percentage and the Membership Percentage of the Class B Members shall equal zero.

4.2 <u>Warrants</u>. The Company shall issue to XE Capital Warrant(s) for the purchase of Class A Interests in the Company equal to nine (9%) percent of all Class A Interests on a fully-diluted basis after giving effect to such exercise, which shall be exercisable at any time up to and including the fifth anniversary of the original issue date of the Warrant(s) at an aggregate exercise price of $2,850,000 or, if the Warrants are being exercised in part, the exercise price shall be equal to $2,850,000 multiplied by a fraction, the numerator of which is the percentage amount of the Class A Interests to be

13

acquired through such exercise, and the denominator of which is nine percent. The Warrants may be exercised or transferred only on the terms and conditions set forth in the Warrants. Upon the exercise of any of the Warrants, the percentage of total Class A Interests set forth in Schedule A of each of the Managing Member and XE Capital (excluding any Class A Interests acquired by either of them through its exercise of a Warrant) shall be adjusted in proportion to their then-existing percentage of total Class A Interests (excluding any Class A Interests acquired by either of them through its exercise of a Warrant) so that the total percentage of all Class A Interests shall be equal to 100%.

## ARTICLE V

## CAPITAL CONTRIBUTIONS;
## CAPITAL ACCOUNTS; ALLOCATIONS

5.1 <u>Capital Contributions</u>. As of the date hereof, each Member has contributed as its Capital Contribution to the capital of the Company the amounts set forth under "<u>Capital Contributions</u>" opposite such Member's name on Schedule A hereto. The Capital Contribution by each Class A Member for any Class A Interest acquired by it through the exercise of a Warrant shall be the sum of the price paid to the Company for such Warrant (such price to be allocated on a pro rata basis in the case of exercise in part of the Warrants) plus the exercise price paid for such Class A Interest.

5.2 <u>Capital Accounts</u>.

Each Member shall have a capital account ("<u>Capital Account</u>") to which shall be credited the amount of any Capital Contributions made by each such Member pursuant to Section 5.1. A Member's Capital Account shall be increased from time to time by the amount of any additional Capital Contributions to the Company made by such Member and decreased by the amount of any distribution made to such Member. A Member's Capital Account shall be increased from time to time by any items of income or gain allocated to such Member in accordance with Section 5.3 and decreased by the amount of any items of loss or deduction allocated to such Member in accordance with Section 5.3.

5.3 <u>Tax Matters</u>.

(a) Except as otherwise provided herein, income, gains, loss and deduction (and items thereof) of the Company (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Capital Accounts of the Members with respect to each Fiscal Year, in a manner that as closely as possible gives economic effect to the provisions of Articles VI and X and the other relevant provisions of this Agreement.

14

(b) The Managing Member shall equitably allocate tax credits among all Members. Upon request by a Non-Managing Member, the Managing Member shall provide a written explanation of such allocations to all Members.

(c) Each item of income, gain, loss or deduction recognized by the Company shall be allocated among the Members for U.S. federal, state and local income tax purposes in the same manner that each such item is allocated to the Members' Capital Accounts or as otherwise provided herein. Notwithstanding any other provision of this Section 5.3, the Managing Member shall have the power to make such allocations for U.S. federal, state and local income tax purposes as may be necessary to maintain substantial economic effect, or to insure that such allocations are in accordance with the interests of the Members in the Company, in each case within the meaning of the Code and the Treasury Regulations. All matters concerning allocations for U.S. federal, state and local income tax purposes, including accounting procedures, not expressly provided for in this Agreement shall be equitably determined in good faith by the Managing Member. The Managing Member is hereby designated as the tax matters partner of the Company, as provided in the Treasury Regulations pursuant to section 6231 of the Code (and any similar provisions under any other state or local or non-U.S. tax laws). Each Member hereby consents to such designation and agrees that upon the request of the Managing Member it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Managing Member shall not permit the Company to elect, and the Company shall not elect, to be treated as an association taxable as a corporation for U.S. federal, state or local income tax purposes under Treasury Regulations section 301.7701-3(a) or under any corresponding provision of state or local law.

