# Exhibit C

XE-R, LLC

$2,850,000

15% Senior Notes due August 21, 2009

## NOTE PURCHASE AGREEMENT

Dated August 23, 2004

## TABLE OF CONTENTS

Section

Page

Section 1.      Authorization of Notes......................................................................1

Section 2.      Sale and Purchase of Notes..............................................................1

Section 3.      Closing.-.........................................................................................1

Section 4.      Conditions to Closing. ....................................................................2

    Section 4.1.    Representations and Warranties....................................2
    Section 4.2.    Performance; No Default. ............................................2
    Section 4.3.    Compliance Certificate. ..............................................2
    Section 4.4.    Other Agreements..........................................................2
    Section 4.5.    Good Standing. ............................................................2
    Section 4.6.    Proceedings and Documents. ......................................3

Section 5.      Representations and Warranties of the Company. ..........................3

    Section 5.1.    Organization; Power and Authority. ..........................3
    Section 5.2.    Authorization, etc.......................................................3
    Section 5.3.    Disclosure. ................................................................3
    Section 5.4.    Subsidiaries................................................................4
    Section 5.5.    Liabilities. ................................................................4
    Section 5.6.    Compliance with Laws, Other Instruments, etc.........4
    Section 5.7.    Governmental Authorizations, etc. ...........................4
    Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders...........5
    Section 5.9.    Taxes.........................................................................5
    Section 5.10.   Title to Property...........................................................5
    Section 5.11.   Licenses, Permits, etc..................................................5
    Section 5.12.   Compliance with ERISA..............................................5
    Section 5.13.   Private Offering by the Company. ..............................6
    Section 5.14.   Use of Proceeds; Margin Regulations.........................6
    Section 5.15.   Foreign Assets Control Regulations, etc.....................6
    Section 5.16.   Investment Company. ................................................7

Section 6.      Representations of the Purchaser ....................................................7

    Section 6.1.    Purchase for Investment..............................................7
    Section 6.2.    Source of Funds. ........................................................7
    Section 6.3.    No Violation, etc.........................................................9

Section 7.      Information as to Company. ...........................................................9

    Section 7.1.    Financial and Business Information.............................9
    Section 7.2.    Inspection...................................................................10

i

Section 8.    Payment and Prepayment of the Notes.. ......................................11

    Section 8.1.    Maturity; Prepayment. .............................................11
    Section 8.2.    Purchase of Notes. ...............................................11

Section 9.    Affirmative Covenants. ...........................................................11

    Section 9.1.    Compliance with Law. ..........................................11
    Section 9.2.    Insurance. ............................................................11
    Section 9.3.    Maintenance of Properties. ...................................12
    Section 9.4.    Payment of Taxes and Claims. ..............................12
    Section 9.5.    Existence, etc. ......................................................12
    Section 9.6.    Books and Records. ..............................................12
    Section 9.7.    Separate Existence. ..............................................13

Section 10.    Negative Covenants ..............................................................14

    Section 10.1.    Transactions with Affiliates. ...............................14
    Section 10.2.    Merger, Consolidation, etc. .................................14
    Section 10.3.    Line of Business. ................................................14
    Section 10.4.    [Intentionally Omitted.] ......................................15
    Section 10.5.    Compliance with ERISA. ....................................15
    Section 10.6.    Compliance with Board Regulations. ...................15
    Section 10.7.    Indebtedness. .....................................................15
    Section 10.8.    Limitation on Modification of Constituent Documents and
                  Certain Other Agreements. ..................................15

Section 11.    Events of Default. ...............................................................15

Section 12.    Remedies on Default, Etc. ....................................................17

    Section 12.1.    Acceleration.. ....................................................17
    Section 12.2.    Other Remedies. .................................................18
    Section 12.3.    Rescission. ........................................................18
    Section 12.4.    No Waivers or Election of Remedies, Expenses, etc. ........18

Section 13.    Registration; Exchange; Substitution of Notes. .......................19

    Section 13.1.    Registration of Notes. .........................................19
    Section 13.2.    Transfer and Exchange of Notes. ..........................19
    Section 13.3.    Replacement of Notes. ........................................20

Section 14.    Payments on Notes. .............................................................20

    Section 14.1.    Place of Payment. ..............................................20

ii

Section 14.2.    Home Office Payment................................................................20

Section 15.    Expenses, etc. .......................................................................................21

Section 15.1.    Transaction Expenses.............................................................21
Section 15.2.    Survival...................................................................................21

Section 16.    Survival of Representations and Warranties; Entire Agreement. ..............21

Section 17.    Amendment and Waiver. ......................................................................21

Section 17.1.    Requirements. .......................................................................21
Section 17.2.    Solicitation of Holders of Notes. ..........................................22
Section 17.3.    Binding Effect, etc. ...............................................................22
Section 17.4.    Notes held by Company, etc.................................................23

Section 18.    Notices. ................................................................................................23

Section 19.    Reproduction of Documents. ................................................................24

Section 20.    Confidential Information. .....................................................................24

Section 21.    Substitution of Purchaser. ....................................................................25

Section 22.    Miscellaneous. .....................................................................................26