## ARTICLE VI

## SHARING OF DISTRIBUTABLE CASH; DISTRIBUTIONS; WITHHOLDING

6.1 <u>Withdrawal of Capital</u>. Except as otherwise expressly provided in this Article VI or in Article X, no Member shall have the right to withdraw capital from the Company or to receive any distribution of or return on such Member's Capital Contributions.

6.2 <u>Distributions</u>. Except as provided in Section 6.3, and subject to the terms of any Class B Preferred Interests established pursuant to Section 4.1(b) from time to time, any Distributable Cash shall be distributed to the Class A Members *pro rata* in accordance with their Membership Percentages, at such times and in such amounts as deemed appropriate by the Managing Member. For the avoidance of doubt: generally distributions shall be made pursuant to this subsection in accordance with the Membership Percentages in effect at the time that the amount of such distribution is



determined; however, distributions made on or before April 15 of a year may be made in accordance with the Membership Percentages in effect on December 31 of the prior year.

6.3 <u>Tax Distributions</u>. The Company may, at the discretion of the Managing Member, make distributions ("<u>Tax Distributions</u>") to the Class A Members (prior to making any other distribution pursuant to any other provision of this Agreement) in amounts sufficient to enable the Class A Members to discharge their respective United States federal, state and local income tax liabilities arising from the allocations made pursuant to this Agreement. Amounts, if any, distributable pursuant to this Section 6.3 shall be determined by the Managing Member in its reasonable discretion, taking into account the maximum combined United States federal, New York State and New York City tax rates applicable to the Members, and the deductibility of state and local taxes, to the extent allowable. The amount of any Tax Distribution to a Member shall reduce the amount distributable to such Member pursuant to Section 6.2, and shall be deemed to have been distributed to the extent of such reduction pursuant to such applicable Section.

6.4 <u>Tax Withholding</u>. Each Member hereby authorizes the Company to withhold and pay over any withholding or other taxes payable by the Company as a result of such Member's status as a Member. To the extent such tax is paid by the Company but not withheld from a distribution being made to a Member, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time each such withholding is paid by the Company, which payment shall be considered a loan from the Company to such Member. Such loan shall bear interest at the then "applicable federal short-term rate" under the Code, and shall be repayable on demand or, at the election of the Company, discharged out of and deducted from distributions to which such Member would otherwise be entitled. The withholdings referred to in this Section 6.4 shall be made at the maximum statutory rate under applicable laws unless the Company has received an opinion of counsel or other evidence, satisfactory to the Company, that a lower rate is applicable, or that no withholding is applicable. The provisions of this Section 6.4 shall survive the dissolution, winding up and termination of the Company and this Agreement.

6.5 <u>Final Distribution</u>. The final distributions following dissolution of the Company shall be made in accordance with the provisions of Sections 6.2.

6.6 <u>Overriding Provision</u>. Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of available assets of the Company. No distribution shall be made with respect to Class B Preferred Interests or Class A Interests (other than pursuant to Section 6.3) unless all amounts then due and payable with respect to the notes issued pursuant to the Note Purchase Agreement have been made in full. Any distribution by the Company to the Person shown on the Company's records as a Member or to such Member's legal representatives, or to the transferee of such Person's right to receive such distributions as provided herein, shall acquit the Company of any liability to any other Person that may be interested in such

16

distribution by reason of any Transfer of such Person's Interests in the Company for any reason (including a Transfer of such Interests by reason of the death, incompetence, bankruptcy or liquidation of such Person).

6.7  <u>Distributions in Kind</u>

(a)  In the event that a distribution of Securities is made, such Securities shall be deemed to have been sold at their fair market value and the proceeds of such sale shall be deemed to have been distributed in cash to the Members for all purposes of this Agreement.  Distributions of Securities or other property shall be made in proportion to the aggregate amounts that would be distributed to each Member pursuant to Section 6.2, as determined by the Managing Member.  The Managing Member may cause certificates evidencing any Securities to be distributed and to be imprinted with legends as to such restrictions on Transfer as it may determine are necessary or appropriate, including legends as to applicable U.S. federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Member to which Securities are to be distributed, as a condition to such distribution, to agree in writing (i) that such Member will not Transfer such Securities except in compliance with such restrictions and (ii) to such other matters as the Managing Member may determine are necessary or appropriate.