Section 22.1.    Successors and Assigns..........................................................26
Section 22.2.    Payments Due on Non-Business Days....................................26
Section 22.3.    Accounting Terms...................................................................26
Section 22.4.    Severability. ...........................................................................26
Section 22.5.    Construction, etc. ...................................................................26
Section 22.6.    Counterparts............................................................................27
Section 22.7.    Governing Law. ......................................................................27
Section 22.8.    Jurisdiction and Process; Waiver of Jury Trial. .....................27

SCHEDULE A    –    INFORMATION RELATING TO PURCHASERS

SCHEDULE B    –    DEFINED TERMS

EXHIBIT 1    –    Form of 15% Senior Note due August 21, 2009

XE-R, LLC
c/o Mark Ross & Co., Inc.
400 Park Avenue, 18th Floor
New York, NY 10022

15% Senior Notes due August 21, 2009

August 23, 2004

TO THE PURCHASERS LISTED IN
SCHEDULE A HERETO:

Ladies and Gentlemen:

XE-R, LLC, a Delaware limited liability company (the **"Company"**), agrees with each of the purchasers whose names appear at the end hereof (each, a **"Purchaser"** and, collectively, the **"Purchasers"**) as follows:

## Section 1. AUTHORIZATION OF NOTES.

The Company will authorize the issuance and sale of $2,850,000 aggregate principal amount of its 15% Senior Notes due August 21, 2009 (the **"Notes"**, such term to include any such notes issued in substitution therefor pursuant to Section 13). The Notes shall be substantially in the form set out in Exhibit 1. Certain capitalized and other terms used in this Agreement are defined in Schedule B; and references to a **"Schedule"** or an **"Exhibit"** are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.

## Section 2. SALE AND PURCHASE OF NOTES.

Subject to the terms and conditions of this Agreement, the Company will issue and sell to each Purchaser and each Purchaser will purchase from the Company, at the Closing provided for in Section 3, Notes in the principal amount specified opposite such Purchaser's name in Schedule A at the purchase price of 100% of the principal amount thereof. The Purchasers' obligations hereunder are several and not joint obligations; and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.

## Section 3. CLOSING.

The sale and purchase of the Notes to be purchased by each Purchaser shall occur at such location and time as may be agreed upon by the Company and the Purchasers (the **"Closing"**), <u>provided</u> that the Closing shall occur no later than Friday,

August 27, 2004. At the Closing the Company will deliver to each Purchaser the Note to be purchased by such Purchaser in the form of a single Note dated the date of the Closing and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser to the Company or its order of immediately available funds in the amount of the purchase price therefor by wire transfer of immediately available funds for the account of the Company to account number 469502643865 at JPMorgan Chase Bank, 410 Park Avenue, New York, New York 10022, ABA Number 021000021. If at the Closing the Company shall fail to tender such Notes to any Purchaser as provided above in this Section 3, or any of the conditions specified in Section 4 shall not have been fulfilled to such Purchaser's satisfaction, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may have by reason of such failure or such nonfulfillment.

## Section 4. CONDITIONS TO CLOSING.

Each Purchaser's obligation to purchase and pay for the Notes to be sold to such Purchaser at the Closing is subject to the fulfillment to such Purchaser's satisfaction, prior to or at the Closing, of the following conditions:

### Section 4.1.    Representations and Warranties.

The representations and warranties of the Company in this Agreement shall be correct when made and at the time of the Closing.

### Section 4.2.    Performance; No Default.

The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing and after giving effect to the issue and sale of the Notes (and the application of the proceeds thereof as contemplated by Section 5.14) no Default or Event of Default shall have occurred and be continuing.

### Section 4.3.    Compliance Certificate.

The Company shall have delivered to such Purchaser an Officer's Certificate, dated the date of the Closing, certifying that the conditions specified in Sections 4.1, and 4.2 have been fulfilled, and as to the limited liability company proceedings relating to the authorization, execution and delivery of the Notes, this Agreement and the other Transaction Documents.

### Section 4.4.    Other Agreements.

Each of the LLC Agreement and the Services Agreement (together with this Agreement and the Notes, the "**Transaction Documents**") has been duly executed

2

and delivered by the parties thereto, in each case, in form and substance satisfactory to each Purchaser and is in full force and effect. Each of the conditions precedent to the effectiveness of each of the Transaction Documents as set forth therein shall have been satisfied or waived.

### Section 4.5.    Good Standing.

A certificate of the Secretary of State of the State of Delaware, dated a date not earlier than ten Business Days prior to the Closing Date, as to the good standing of the Company.

### Section 4.6.    Proceedings and Documents.

All limited liability company and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to such Purchaser and its special counsel, and such Purchaser and its special counsel shall have received all such counterpart originals or certified or other copies of such documents as such Purchaser or such special counsel may reasonably request.

## Section 5. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each Purchaser that:

### Section 5.1.    Organization; Power and Authority.

The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware, and is duly qualified as a foreign company and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company has the power and authority and legal right to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver this Agreement, the Notes and the other Transaction Documents and to perform the provisions hereof and thereof.

### Section 5.2.    Authorization, etc.

This Agreement, the Notes and the other Transaction Documents have been duly authorized by all necessary limited liability company action on the part of the Company, and each Transaction Document (other than the Notes) constitutes, and upon execution and delivery thereof each Note will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its

3

terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.3.    **Disclosure.**

All information provided with respect to the Company and its Affiliates delivered to each Purchaser by or on behalf of the Company and its Affiliates for purposes of or in connection with this Agreement or any other Transaction Document, or the transactions contemplated hereby and thereby, including, without limitation, any financial statements of the Company, was, on or as of the applicable date of provision thereof, true, complete and correct in all material respects and did not contain any untrue statement of a material fact or omit to state any fact necessary to make the statements therein taken as a whole, in light of the time and circumstances under which they were made, not misleading.