(b)  Prior to making a distribution in-kind, the Managing Member shall inform all Non-Managing Members, and any Non-Managing Members may instruct the Managing Member to retain the Securities which would otherwise have been distributed to such Non-Managing Members and to liquidate them on behalf of such Non-Managing Members.

**ARTICLE VII**

**LIABILITY, EXCULPATION AND INDEMNIFICATION**

7.1  <u>Liability</u>.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company.  Except as otherwise expressly required by law, a Member, in its capacity as such, shall have no liability in excess of (i) its share of any undistributed profits and assets of the Company, (ii) its obligation to make other payments expressly provided for in this Agreement, subject to the terms and conditions herein and (iii) the amount of any distributions wrongfully distributed to it and required by the Act to be returned to the Company.



17

### 7.2 Exculpation.

(a) General. No Covered Person shall be liable to the Company or any Member for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, provided that such act or omission does not constitute Disabling Conduct of such Covered Person. No Member shall be liable to the Company or any Member for any action taken by any other Member. To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, any Covered Person acting under this Agreement shall not be liable to the Company or any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) Reliance. A Covered Person shall incur no liability in acting in good faith upon any signature or writing believed by such Covered Person to be genuine, may rely on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely on an opinion of counsel selected by such Covered Person with respect to legal matters. Each Covered Person may act directly or through such Covered Person's agents or attorneys. Each Covered Person may consult with counsel, appraisers, engineers, accountants and other skilled Persons selected by such Covered Person with reasonable care, and shall not be liable for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons. No Covered Person shall be liable to the Company or any Member for any error of judgment made in good faith by an officer or employee of such Covered Person, provided that such error does not constitute Disabling Conduct of such Covered Person.

(c) Not Liable for Return of Capital Contributions. No Covered Person shall be liable for the return of the Capital Contribution or Capital Account of any Member, and such return shall be made solely from available Company assets, if any, and each Member hereby waives any and all claims it may have against each Covered Person in this regard.

### 7.3 Indemnification.

(a) Indemnification Generally. The Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify, hold harmless and release (and each Member does hereby release) each Covered Person from and against, and shall pay or reimburse each Covered Person for, all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative,

21786933v10

investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the business and affairs of, or activities undertaken in connection with, the Company, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal, and whether or not resulting from third party claims, (all of such Claims and amounts covered by this Section 7.3 are referred to collectively as "Damages"), except to the extent that (i) it shall have been determined ultimately by a court of competent jurisdiction that such Damages arose from Disabling Conduct of such Covered Person; provided, however, that irrespective of such adjudication of liability, such court, in view of all the circumstances, may, upon application, award such indemnity to such Covered Persons as it deems fair, reasonable and proper, or (ii) such Damages arise out of a Claim brought by the Company or an Affiliate of the Company against any Covered Person. Notwithstanding the foregoing, a Covered Person will only be eligible for indemnification pursuant to this Section 7.3 for Claims relating to or arising out of transactions or actions that took place during the time such Covered Person was a shareholder, officer, director, employee, partner, member, manager or agent of any of the Company or its Affiliates. Any termination of a Proceeding by settlement shall require the prior written consent of the Managing Member, and any settlement entered into without such consent shall not be subject to indemnification hereunder. Any termination of a Proceeding by settlement shall require a release or a waiver of all claims against the Company by the parties to such settlement. The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement arose from a material violation of this Agreement by, or the Disabling Conduct of, any Covered Person.

(b) No Direct Member Indemnity. Members shall not be required directly to indemnify any Covered Person.

(c) Expenses, etc. To the fullest extent permitted by law, the reasonable expenses incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Company to such Covered Person prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified hereunder. The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns and legal representatives.