Section 5.4.    **Subsidiaries.**

The Company has no Subsidiaries.

Section 5.5.    **Liabilities.**

The Company is newly formed and has no liabilities other than organizational costs and costs contemplated by or incurred under the Transaction Documents.

Section 5.6.    **Compliance with Laws, Other Instruments, etc.**

The execution, delivery and performance by the Company of the Transaction Documents will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien in respect of any property of the Company under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, certificate of incorporation or by-laws, or any other agreement or instrument to which the Company is bound or by which the Company or any of its properties may be bound or affected, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to the Company or (iii) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company.

4

**Section 5.7.    Governmental Authorizations, etc.**

No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Company of the Transaction Documents.

**Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders.**

(a) There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Company or any property of the Company in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b) The Company is not in default under any term of any agreement or instrument to which it is a party or by which it is bound, or any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority, which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**Section 5.9.    Taxes.**

The Company is newly formed and has not been required to file tax returns in any jurisdiction.  No taxes or assessments have been levied upon it or its properties, assets, income or franchises.

**Section 5.10.  Title to Property.**

The Company is newly formed and has no properties or assets other than the proceeds of the Notes, the capital contributed by its members and the rights under the Transaction Documents and agreements contemplated thereby.

**Section 5.11.  Licenses, Permits, etc.**

The business activities of the Company will not require access to licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, other than as available to the Company under the Services Agreement or as are available to the Company on usual terms.

21779630v8

### Section 5.12.  Compliance with ERISA

The Company has no liability under Title IV of ERISA or Section 4975 of the Code.  No ERISA Affiliate of the Company has any liability under Title IV of ERISA or Section 4975 of the Code that would have a Material Adverse Effect on the Company.

### Section 5.13.  Private Offering by the Company.

Neither the Company nor anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Purchasers, each of which has been offered the Notes at a private sale for investment. Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

### Section 5.14.  Use of Proceeds; Margin Regulations.

The Company will apply the proceeds of the sale of the Notes to general limited liability company purposes.  No proceeds of any Note will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock.  The Company is not a "United States person" or a "foreign person controlled by a United States person" within the meaning of Regulation X and the Company is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

### Section 5.15.  Foreign Assets Control Regulations, etc.

(a) Neither the sale of the Notes by the Company hereunder nor its use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b) The Company (i) is not, and will not become, a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (ii) does not engage, and will not engage in any dealings or transactions, or is or will be otherwise associated, with any such Person.  The Company is in compliance, in all material respects, with the USA Patriot Act.

(c) No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for any payments to any governmental official or employee,

6

political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Company.

### Section 5.16.  Investment Company.

The Company is not an "investment company," or a Person "controlled by" an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act.

## Section 6.  REPRESENTATIONS OF THE PURCHASER

### Section 6.1.  Purchase for Investment.

Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of such Purchaser's or their property shall at all times be within such Purchaser's or their control.  Each Purchaser understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

### Section 6.2.  Source of Funds.

Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "**Source**") to be used by such Purchaser to pay the purchase price of the Notes to be purchased by such Purchaser hereunder:

(a)    the Source is an "insurance company general account" (as the term is defined in the United States Department of Labor's Prohibited Transaction Exemption ("**PTE**") 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the National Association of Insurance Commissioners (the "**NAIC Annual Statement**")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed 10% of the total reserves and liabilities of the general account (exclusive of

7

separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(b)      the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(c)      the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 and, except as disclosed by such Purchaser to the Company in writing pursuant to this clause (c), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(d)      the Source constitutes assets of an "investment fund" (within the meaning of Part V of PTE 84-14 (the **"QPAM Exemption"**) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Company and (i) the identity of such QPAM and (ii) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Company in writing pursuant to this clause (d); or

(e)      the Source constitutes assets of a "plan(s)" (within the meaning of Section IV of PTE 96-23 (the **"INHAM Exemption"**)) managed by an "in-house assets manager" or "INHAM" (within the meaning of Part IV of the INHAM exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Section IV(d) of the INHAM exemption) owns a 5% or more interest in the Company and (i) the identity of such INHAM and (ii) the names(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Company in writing pursuant to this clause (e); or

(f)      the Source is a governmental plan; or

8

(g)     the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Company in writing pursuant to this clause (g); or

(h)     the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this Section 6.2, the terms **"employee benefit plan"**, **"governmental plan"**, and **"separate account"** shall have the respective meanings assigned to such terms in section 3 of ERISA.

### Section 6.3.    No Violation, etc.

The execution, delivery and performance by each Purchaser of this Agreement will not violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to such Purchaser, or any contract or agreement binding upon such Purchaser or its property.