19

(d) <u>Notices of Claims, etc.</u> Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of the commencement of such Proceeding, <u>provided</u> that the failure of any Covered Person to give notice as provided herein shall not relieve the Company of its obligations under this Section 7.3, except to the extent that the Company is actually prejudiced by such failure to give notice. In case any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Company), the Company will be entitled to participate in and to assume the defense thereof to the extent that the Company may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Company to such Covered Person of the Company's election to assume the defense thereof, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Company will not consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Claim.

(e) <u>No Waiver</u>. Nothing contained in this Section 7.3 shall constitute a waiver by any Member of any right that it may have against any party under United States federal or state securities laws.

## ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO MEMBERS

8.1 <u>Books and Records</u>. The Company shall keep or cause to be kept full and accurate accounts of the transactions of the Company in proper books and records of account which shall set forth all information required by the Act. Such books and records shall be maintained on the basis utilized in preparing the Company's United States income tax returns. Each Class A Member shall be entitled to inspect or copy the books and records of the Company at any time during normal business hours at the principal place of business of the Company. Upon the reasonable request of any Class A Member, the Principals shall hold a meeting or conference call open to representatives of all Class A Members and to representatives of each holder of a Warrant at which the performance and prospects of the Company shall be discussed.

8.2 <u>United States Federal Income Tax Information</u>. As soon as reasonably practicable after the end of each Fiscal Year, the Company shall send to each Member copies of federal and reasonable state equivalents of Schedule K-1, "Partner's Share of Income, Credits, Deductions, Etc.", or any successor schedule or form, with respect to such Member.

8.3 <u>Reports to Members</u>. Commencing with the calendar quarter in which the first anniversary of the date of the First Amended Agreement falls, the Company shall provide to each Member reports for each calendar quarter summarizing the Company's performance and prospects within 90 calendar days of the close of such calendar quarter. The Company shall provide to each Member and to each holder of a Warrant financial statements for the Company (audited by an internationally recognized accounting firm) for each Fiscal Year within 120 calendar days of the close of such Fiscal Year. Except as otherwise provided in this Agreement or required by applicable law, the Company shall send to each Class A Member only such other financial reports as such Class A Member may reasonably request pursuant to due notice. The Principals shall be available to discuss the Company's performance and prospects at any time upon the reasonable request of a Class A Member.

## ARTICLE IX

## ADMISSION OF ADDITIONAL MEMBERS; TRANSFERS

9.1 <u>Admission of Additional Members</u>. The Managing Member may from time to time admit one or more Carriers to the Company as Class B Members, subject to the prior written unanimous consent of the Class A Members. Upon its admission as a Class B Member of the Company, a Carrier will be issued Class B Preferred Interests in accordance with Section 4.1(b). Each such Carrier shall be admitted as a Class B Member of the Company at the time such Carrier (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto.

9.2 <u>Transfer by Members</u>.

(a) <u>General</u>. No Member other than the Managing Member may assign, sell, convey, pledge, mortgage, encumber, hypothecate or otherwise transfer in any manner whatsoever ("<u>Transfer</u>") all or any part of its Interest in the Company without the express prior written consent of the Managing Member, which consent will not unreasonably be withheld.

(b) <u>Transfer by Managing Member</u>. The Managing Member may Transfer all or any portion of its Interest in the Company only with the prior unanimous written consent of the Class A Members, <u>provided</u> that following the second anniversary of the date of the First Amended Agreement, the Class A Members will not unreasonably withhold their consent to any Transfer of a Class A Interest by the Managing Member if the opportunity to participate in such Transfer is made available to each Class A Member on equal terms and conditions.

21

(c) <u>Transfers in Violation of Agreement Not Recognized</u>.  No attempted Transfer or substitution shall be recognized by the Company unless effected in accordance with and as permitted by this Agreement.

9.3 <u>Further Actions</u>.  The Members shall cause this Agreement with the unanimous consent of the Class A Members to be amended so as reasonably to reflect the occurrence of any of the transactions referred to in this Article IX as promptly as is practicable after such occurrence.