## Section 7. INFORMATION AS TO COMPANY.

### Section 7.1.    Financial and Business Information.

The Company shall deliver to each Purchaser:

(a)     <u>Quarterly Statements</u> -- commencing with the calendar quarter in which the first anniversary of the date hereof falls, reports for each calendar quarter summarizing the Company's performance and prospects within 90 calendar days of the close of such calendar quarter;

(b)     <u>Annual Statements</u> -- financial statements for the Company (audited by an internationally recognized accounting firm) for each fiscal year of the Company within 120 calendar days of the close of such fiscal year;

(c)     <u>Other Reports</u> -- promptly upon their becoming available, one copy of each financial statement, report or notice sent by the Company or any Subsidiary to its principal bank lenders or to any other holder of indebtedness for money borrowed of the Company or any Subsidiaries (excluding information sent to such lenders or holders in the ordinary course of administration of a loan facility including information relating to determination of interest rate or borrowing availability);

(d)     <u>Notice of Default or Event of Default</u> -- promptly, and in any event within five days after a Responsible Person becoming aware of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11(f),

9

a written notice specifying the nature and period of existence thereof and what action the Company is taking or proposes to take with respect thereto;

      (e)    <u>Notices from Governmental Authority</u> -- promptly, and in any event within 30 days of receipt thereof, copies of any notice to the Company or any Subsidiary from any federal or state Governmental Authority relating to any order, ruling, statute or other law or regulation that could reasonably be expected to have a Material Adverse Effect; and

      (f)    <u>Requested Information</u> -- with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Company or any of its Subsidiaries or relating to the ability of the Company to perform its obligations hereunder and under the Notes as from time to time may be reasonably requested by any such holder of Notes.

**Section 7.2.**    **Inspection.**

The Company shall permit the representatives of each Purchaser:

      (a)    <u>No Default</u> -- if no Default or Event of Default then exists, at the expense of such holder and upon reasonable prior notice to the Company, to visit the principal executive office of the Company, to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the Company's officers, and (with the consent of the Company, which consent will not be unreasonably withheld) its independent public accountants, and (with the consent of the Company, which consent will not be unreasonably withheld) to visit the other offices and properties of the Company and each Subsidiary, all at such reasonable times and as often as may be reasonably requested in writing; provided that such visits shall not unduly interfere with the Company's conduct of its business; and

      (b)    <u>Default</u> -- if a Default or Event of Default then exists, at the expense of the Company to visit and inspect any of the offices or properties of the Company or any Subsidiary, to examine all their respective books of account, records, reports and other papers, to make copies and extracts therefrom, and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Company authorizes said accountants to discuss the affairs, finances and accounts of the Company and its Subsidiaries), all at such times and as often as may be requested.

## Section 8. PAYMENT AND PREPAYMENT OF THE NOTES.

### Section 8.1.    Maturity; Prepayment.

Subject to the terms and conditions set forth herein, the Company shall repay each Note, and each Note shall mature, on the Maturity Date.  The Notes may not be prepaid prior to the Maturity Date.

### Section 8.2.    Purchase of Notes.

The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except upon the payment of the Notes at Maturity in accordance with the terms of this Agreement and the Notes.

## Section 9. AFFIRMATIVE COVENANTS.

The Company covenants that so long as any of the Notes are outstanding:

### Section 9.1.    Compliance with Law.

The Company will, and will cause each of its Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, including, without limitation, ERISA, the USA Patriot Act, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 9.2.    Insurance.

The Company will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.

11

### Section 9.3.  Maintenance of Properties.

The Company will, and will cause each of its Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times.

### Section 9.4.  Payment of Taxes and Claims.

The Company will, and will cause each of its Subsidiaries to, file all tax returns required to be filed in any jurisdiction and to pay and discharge all taxes shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies imposed on them or any of their properties, assets, income or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent and all claims for which sums have become due and payable that have or might become a Lien on properties or assets of the Company or any Subsidiary, provided that neither the Company nor any Subsidiary need pay any such tax or assessment or claims if (i) the amount, applicability or validity thereof is contested by the Company or such Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary has established adequate reserves therefor in accordance with GAAP on the books of the Company or such Subsidiary or (ii) the nonpayment of all such taxes, assessments and claims in the aggregate could not reasonably be expected to have a Material Adverse Effect.

### Section 9.5.  Existence, etc.

Subject to Section 10.2, the Company will at all times preserve and keep in full force and effect its limited liability company existence.  Subject to Sections 10.2, the Company will at all times preserve and keep in full force and effect the limited liability company existence of each of its Subsidiaries (unless merged into the Company or a Wholly-Owned Subsidiary) and all rights and franchises of the Company and its Subsidiaries unless, in the good faith judgment of the Company, the termination of or failure to preserve and keep in full force and effect such limited liability company existence, right or franchise could not, individually or in the aggregate, have a Material Adverse Effect.

### Section 9.6.  Books and Records.

The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Company, or such Subsidiary, as the case may be.

12

Section 9.7.    Separate Existence.