## ARTICLE X

## DURATION AND TERMINATION OF THE COMPANY

10.1 <u>Dissolution</u>.  There will be a dissolution of the Company, and its affairs shall be wound up, upon the first to occur of any of the following events:

(a)  a decision by the Managing Member to dissolve the Company with the consent of the Members holding 100% of the Voting Percentages;

(b)  the entry of a decree of judicial dissolution pursuant to section 18-802 of the Act;

(c)  a reasonable determination by the Managing Member that the actions of XE Capital constitute Cause, <u>provided</u> that (i) the Managing Member shall previously have <u>notified XE Capital</u> in writing of the alleged Cause in reasonable detail and afforded XE Capital an opportunity to respond to the allegation within five Business Days after receipt of such notice and (ii) a dissolution of the Company pursuant to this Section 10.1(c) shall be at the option of the Managing Member;

(d)  a reasonable determination by XE Capital that the actions of the Managing Member constitute Cause, <u>provided</u> that (i) XE Capital shall previously have notified the Managing Member in writing of the alleged Cause in reasonable detail and afforded the Managing Member an opportunity to respond to the allegation within five Business Days after receipt of such notice and (ii) a dissolution of the Company pursuant to this Section 10.1(d) shall be at the option of XE Capital; or

(e)  the bankruptcy of XE Capital or the Managing Member.

10.2 <u>Distribution Upon Dissolution</u>.  Upon the dissolution of the Company, a duly elected liquidating trustee of the Company or other representative shall proceed, subject to the provisions of this Article X, to liquidate the Company and apply the

21786933v10

proceeds of such liquidation, or in its sole discretion to distribute Company assets, in the following order of priority:

> *First*, to creditors in satisfaction of debts and liabilities of the Company, whether by payment or the making of reasonable provision for payment (other than any loans or advances that may have been made by any of the Members to the Company); to the expenses of liquidation, whether by payment or the making of reasonable provision for payment; and to the establishment of any other reasonable reserves (which may be funded by a liquidating trust) in amounts deemed by the Managing Member (or any duly elected liquidating trustee or other duly designated representative) to be reasonably necessary for the payment of the Company expenses, liabilities and other obligations (whether fixed or contingent or conditional or unmatured);

> *Second*, to the Members in satisfaction of any loans or advances that may have been made by any of the Members to the Company, whether by payment or the making of reasonable provision for payment; and

> *Third*, to the Members in accordance with Article VI and Section 12.9.

10.3  <u>Distributions in Cash or in Kind</u>.

(a)  Upon the dissolution of the Company, the liquidating trustee or other duly designated representative shall use all commercially reasonable efforts to liquidate all of the Company assets in an orderly manner and apply the proceeds of such liquidation as set forth in Section 10.2, <u>provided</u> that if in the good faith judgment of such liquidating trustee or other representative a Company asset should not be liquidated, such liquidating trustee or other representative shall allocate (determined, on the basis of the value (determined in the good faith judgment of the Managing Member) of any Company assets not sold or otherwise disposed of, any unrealized gain or loss based on such value to the Members' Capital Accounts as though the assets in question had been sold on the date of distribution and, after giving effect to any such adjustment, distribute said assets in accordance with Section 10.2, subject to the priorities set forth in Section 10.2, and <u>provided</u>, <u>further</u>, that such liquidating trustee or other representative will in good faith attempt to liquidate sufficient Company assets to satisfy in cash (or make reasonable provision for) the debts and liabilities referred to in paragraphs *First* and *Second* of Section 10.2.

(b)  Any distributions in-kind upon dissolution shall be subject to the same procedures as set forth in Section 6.7(b) in the case of distributions while the Company is operating.

10.4  <u>Termination</u>.  Upon completion of the foregoing, the Managing Member (or any duly elected liquidating trustee or other duly designated representative) shall execute,

acknowledge and cause to be filed a certificate of cancellation of the Certificate with the Secretary of State of the State of Delaware.

10.5 <u>Bankruptcy of a Member</u>. Upon the bankruptcy (as defined in section 18-101(1) of the Act) of a Member (other than XE Capital or the Managing Member) the business of the Company shall continue without dissolution.

10.6 <u>Time for Liquidation, etc</u>. A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Managing Member to seek to minimize potential losses upon such liquidation. The provisions of this Agreement shall remain in full force and effect during the period of winding up and until the filing of a certificate of cancellation of the Certificate with the Secretary of State of the State of Delaware.