The Company shall:

(a)    maintain one or more deposit accounts, each separate from the deposit accounts of any of its members or Affiliates, with commercial banking institutions and ensure that the funds of the Company will not be diverted to any other Person or for other than limited liability company uses of the Company, nor will such funds be commingled with the funds of any of its members or Affiliates;

(b)    to the extent that it shares the same officers or other employees as any of its members or Affiliates, allocate the salaries of and the expenses related to providing benefits to such officers and other employees fairly among such entities and ensure that each such entity will bear its fair share of the salary and benefit costs associated with all such common officers and employees, provided that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of services provided to the Company or its Managing Member during the term of the Services Agreement by Mark Ross & Co., Inc. or any of its Affiliates;

(c)    to the extent that it jointly contracts with any of its members or Affiliates to do business with vendors or service providers or to share overhead expenses, allocate the costs incurred in so doing fairly among such entities and ensure that each such entity will bear its fair share of such costs and to the extent that it contracts or does business with vendors or service providers where the goods and services provided are partially for the benefit of any other Person, allocate the costs incurred in so doing fairly to or among such entities for whose benefit the goods or services are provided and ensure that each such entity will bear its fair share of such costs, provided that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of such joint contracts during the term of the Services Agreement if the other party or parties thereto are Affiliates of Mark Ross & Co., Inc.;

(d)    enter into all material transactions between it and any of its members or Affiliates, whether currently existing or hereafter entered into, only on an arm's-length basis, it being understood and agreed that the transactions contemplated in the Transaction Documents meet the requirements of this paragraph (d);

(e)    to the extent that it and any of its members or Affiliates have offices in the same location, allocate the overhead costs fairly and appropriately to and among them and ensure that each such entity will bear its fair share of such expenses, provided that compensation under the Services Agreement shall be the sole compensation payable by the Company in respect of any such offices during the term of the Services Agreement if any other occupant of such offices is an Affiliate of Mark Ross & Co., Inc.;

13

(f)      conduct its affairs strictly in accordance with its LLC Agreement and observe all necessary, appropriate and customary limited liability company formalities, including, but not limited to, holding all necessary directors' or members' meetings appropriate to authorize all limited liability company actions, keeping separate and accurate minutes of such meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining accurate and separate books, records and accounts, including, but not limited to, payroll and intercompany transaction accounts; and

(g)      not assume or guarantee any of the liabilities of any of its members or Affiliates except as provided in the Transaction Documents.

## Section 10.  NEGATIVE COVENANTS

The Company covenants that so long as any of the Notes are outstanding:

### Section 10.1.  Transactions with Affiliates.

The Company will not and will not permit any Subsidiary to enter into directly or indirectly any transaction or group of related transactions (including without limitation the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Affiliate (other than the Company or another Subsidiary), except for the Services Agreement (or substitute therefor with any Affiliate) and except in the ordinary course and pursuant to the reasonable requirements of the Company's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Company or such Subsidiary than would be expected to be obtainable in a comparable arm's-length transaction with a Person not an Affiliate.

### Section 10.2.  Merger, Consolidation, etc.

The Company will not merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of transactions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of the Company to any Person, except as contemplated in the LLC Agreement.

### Section 10.3.  Line of Business.

The Company will not and will not permit any Subsidiary to engage in any business if, as a result, the general nature of the business in which the Company and its Subsidiaries, taken as a whole, would then be engaged would be substantially changed from the general nature of the business in which the Company and its Subsidiaries, taken as a whole, are engaged on the date of this Agreement.

14

Section 10.4.   [Intentionally Omitted.]

Section 10.5.   Compliance with ERISA.

The Company will not (i) establish, maintain, contribute to, or incur an obligation to contribute to, or incur an obligation to contribute to any Plan or Multiemployer Plan, (ii) incur any liability with respect to retiree medical or death benefits other than as required by Section 4980B of the Code or (iii) incur any liability under Section 4975 of the Code.

Section 10.6.   Compliance with Board Regulations.

No part of the proceeds of the sale of the Notes will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to buy or carry (within the meaning of Regulation U) Margin Stock, or for any other purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board of Governors of the Federal Reserve System, including, to the extent applicable, Regulation U and Regulation X.

Section 10.7.   Indebtedness.

The Company will not, directly or indirectly, create, incur or suffer to exist any Indebtedness that is senior to the Notes.

Section 10.8.   Limitation on Modification of Constituent Documents and Certain Other Agreements.

The Company will not, directly or indirectly, except to the extent necessary to comply with law, amend, modify or change its LLC Agreement, or any agreement entered into by it with respect to its share capital or equity interests, or enter into any new agreement with respect to its share capital or equity interests; provided that the Company may amend, modify or change such documents in connection with (i) an assignment of the share capital or equity interests of the Company or (ii) the issuance of Class B Interests (as defined in the LLC Agreement).

Section 11.   EVENTS OF DEFAULT.

An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:

(a)   the Company defaults in the payment of any principal on any Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; or

15

(b)     the Company defaults in the payment of any interest on any Note for more than five Business Days after the same becomes due and payable; or

(c)     the Company defaults in the performance of or compliance with any term contained in Sections 9.5, 9.7 or 10; or

(d)     the Company defaults in the performance of or compliance with any term contained herein (other than those referred to in Section 11(a), (b) and (c)) or in any other Transaction Document and such default is not remedied within 30 days after the earlier of (i) a Responsible Person obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from any holder of a Note (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 11(d)); or

(e)     any representation or warranty made in writing by or on behalf of the Company or by any officer of the Company in this Agreement or in any writing furnished in connection with the transactions contemplated hereby proves to have been false or incorrect in any material respect on the date as of which made; or