## ARTICLE XI

## SEPARATE LEGAL ENTITY

11.1 <u>Separate Legal Entity</u>. The Company shall be operated in such a manner that it would not be substantively consolidated in the estate of any Person in the event of a bankruptcy or insolvency of such Person and in such regard, the Company shall:

(a) not engage in any business unrelated to the purposes described in Section 2.2;

(b) not have any assets other than for the purposes described in Section 2.2;

(c) remain solvent, which shall mean the ability to pay its debts and liabilities from its assets and available credit as such debts and liabilities shall become due, and maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(d) observe all limited liability company formalities;

(e) comply with all of the terms and provisions contained in this Agreement and any other constituent documents;

(f) correct any known misunderstanding regarding its separate identity;

(g) not become involved in the day-to-day management of any other Person;

(h) not identify any Member, or any Affiliate of any of them, as a division or part of it, and not identify itself as a division of any other Person;

24

21786933v10

(i) not enter into or be a party to any transaction with any Member or Affiliate thereof except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (ii) in connection with the Services Agreement and the Note Purchase Agreement;

(j) not engage in transactions with any other Person except as expressly set forth herein, the Services Agreement and the Note Purchase Agreement and matters necessarily incident thereto;

(k) maintain its bank accounts, books, records, resolutions and agreements separate from any other Person and file its own tax returns;

(l) maintain its financial statements, accounting records and other entity documents separate from any other Person and not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP;

(m) hold its assets in its own name;

(n) not commingle its assets with those of any other Person, and maintain its assets in such a manner as will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(o) not participate in any cash management system with any other Person and maintain its own deposit account or accounts, separate from those of any Member or Affiliate, with commercial banking institutions other than as provided in the Security Documents referred to in the Note Purchase Agreement;

(p) conduct its business in its own name, except for services rendered under the Services Agreement, so long as each of the Managing Member or Mark Ross & Co., Inc., as appropriate, hold itself out as an agent of the Company;

(q) use only its own stationery, invoices, and checks that bear its own name and not the name of any other entity unless such entity is clearly designated as being the Company's agent and conduct all business correspondence of the Company and other communication in the Company's own name, in its own stationery, through a separately listed telephone number and through its own authorized officers and/or agents;

(r) at all times maintain and conduct its business from an office or offices separate and apart from those of any Member, provided to the extent that such office or offices are located within the office or offices of any Member, the Company shall pay fair market rent and its fair share of any overhead costs with respect to such office or offices, or as otherwise provided in the Services Agreement;

(s)  except as contemplated in the Services Agreement, pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and maintain a sufficient number of employees (which employees need not be full-time employees) or independent contractors in light of its contemplated business operations;

(t)  not pay, assume or guarantee from its assets any obligations, liabilities or indebtedness of any Member or any other Person or hold itself or its credit out as being available to satisfy the obligations of any Member or any other Person;

(u)  not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(v)  not acquire obligations or securities of any Member or any Affiliate thereof or, except as otherwise provided in the Note Purchase Agreement, pledge its assets for the benefit of any other Person; and

(w)  not have any of its obligations guaranteed by any Member or Affiliate thereof.

## ARTICLE XII

## MISCELLANEOUS

12.1  Notices.  All notices, requests, demands and other communications relating to this Agreement shall be in writing and shall be deemed to have been duly given if delivered or mailed, registered mail, first-class postage paid, if to the Members, at the addresses set forth on Schedule A hereto or to such other address as any Member shall have last designated by notice to the Company, and if to the Company, at its principal office.  Any notice to a Member shall be effective only if and when received by such Member and any notice to the Company shall be effective only if and when received by the Managing Member.

12.2  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original and together shall constitute a single agreement.

12.3  Table of Contents and Headings.  The table of contents and the headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

26

12.4  <u>Successors and Assigns</u>.  Except as otherwise specifically provided herein, this Agreement shall be binding upon and inure to the benefit of the Members and their legal representatives, successors, heirs and permitted assigns.