(f)     (i) the Company or any Subsidiary is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest on any Indebtedness that is outstanding in an aggregate principal amount of at least $500,000 beyond any period of grace provided with respect thereto, or (ii) the Company or any Subsidiary is in default in the performance of or compliance with any term of any evidence of any Indebtedness in an aggregate outstanding principal amount of at least $500,000 or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared, due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) the Company or any Subsidiary has become obligated to purchase or repay Indebtedness before its regular maturity or before its regularly scheduled dates of payment in an aggregate outstanding principal amount of at least $500,000; or

(g)     the Company or any Subsidiary (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (v) is adjudicated as

16

insolvent or to be liquidated, or (vi) takes limited liability company action for the purpose of any of the foregoing; or

(h)    a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company or any of its Subsidiaries, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company or any of its Subsidiaries, or any such petition shall be filed against the Company or any of its Subsidiaries and such petition shall not be dismissed within 60 days; or

(i)    a final judgment or judgments for the payment of money aggregating in excess of $500,000 are rendered against one or more of the Company and its Subsidiaries and which judgments are not, within 60 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 60 days after the expiration of such stay.

## Section 12.    REMEDIES ON DEFAULT, ETC.

### Section 12.1.  Acceleration.

(a)  If an Event of Default with respect to the Company described in Section 11(g) or (h) (other than an Event of Default described in clause (i) of Section 11(g) or described in clause (vi) of Section 11(g) by virtue of the fact that such clause encompasses clause (i) of Section 11(g)) has occurred, all the Notes then outstanding shall automatically become immediately due and payable.

(b)  If any other Event of Default has occurred and is continuing, any holder or holders of more than 50% in principal amount of the Notes at the time outstanding may at any time at its or their option, by notice or notices to the Company, declare all the Notes then outstanding to be immediately due and payable.

(c)  If any Event of Default described in Section 11(a) or (b) has occurred and is continuing, any holder or holders of Notes at the time outstanding affected by such Event of Default may at any time, at its or their option, by notice or notices to the Company, declare all the Notes held by it or them to be immediately due and payable.

Upon any Notes becoming due and payable under this Section 12.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) shall all be immediately due and payable, in each and every case without presentment, demand,

17

protest or further notice, all of which are hereby waived. The Company acknowledges, and the parties hereto agree, that each holder of a Note has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for).

### Section 12.2.  Other Remedies.

If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 12.1, the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

### Section 12.3.  Rescission.

At any time after any Notes have been declared due and payable pursuant to Section 12.1(b) or (c), the holders of not less than 75% in principal amount of the Notes then outstanding, by written notice to the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest and principal, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, at the Default Rate, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default and Defaults, other than nonpayment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 17, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes. No rescission and annulment under this Section 12.3 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

### Section 12.4.  No Waivers or Election of Remedies, Expenses, etc.

No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by any Note upon any holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. Without limiting the obligations of the Company under Section 15, the Company will pay to the holder of each Note on demand such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in

18

any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

**Section 13.    REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.**

### Section 13.1.  Registration of Notes.

The Company shall keep at its principal executive office a register for the registration and registration of transfers of Notes.  The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register.  Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary.  The Company shall give to any holder of a Note promptly upon request therefor, a complete and correct copy of the names and addresses of all registered holders of Notes.

### Section 13.2.  Transfer and Exchange of Notes.

Upon surrender of any Note at the principal executive office of the Company for registration of transfer or exchange (and in the case of a surrender for registration of transfer, accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the address for notices of each transferee of such Note or part thereof), the Company shall, within five Business Days thereafter, execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit 1.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon.  The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.  Notes shall not be transferred in denominations of less than $100,000, provided that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $100,000.  Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have (i) made the representation set forth in Section 6.2 and (ii) represented that the acquisition of such Note by such transferee will not violate any provision of any statute or other rule of regulation of any Governmental Authority applicable to such transferee.

19

### Section 13.3.  Replacement of Notes.

Upon receipt by the Company of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(a)    in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(b)    in the case of mutilation, upon surrender and cancellation thereof,

the Company at its own expense, within five Business Days there thereafter, shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

## Section 14.    PAYMENTS ON NOTES.

### Section 14.1.  Place of Payment.

Subject to Section 14.2, payments of principal and interest becoming due and payable on the Notes shall be made in New York, New York at the principal office of the Company in such jurisdiction.  The Company may at any time, by notice to each holder of a Note, change the place of payment of the Notes so long as such place of payment shall be either the principal office of the Company in such jurisdiction or the principal office of a bank or trust company in such jurisdiction.

### Section 14.2.  Home Office Payment.

So long as any Purchaser or its nominee shall be the holder of any Note, and notwithstanding anything contained in Section 14.1 or in such Note to the contrary, the Company will pay all sums becoming due on such Note for principal and interest by the method and at the address specified for such purpose below such Purchaser's name in Schedule A, or by such other method or at such other address as such Purchaser shall have from time to time specified to the Company in writing for such purpose, without the presentation or surrender of such Note or the making of any notation thereon, except that upon written request of the Company made concurrently with or reasonably promptly after payment or prepayment in full of any Note, such Purchaser shall surrender such Note for cancellation, reasonably promptly after any such request, to the Company at its principal executive office or at the place of payment most recently designated by the Company pursuant to Section 14.1.  Prior to any sale or other disposition of any Note held by a Purchaser or its nominee, such Purchaser will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Company in exchange for a new Note or Notes

20

pursuant to Section 13.2. The Company will afford the benefits of this Section 14.2 to any direct or indirect transferee of any Note purchased by a Purchaser under this Agreement and that has made the same agreement relating to such Note as the Purchasers have made in this Section 14.2.