12.5  <u>Severability</u>.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

12.6  <u>Further Actions</u>.  Each Member shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the Company in connection with the achievement of the purposes of the Company or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the Managing Member determines to be necessary or appropriate to form, qualify or continue the Company as a limited liability company in all jurisdictions in which the Company conducts or plans to conduct its investment and other activities and all such agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Company.

12.7  <u>Determinations of the Managing Member</u>.  Unless otherwise specified in this Agreement, any determination, decision, consent, vote or judgment of, or exercise of discretion by, or action taken or omitted to be taken by, the Managing Member under this Agreement shall be made, given, exercised, taken or omitted as the Managing Member shall determine in its sole and absolute discretion.  In connection with the foregoing, the Managing Member shall be entitled to consider only such interests and factors as the Managing Member deems appropriate, including the Managing Member's own interests, and shall act in good faith.

12.8  <u>Non-Waiver</u>.  No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

12.9  <u>Intellectual Property</u>.  Each of the Members hereby agrees that the Company shall have exclusive right, title and interest in and to all Intellectual Property developed at the expense of or in connection with the business of the Company and that any other Person using such Intellectual Property shall pay commercially reasonable licensing fees to the Company for use thereof.  Upon the dissolution of the Company, each Class A Member other than the Managing Member shall receive a perpetual, non-transferable (except to its Affiliates at the time of the dissolution) royalty-free license to the use of all such Intellectual Property, and the Managing Member shall receive all right, title and interest in and to such Intellectual Property, subject to such licenses. The respective

27

values of such licenses and such right, title and interest shall be taken into account in the final distribution of the assets of the Company in accordance with Article VI hereof. Intellectual Property owned by the Managing Member, a Non-Managing Member or their respective Affiliates but used in the business of the Company shall remain the property of the Managing Member, a Non-Managing Member or their respective Affiliates, as the case may be, irrespective of whether such Intellectual Property relates to one or more activities of the Company or is used in the business of the Company.

12.10 <u>Governing Law</u>.

(a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.

(b) Interests in the Company and the Warrants are securities governed by Article 8 of the Uniform Commercial Code, as provided for by Section 8-103(c) of the Uniform Commercial Code.

12.11 <u>Waiver of Partition</u>. Except as may be otherwise provided by law in connection with the dissolution, winding up and liquidation of the Company, each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's property.

12.12 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof and supersedes any prior agreement or understanding among them with respect to such subject matter.

12.13 <u>Arbitration</u>. Each of the parties hereto agrees that any dispute, controversy or claim arising out of or related to this Agreement, or any transactions contemplated herein, including, without limitation, whether such controversy or claim is subject to arbitration, shall be finally resolved by binding arbitration held in New York, New York, in accordance with the domestic arbitration rules of the American Arbitration Association, except as may be modified by this Section 12.13 or by mutual agreement of the parties to such dispute, claim or controversy. Arbitration proceedings shall be conducted by a panel of three persons selected as follows: the party or parties initiating arbitration shall select one arbitrator and the other party or parties shall select a second arbitrator. The two arbitrators so selected shall select a third arbitrator as soon as possible. Each party shall provide prompt written notice of the arbitrator selected by it in accordance with the terms of this Agreement. No arbitrator shall have or previously have had any significant relationship with any of the parties. Notwithstanding Section 12.10, the arbitration and this clause shall be governed by Title 9 (Arbitration) of the United States Code.

28

12.14 <u>Expenses</u>. Upon Closing, the Company shall reimburse all expenses (including legal, accounting and applicable licensing fees) incurred by the Members in connection with the organization and formation of the Company and the transactions contemplated by the Note Purchase Agreement prior to the date hereof; <u>provided</u> that, the Company will not reimburse (i) the Managing Member for such fees and expenses to the extent such fees and expenses were incurred internally by the Managing Member and (ii) any Member to the extent any fees and expenses incurred by such Member are specific to such Member's Interest in the Company.