## Section 15.   EXPENSES, ETC.

### Section 15.1.  Transaction Expenses.

Whether or not the transactions contemplated hereby are consummated, each party hereto will pay its own costs and expenses (including attorneys' fees) incurred by it in connection with the preparation, execution and delivery of this Agreement and consummation of the transactions contemplated hereby.

### Section 15.2.  Survival.

The obligations of the Company under this Section 15 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement or the Notes, and the termination of this Agreement.

## Section 16.   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Notes, the purchase or transfer by any Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent holder of a Note, regardless of any investigation made at any time by or on behalf of such Purchaser or any other holder of a Note. All statements contained in any certificate or other instrument delivered by or on behalf of the Company pursuant to this Agreement shall be deemed representations and warranties of the Company under this Agreement. Subject to the preceding sentence, this Agreement and the Notes embody the entire agreement and understanding between each Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

## Section 17.   AMENDMENT AND WAIVER.

### Section 17.1.  Requirements.

This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Company and the Required Holders, except that (a) no amendment or waiver of any of the provisions of Section 1, 2, 3, 4, 5, 6 or 21 hereof, or any defined term (as it is used therein), will be effective as to any

Purchaser unless consented to by such Purchaser in writing and (b) no such amendment or waiver may, without the written consent of the holder of each Note at the time outstanding affected thereby, (i) subject to the provisions of Section 12 relating to acceleration or rescission, change the amount or time of any prepayment or payment of principal of, or reduce the rate or change the time of payment or method of computation of interest on the Notes, (ii) change the percentage of the principal amount of the Notes the holders of which are required to consent to any such amendment or waiver, or (iii) amend any of Sections 8, 11(a), 11(b), 12, 17 or 20.

### Section 17.2.   Solicitation of Holders of Notes.

(a) <u>Solicitation</u>.  The Company will provide each holder of the Notes (irrespective of the amount of Notes then owned by it) with sufficient information, sufficiently far in advance of the date a decision is required, to enable such holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof or of the Notes.  The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 17 to each holder of outstanding Notes promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite holders of Notes.

(b) <u>Payment</u>.  The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security, to any holder of Notes as consideration for or as an inducement to the entering into by any holder of Notes of any waiver or amendment of any of the terms and provisions hereof unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each holder of Notes then outstanding even if such holder did not consent to such waiver or amendment.

### Section 17.3.   Binding Effect, etc.

Any amendment or waiver consented to as provided in this Section 17 applies equally to all holders of Notes and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and the holder of any Note nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.  As used herein, the term **"this Agreement"** and references thereto shall mean this Agreement as it may from time to time be amended or supplemented.

22

### Section 17.4.  Notes held by Company, etc.

Solely for the purpose of determining whether the holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement or the Notes, or have directed the taking of any action provided herein or in the Notes to be taken upon the direction of the holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Company or any of its Affiliates shall be deemed not to be outstanding; provided that Arche Master Fund L.P. and its Affiliates as of the date hereof shall not be deemed "Affiliates" for any purposes of this paragraph until after such time as none of the Notes are held by Arche Master Fund, L.P. or any of its Affiliates.

### Section 18.    NOTICES.

All notices and other communications provided for hereunder shall be in writing and mailed, delivered by overnight courier, telecopied or delivered by hand

(i)      if to any Purchaser or its nominee, to such Purchaser or nominee at the address specified for such communications in Schedule A, or at such other address as such Purchaser or nominee shall have specified to the Company in writing,

(ii)      if to any other holder of any Note, to such holder at such address as such other holder shall have specified to the Company in writing, or

(iii)      if to the Company, to the Company at its address set forth at the beginning hereof to the attention of Mark E. Ross, Chief Executive Officer, or at such other address as the Company shall have specified to the holder of each Note in writing,

or at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be deemed to have been duly given or made (i) in the case of hand deliveries, when delivered by hand, (ii) in the case of mailed notices, four Business Days after being deposited in the mail, first class airmail, postage prepaid, (iii) in the case of delivery by overnight courier, when actually delivered by such courier and (iv) in the case of telecopier notice, when transmitted and confirmed during normal business hours (or, if delivered after the close of normal business hours, at the beginning of business hours on the next Business Day).

23

**Section 19.    REPRODUCTION OF DOCUMENTS.**

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any Purchaser at the Closing (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to any Purchaser, may be reproduced by such Purchaser by any photographic, photostatic, electronic, digital or other similar process and such Purchaser may destroy any original document so reproduced. The Company agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Purchaser in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence. This Section 19 shall not prohibit the Company or any other holder of Notes from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

**Section 20.    CONFIDENTIAL INFORMATION.**

For the purposes of this Section 20, **"Confidential Information"** means information delivered to any Purchaser by or on behalf of the Company or any Subsidiary in connection with the transactions contemplated by or otherwise pursuant to this Agreement that is proprietary in nature and that was clearly marked or labeled or otherwise adequately identified when received by such Purchaser as being confidential information of the Company or such Subsidiary, provided that such term does not include information that (a) was publicly known or otherwise known to such Purchaser prior to the time of such disclosure, (b) subsequently becomes publicly known through no act or omission by such Purchaser or any person acting on such Purchaser's behalf, (c) otherwise becomes known to such Purchaser other than through disclosure by the Company or any Subsidiary or (d) constitutes financial statements delivered to such Purchaser under Section 7.1 that are otherwise publicly available. Each Purchaser will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Purchaser in good faith to protect confidential information of third parties delivered to such Purchaser, provided that such Purchaser may deliver or disclose Confidential Information to (i) its directors, officers, employees, agents, attorneys and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (ii) its financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 20, (iii) any other holder of any Note, (iv) any Person to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 20), (v) any