12.15 <u>Provisions Relating to Loans</u>. The Managing Member will promptly deliver to XE Capital a notice containing information relating to the terms and conditions of any portfolio of Loans originated by the Company that the Company expects to market. Subject to the last sentence of this Section, XE Capital or any of its Affiliates will have 5 Business Days from the date such notice is received in which to notify the Managing Member whether XE Capital or any of its Affiliates has elected to purchase such Loan portfolio. If, and only if, XE Capital or any of its Affiliates does not elect to purchase such Loan portfolio during such period, the Managing Member may take such actions with respect to such Loan portfolio as it deems appropriate pursuant to this Agreement (including, without limitation, selling such Loan portfolio to investors). The right of XE Capital or any of its Affiliates to purchase Loans pursuant to this Section 12.5 is limited to 50% of the aggregate value of the Loans originated by the Company, <u>provided</u> that the Company will use reasonable efforts to structure Loan portfolio sales to permit XE Capital or its Affiliates to participate in the purchase of a Loan portfolio if the purchase by XE Capital or one or more of its Affiliates of the entire Loan portfolio would cause such limit to be exceeded.

## ARTICLE XIII

## POWER OF ATTORNEY

13.1 <u>Power of Attorney</u>. Each Member hereby constitutes and appoints the Managing Member as such Member's true and lawful representative and attorney-in-fact (the "<u>Attorney-in-Fact</u>") in such Member's name, place and stead to make, execute, acknowledge, record and file the following:

(a) any amendment to the Certificate which may be required by the laws of the State of Delaware because of:

(i) any duly made amendment to this Agreement, or

(ii) any change in the information contained in such Certificate, or any amendment thereto;

(b)  any other certificate or instrument which may be required to be filed by the Company under the laws of the State of Delaware or under the applicable laws of any other jurisdiction in which counsel to the Company determines that it is advisable to file;

(c)  any certificate or other instrument which the Attorney-in-Fact deems necessary or desirable to effect a termination and dissolution of the Company which is authorized under this Agreement;

(d)  any amendments to this Agreement, duly adopted in accordance with the terms of this Agreement; and

(e)  any other instruments that the Attorney-in-Fact may deem necessary or desirable to carry out fully the provisions of this Agreement; provided, however, that any action taken pursuant to this power shall not, in any way, increase the liability of the Members beyond the liability expressly set forth in this Agreement, and provided further that where action by consent of the Members is required, such consent shall have been obtained.

Such Attorney-in-Fact is not by the provisions of this Section 13.1 granted any authority on behalf of the undersigned to amend this Agreement, except as provided for in this Agreement.  Such power of attorney is coupled with an interest and shall continue in full force and effect notwithstanding the subsequent bankruptcy or dissolution of the Member granting such power of attorney.

IN WITNESS WHEREOF, the undersigned have duly executed this Second Amended and Restated Limited Liability Company Agreement of XE–R, LLC as of the day and year first above written.

**MANAGING MEMBER:**

R 2004, LLC

By: _____

Name:  Mark E. Ross
Title:  Manager

**MEMBER:**

XE CAPITAL MANAGEMENT, LLC

By: _____

Name:  Terry Leighton
Title:  Managing Director

## CLASS A INTERESTS

### Managing Member

| Member Name | Capital Contribution | Percentage of Total Class A Interests |
|---|---|---|
| R 2004, LLC c/o Mark Ross & Co., Inc. 400 Park Avenue, 18th Floor New York, New York 10022 | $500,000 | 55.56% |

### Non-Managing Members

| Member Name | Capital Contribution | Percentage of Total Class A Interests |
|---|---|---|
| XE Capital Management, LLC 24 West 40 Street, 3rd Floor New York, New York 10018 | $400,000 | 44.44% |

| | | |
|---|---|---|
| TOTAL Class A: | $900,000 | 100% |

## CLASS B PREFERRED INTERESTS

| Member Name | Capital Contribution | Percentage of Total Class B Interests |
|---|---|---|
| | | |

| | | |
|---|---|---|
| TOTAL Class B: | | 100% |

## WARRANT HOLDERS

| Holder Name | Original Purchase Price | Percentage of Class A Interest Purchasable under Warrant |
|---|---|---|
| XE Capital Management, LLC 24 West 40 Street, 3rd Floor New York, New York 10018 | $25,000 | 9% |

33

Warrant