24

Person from which its offers to purchase any security of the Company (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 20), (vi) any federal or state regulatory authority having jurisdiction over such Purchaser, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such Purchaser's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Purchaser, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Purchaser is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Purchaser may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such Purchaser's Notes and this Agreement; so long as, in the case of clauses (w), (x) and (y) above, such Purchaser (A) gives the Company prompt notice of the existence, terms and circumstances surrounding such request, (B) consults with the Company on the advisability of taking legally available steps to resist or narrow such request and (C) assists the Company (at the cost and expense of the Company) in seeking a protective order or other appropriate remedy (unless the board of directors or similar body of such Purchaser shall have determined in good faith that participation of the Company in such effort would be materially adverse to the interests of such Purchaser). Each holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 20 as though it were a party to this Agreement. On reasonable request by the Company in connection with the delivery to any holder of a Note of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominee), such holder will enter into an agreement with the Company embodying the provisions of this Section 20.

## Section 21.  SUBSTITUTION OF PURCHASER.

Each Purchaser shall have the right to substitute any one of its Affiliates as the purchaser of the Notes that it has agreed to purchase hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Affiliate, shall contain such Affiliate's agreement to be bound by this Agreement and shall contain a confirmation by such Affiliate of the accuracy with respect to it of the representations set forth in Section 6. Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 21), shall be deemed to refer to such Affiliate in lieu of such original Purchaser. In the event that such Affiliate is so substituted as a Purchaser hereunder and such Affiliate thereafter transfers to such original Purchaser all of the Notes then held by such Affiliate, upon receipt by the Company of notice of such transfer, any reference to such Affiliate as a "Purchaser" in this Agreement (other than in this Section 21) shall no longer be deemed to refer to such Affiliate, but shall refer to

25

such original Purchaser, and such original Purchaser shall again have all the rights of an original holder of the Notes under this Agreement.

## Section 22.    MISCELLANEOUS.

### Section 22.1.  Successors and Assigns.

All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent holder of a Note) whether so expressed or not.

### Section 22.2.  Payments Due on Non-Business Days.

Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed, in the computation of the interest payable on such next succeeding Business Day; provided that if the maturity date of any Note is a date other than a Business Day, the payment otherwise due on such maturity date shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

### Section 22.3.  Accounting Terms.

All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP. Except as otherwise specifically provided herein, all computations made pursuant to this Agreement shall be made in accordance with GAAP. Except as otherwise specifically provided herein, any consolidated financial statement or financial computation shall be done in accordance with GAAP; and, if at the time that any such statement or computation is required to be made the Company shall not have any consolidated Subsidiary, such terms shall mean a financial statement or a financial computation, as the case may be, with respect to the Company only.

### Section 22.4.  Severability.

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

26

### Section 22.5.  Construction, etc.

Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

For the avoidance of doubt, all Schedules and Exhibits attached to this Agreement shall be deemed to be part hereof.

### Section 22.6.  Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

### Section 22.7.  Governing Law.

This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York.

### Section 22.8.  Jurisdiction and Process; Waiver of Jury Trial.

(a) The Company irrevocably submits to the non-exclusive jurisdiction of any New York State or federal state court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or the Notes.  To the fullest extent permitted by applicable law, the Company irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b) The Company consents to process being served by or on behalf of any holder of Notes in any suit, action or proceeding of the nature referred to in Section 22.8(a) by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 18 or at such other address of which such holder shall then have been notified pursuant to said Section or, in the case of the Company, to Corporation Service Company, as its agent for the purpose of accepting service of any

process. The Company agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it. Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c) Nothing in this Section 22.8 shall affect the right of any holder of a Note to serve process in any manner permitted by law, or limit any right that the holders of any of the Notes may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(d) The Company hereby irrevocably appoints Corporation Service Company to receive for it, and on its behalf, service of process.

(e) THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

*      *      *      *      *

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

XE-R, LLC

By: R 2004, LLC, its managing member

By: _____
Name: Mark E. Ross
Title: Manager

This Agreement is hereby accepted
and agreed to as of the date thereof.

ARCHE MASTER FUND, LP

By: Arche GP, LLC, its general partner,
by XE Capital Management, LLC,
its sole member, by XE Partners, LLC,
its managing member

By: _____
Name: Terence S. Leighton
Title: Managing Member

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

XE-R, LLC

By: R 2004, LLC, its managing member

By: _____
      Name: Mark E. Ross
      Title: Manager

This Agreement is hereby accepted
and agreed to as of the date thereof.

ARCHE MASTER FUND, LP

By: Arche GP, LLC, its general partner,
by XE Capital Management, LLC,
its sole member, by XE Partners, LLC,
its managing member

By: _____
    Name: Terence S. Leighton
    Title: Managing Member