UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARCHE MASTER FUND, L.P.,

                              Plaintiff,

                 v.

XE–R, LLC,

                              Defendant.

---

ECF Case

Civil Action No. 07–CV–2993
(TBG)(AJP)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
<u>AND FOR A STAY PENDING ARBITRATION</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT .................................................................................................................... 6

I.   ARCHE'S CLAIM FOR BREACH OF CONTRACT PRESENTS TRIABLE
     ISSUES OF FACT ...................................................................................................... 8

      A.   Triable Issues Exist as to the Breach of the Note Purchase
          Agreement ............................................................................................... 8

      B.   Triable Issues Exist as to the Breach of the XE–R Agreement ................. 11

II.  DEFENDANT'S MOTION TO STAY PENDING ARBITRATION SHOULD
     BE DENIED. ............................................................................................................ 12

    A.   Defendant Waived Its Right To Arbitration by Seeking Summary
        Judgment................................................................................................ 12

    B.   Arche, a Non–Signatory to the XE–R Agreement, Cannot Be Compelled
        to Arbitrate. ........................................................................................... 13

        1.   Arche is Not a Direct Beneficiary of the XE–R Agreement. .............. 13

        2.   The Note Purchase Agreement Does Not Incorporate the XE–R
            Agreement ..................................................................................... 15

CONCLUSION ............................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

## Cases

Adickes v. S. H. Kress & Co.,
    398 U.S. 144 (1970) ..................................................................................................9

Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,
    170 F.3d 349 (2d Cir. 1999) ...................................................................................15

Amaker v. Foley,
    274 F.3d 677 (2d Cir. 2001) .....................................................................................7

Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry Inc.,
    50 F.3d 388 (7th Cir. 1995) ................................................................................8, 14

Cable Science Corp. v. Rochdale Village, Inc.,
    920 F.2d 147 (2d Cir. 1990) .....................................................................................6

Cunningham v. Insurance Co. of North America,
    2006 WL. 1896354 (E.D.N.Y. 2006) .......................................................................7

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,
    9 F.3d 1060 (2d Cir. 1993) .....................................................................................15

In re E.C. Ernst, Inc.,
    24 B.R. 192 (Bkrtcy. S.D.N.Y. 1982) ....................................................................11

Giannullo v. City of New York,
    322 F.3d 139 (2d Cir. 2003) .................................................................................7, 9

Heyman v. Commerce & Industry Ins. Co.,
    524 F.2d 1317 (2d Cir. 1975) .............................................................................6, 11

HRH Construction LLC v. Metropolitan Transp. Auth.,
    33 A.D.3d 568 (1st Dep't 2006) .............................................................................15

Import Export Steel Corp. v. Mississippi Valley Barge Line Co.,
    351 F.2d 503 (2d Cir. 1965) .............................................................................16, 17

International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.,
    407 F. Supp. 2d 483 (S.D.N.Y. 2005) ....................................................................10

John Hancock Mutual Life Ins. Co. v. Amerford International Corp.,
    22 F.3d 458 (2d Cir. 1994) .......................................................................................6

Jonathan Cass Ltd. v. Wal–Mart Stores, Inc.,
    216 A.D.2d 31 (1st Dep't 1995) .............................................................................12

Mag Portfolio Consult, GMBH v. Merlin Biomed Group LLC,
    268 F.3d 58 (2d Cir. 2001) ...............................................................................14, 15

Malchman v. Davis,
   706 F.2d 426 (2d Cir. 1983) ............................................................................. 10

New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.,
   666 F.2d 787 (2d Cir. 1981) ............................................................................. 11

Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela,
   991 F.2d 42 (2d Cir. 1993) .......................................................................... 16, 17

Rothenberg v. Lincoln Farm Camp, Inc.,
   755 F.2d 1017 (2d Cir.1985) ........................................................................ 7, 11

S & R Co. of Kingston v. Latona Trucking, Inc.,
   159 F.3d 80 (2nd Cir. 1998) ......................................................................... 8, 14

Sablosky v. Edward S. Gordon Co., Inc.,
   73 N.Y.2d 133 (N.Y. 1989) ............................................................................ 10

St. Mary's Medical Center of Evansville, Inc. v. Disco  Aluminum Products Co., Inc.,
   969 F.2d 585 (7th Cir. 1992) ........................................................................... 13

Sweater Bee by Banff, Ltd. v. Manhattan Industries, Inc.,
   754 F.2d 457 (2d Cir. 1985) .............................................................................. 8

Terrydale Liquidating Trust v. Barness,
   611 F. Supp. 1006 (S.D.N.Y. 1984) ................................................................. 10

Thomson–CSF, S.A. v. American Arbitration Association,
   64 F.3d 773 (2d Cir. 1995) .............................................................................. 16

Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,
   373 F.3d 241 (2d Cir. 2004) .............................................................................. 9

Wilson v. Pessah,
   2007 WL. 757993 (E.D.N.Y. 2007) ................................................................... 7

## Statutes

9 U.S.C. § 3  ....................................................................................................... 8

## Other Authorities

New York City. NPA § 22.8(a) ............................................................................ 16

Plaintiff Arche Master Fund, L.P. ("Arche") respectfully submits this memorandum of law in opposition to Defendant XE–R, LLC's ("XE–R") motion for summary judgment and for a stay pending arbitration.

## PRELIMINARY STATEMENT

Plaintiff Arche is the owner of notes issued by Defendant XE–R with an aggregate principal amount of $30,000,000. This case arises from XE–R's failure to pay on the notes, which have been accelerated pursuant to the terms of the Note Purchase Agreement on account of the occurrence of events of default. The events of default include XE–R's breach of certain provisions of the Note Purchase Agreement and the joint venture agreement that governs the conduct of XE–R's business. Those breaches resulted from the decision of XE–R's CEO, Mark Ross, to engage in self–dealing by using XE–R funds to secure a brokerage opportunity and related commissions that could have been realized by XE–R for another of Ross's business ventures, Mark Ross & Co., Inc. ("MRC")

In moving for summary judgment, XE–R does not dispute any of this. Instead, XE–R argues primarily that Ross's self–dealing does not breach any contractual provision because Ross has recently stated his intention to turn over to XE–R all of the commissions MRC receives through the disputed transaction. However, that purported intention -- which has not been reduced to a binding document and which is not competently averred in an affidavit in support of this motion – changes nothing. At most, Ross's supposed plan to disgorge his ill–gotten gains is a potential remedy for his self–dealing. It does not erase his past conduct or XE–R's resulting breaches of its contractual obligations. And it manifestly does not defeat Arche's claim on summary judgment.

1

XE–R fares no better with the other aspect of its motion, which seeks to stay a portion of this litigation in favor of arbitration pursuant to the XE–R joint venture agreement, to which Arche is not a party. In the first place, a party may not seek summary judgment and, in the alternative, compel arbitration of "whatever remains of the litigation." *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment and For a Stay Pending Arbitration ("Def. Br.") at 1. The submission of a claim for arbitration waives any right to arbitrate. Additionally, for reasons detailed below, Arche cannot be compelled to arbitrate under either the estoppel or incorporation by reference theories advanced by Defendant.

Defendant's motion should be denied in its entirety.

## STATEMENT OF FACTS

**The Formation of XE–R, LLC**

In August of 2004, XE Capital and MRC negotiated the creation of a joint venture entity that would provide high net worth individuals with greater flexibility in financing their life insurance policies. The result was XE–R, a joint venture between XE Capital and R 2004, a newly–created company by Mark E. Ross ("Ross") formed to act as Managing Member of XE–R. Ross is the principal owner of R 2004, and, for all practical purposes, the Managing Member of XE–R. *See* XE–R Agreement, attached to Compl. as Ex. A. The purposes of XE–R, as set forth in the parties' joint venture agreement, include "sell[ing] newly issued life insurance policies financed through the origination of new Loans and receives sales commissions of such policy sales, ... broker[ing] life settlements of policies and receiv[ing] compensation related to such brokerage ... and ... transact[ing] the foregoing ... with policy owners on a direct basis with MRC and the Company as co–brokers, and as a 'wholesaler' for other life insurance brokers and intermediaries through the Company." XE–R Agreement, attached to Compl. as Ex. A, § 2.2(a).

Pursuant to the XE–R Agreement, MRC, as a licensed insurance broker and on behalf of XE–R, communicates with insurance agents to identify individuals wishing to finance the purchase of an insurance policy. If the candidate meets certain criteria, XE–R then extends a loan, which is secured by the life insurance policy, to an irrevocable life insurance trust established by the insured. The principal amount of the loan covers the life insurance premiums for a fixed term, often a two–year period. When the loan matures, the insured has the option of purchasing the policy by repaying the amount of principal and interest due on the loan, or tendering the policy to XE–R. In exchange for receiving financing for his or her premiums, the insured agrees that if he or she repays the loan and then decides to re–sell his policy within three years of the maturity date of the loan, the insured will use XE–R as the broker for the resale of the policy in the life settlement market. XE–R therefore finances life insurance premiums partly for the purpose of brokering future life settlements of the policies.

**The Note Purchase Agreement and the XE–R Agreement**

When XE–R was formed, Arche and XE–R entered into a Note Purchase Agreement, dated August 23, 2004, which provided for the issuance and sale of 15% Senior Notes due August 21, 2009. *See* Note Purchase Agreement, attached to Compl. as Ex. B. Pursuant to the Note Purchase Agreements, XE–R has issued notes in the aggregate principal amount of $30,000,000. Arche currently holds 100% of the outstanding notes in XE–R.

The Note Purchase Agreement contains several key provisions that protect Arche's investment. Most significantly for present purposes, § 10.1 of the Note Purchase Agreement expressly governs XE–R's transactions with its affiliates, including MRC. Pursuant to § 10.1, XE–R covenants, in pertinent part, that "so long as any of the Notes are outstanding[,]" it "will not ... enter into directly or indirectly any transaction or group of related transactions ... with any Affiliate ... and except in the ordinary course and pursuant to the reasonable

3

requirements of the Company's ... business and upon fair and reasonable terms no less favorable

to the Company ... than would be expected to be obtainable in a comparable arm's–length

transaction with a Person not an Affiliate."

The XE–R Agreement contains additional covenants made by the Managing

Member—Ross, for all practical purposes—which protect the Company and, ultimately, Arche.

One such covenant is that "[t]he Company will be the exclusive means by which the Managing

Member and its Affiliates (including MRC) transact as a wholesaler through other life insurance

brokers and intermediaries as to the transactions listed in Section 2.2." § 3.6(a)(iv).  This

covenant applies to the brokerage of life settlements of policies as one of the transactions listed

in Section 2.2.  Another is that "[i]n managing the Company, the Managing Member will at all

times act in accordance with applicable law and in a good faith and commercially reasonable

manner." §3.6(a)(ii).

Because Arche's investment could be threatened by a violation of the XE–R

Agreement, the Note Purchase Agreement defines "Event of Default" broadly to include

violations both of the terms of the Note Purchase Agreement and of the terms of the XE–R

Agreement.  Note Purchase Agreement §§ 11(c),11(d).  Specifically, the Note Purchase

Agreement provides that an "Event of Default" exists if any of the following conditions or events

shall occur and be continuing:  "the Company defaults in the performance of or compliance with

any term contained in *Section[] ... 10*," (§ 11(c)); or "the Company defaults in the performance

of or compliance with any term contained ... in *any other Transaction Document*," including the

XE–R Agreement, (§ 11(d)(emphasis added)).

**The Jenkins Transaction and Defendant's Misconduct**

Within a few months of the formation of XE–R, XE Capital and XE–R engaged

in business with a California premium finance company, Mutual Credit Corporation ("MCC"),

4

and its affiliated life insurance broker, Sierra Life Solutions, LLC ("Sierra"). MCC and Sierra

operated a similar premium finance program in which Sierra placed newly–issued life insurance

policies that were financed by MCC. To ensure that it would have adequate capital to continue

funding policies, MCC negotiated with XE Capital to purchase its premium finance loans. XE

Capital ultimately agreed to purchase some of these loans through a special purpose vehicle,

Spurling Group LLC ("Spurling"), on the condition that XE–R be hired as a consultant to

individually evaluate and approve each transaction.[1] *See* Consulting Agreement, dated

November 2, 2004, attached to Leighton Decl. as Ex. A.

In addition, XE–R was permitted to earn a percentage of commissions as a

wholesaler for certain sales executed through the Spurling program. *See* Letter of Intent

Regarding Wholesaling Arrangement, dated November 1, 2004, attached to Leighton Decl. as

Ex. B. All of the business transacted by XE–R with respect to the Spurling policies was

considered part of XE–R's "wholesale" business, because it was sourced and/or transacted

through MCC and Sierra. *See* Leighton Decl. ¶ 8.

Unbeknownst to XE Capital or MCC, Ross decided to pursue additional business

through the Spurling program exclusively for the benefit of MRC. Among the Spurling policies

was a policy funded by an MCC loan to the Harry L. Jenkins Irrevocable Insurance Trust (the

"Jenkins Trust"). *See* Baker email dated April 12, 2005, attached to Leighton Decl. as Ex. C.

Ross, in his capacity as CEO of XE–R, used XE–R funds to refinance the MCC loan on the

Jenkins policy in exchange for an agreement from the Jenkins Trust that it would use MRC

exclusively – not XE–R – in any future resale (or settlement) of the Jenkins policy. Ross admits

---

[1]  The policies affiliated with the Spurling loans are now referred to as the "Spurling
policies" or the "Spurling portfolio."

this *quid pro quo* in a recent complaint he filed against MCC and Sierra, and Defendant does not contest this agreement in its Motion.[2]

As detailed below, Ross's *quid pro quo* constitutes self–dealing and misappropriation of a corporate opportunity for XE–R, directly violates key provisions of the Note Purchase Agreement and the XE–R Agreement, and triggers an Event of Default.[3]  On April 13, 2007, Arche therefore declared the outstanding Notes immediately due and payable under Section 12.1 of the Note Purchase Agreement.  Correctly assuming that no portion of the $31,125,000 owed to Arche was forthcoming, Arche commenced this action the following day.

## ARGUMENT

The Court is undoubtedly well aware of the standard on a motion for summary judgment and that this "procedural weapon is a drastic device." *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319 –1320 (2d Cir. 1975).  As a result, "when the court considers a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute," *Id.* (internal citations omitted).  Further, when summary judgment is sought in a breach of contract action, the moving party must further show that the contract is unambiguous and

---

[2]  *See* MCC Complaint, attached to Compl. as Ex. C at ¶ 31 ("XE–R provided [to the Trust] the funds for the payment [of the principal plus interest on the premium finance loan].  In consideration of its provision of valuation and other services, the Trust agreed to appoint Mark Ross & Co., Inc. as the broker of record in the event that the Trust later decided to sell the Policy on the secondary market through a life settlement"); and ¶ 54 ("[T]he Trust intended to repay the MCC loan ... through financing from XE–R ... In the event that the Trust later decided to sell the policy, the Trust could negotiate a life settlement on the secondary market using Mark Ross & Co., Inc. as the broker").

[3]  In addition, Ross's actions have exposed XE–R to a counter-suit by MCC and Sierra alleging tortious interference, misappropriation of trade secrets, and breach of contract. *See* MCC Amended Cross–Complaint, attached to Reed Decl. as Ex. A.

lends itself to a single reasonable interpretation. *John Hancock Mutual Life Ins. Co. v. Amerford International Corp.*, 22 F.3d 458, 461 (2d Cir. 1994) (summary judgment is appropriate in a breach of contract action only "where the agreement's language is unambiguous and conveys a definite meaning").[4]

Here, Defendant fails to present any evidence establishing a prima facie case for summary judgment, which warrants denying its motion irrespective of any opposition. *See Giannullo v. City of New York*, 322 F.3d 139, 140–141 (2d Cir. 2003) (where no prima facie case is made, summary judgment must be denied "even if no opposing evidentiary matter is presented, for the non–movant is not required to rebut an insufficient showing") (internal quotation marks omitted). Indeed, Defendant's entire motion is based on an irrelevant statement of MRC's intent concerning the proceeds of his self–dealing transaction and a claim to privity which is contradicted by the few documents already in Arche's possession. Such unsupported assertions are entitled to no credit and are compelling only in highlighting the need for discovery. *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (internal quotation marks and citations omitted). ("[T]he burden of the nonmovant to respond arises only if the motion is properly supported ... If the evidence adduced in support of the summary judgment motion does not meet this burden, summary judgment must be denied even if no opposing evidentiary matter is presented").[5]

---

[4]  *See also Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1990) ("It is only where the language and the inferences to be drawn from it are unambiguous that a district court may construe the contract as a matter of law and grant summary judgment accordingly"); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985) ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court.") *Cunningham v. Insurance Co. of North America*, 2006 WL 1896354, *3 (E.D.N.Y. 2006) (same).

[5]  *See also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F. 3d 241, 244 (2d Cir. 2004) ("Moreover ... the district court may not rely solely on the statement of undisputed facts contained in the moving party's 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion"); *Id.* at 244 –245 (2d Cir. 2004) (stating that even (footnote continued)

The arbitration portion of Defendant's motion fares no better. XE–R asks the Court "to stay whatever remains of this litigation [after XE–R's summary judgment motion is decided], if anything, pending arbitration pursuant to 9 U.S.C. § 3." Def. Br. at 1. However, by first submitting this case to the Court and asking for summary judgment, XE–R voluntarily avails itself of this forum and thereby waives its right to demand arbitration. *Sweater Bee by Banff, Ltd. v. Manhattan Industries, Inc.*, 754 F.2d 457, 461 (2d Cir. 1985) ("The rule of this circuit ... is that the litigation of substantial issues going to the merits may constitute a waiver of arbitration"). Litigants may not "test[] the water before taking the swim." *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2nd Cir. 1998).[6]

In any event, waiver aside, XE–R fails in its attempt to shoehorn Arche into two standard theories under which a nonsignatory to an arbitration clause can be compelled to arbitrate. The estoppel theory does not apply here because Arche is neither referenced in the XE–R Agreement nor a direct beneficiary of that Agreement. Neither does the incorporation by reference theory apply here. Although the Note Purchase Agreement references the XE–R Agreement to make clear that XE–R is subject to the terms of both, it nowhere indicates that *Arche* is bound to *any term* in the XE–R Agreement. XE–R's Motion to Stay thus fails as well.

## I.  ARCHE'S CLAIM FOR BREACH OF CONTRACT PRESENTS TRIABLE ISSUES OF FACT

### A.  Triable Issues Exist as to the Breach of the Note Purchase Agreement

Defendant does not contest the basic *quid pro quo* terms of the Jenkins transaction—that Ross used XE–R funds to secure a brokerage opportunity for MRC that XE–R

---

an "unopposed summary judgment motion may also fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law").

[6]  *See also Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry Inc.*, 50 F.3d 388, 390 (7th Cir. 1995) (J. Posner) ("[T]he intention behind [arbitration] clauses, and the reason for judicial (footnote continued)

could have exploited. Nor does Defendant contest that the terms of the Jenkins transaction are
such that MRC is given total control and discretion over the disposal of all brokerage
commissions. *See* Def. Br. at 8. Defendant even implicitly concedes that, insofar as the Jenkins
transaction results in MRC receiving all of the brokerage commissions earned on the sale of the
policies, it is unfair and unreasonable toward XE–R. Defendant nevertheless contends that this
transaction does not violate § 10.1 of the Note Purchase Agreement – and that, in fact, the
Jenkins transaction "could not be more favorable to XE–R" – because "R 2004, and MR&Co. ...
have represented, through counsel, that XE–R will receive a one hundred percent (100%)
participation in MR&Co's share of any such brokerage commissions." Def. Br. at 8. That
argument is unavailing.

   To begin with, XE–R's sole evidence of MRC's "intent" is a letter from XE–R's
(and MRC's) counsel—drafted after this suit was initiated—stating that MRC intends to provide
"one hundred percent (100%) participation to XE–R in any settlement brokerage commission in
connection with the Jenkins transaction." Def. Br. at 5. Even if it were relevant, such a self–
serving letter from Defendant's counsel after this suit was initiated falls far short of Defendant's
evidentiary burden. *See Jonathan Cass Ltd. v. Wal–Mart Stores, Inc.,* 216 A.D.2d 31 (1st Dep't
1995) (summary judgment properly denied where triable issues existence as to parties'
credibility and intent). This is particularly true in view of the fact that Arche's sole member, XE
Capital, is currently seeking to recover $30 million from MRC in commissions that were
wrongfully withheld from XE–R, Arche has reason to distrust MRC's declaration of intent. *See*
Leighton Decl. ¶ 12.

---

enforcement of them, are not to allow or encourage the parties to proceed, either simultaneously
or sequentially, in multiple forums").

Even if Defendant had proved Ross's "intention" with competent evidence, XE–R still overlooks that the fairness of a transaction is assessed by examining its terms, not by *post hoc*, non–binding promises.[7] The terms of the Jenkins transaction, as Defendant admits, vest MRC with brokerage rights that could have gone to XE–R and with control of the related commissions that XE–R could have earned. That MRC's counsel has now represented that MRC will turn over the commissions to XE–R cannot change that. If such a *post hoc* justification rendered a transaction fair, it could be invoked as a kind of safe harbor by any corporate fiduciary accused of self–dealing. Moreover, if the terms of the Jenkins transaction are such that XE–R must rely upon MRC to fulfill a non–binding promise to pay these commissions, they are neither fair nor reasonable, and are far less favorable than XE–R would expect in a comparable arm's length transaction.

Not surprisingly, XE–R neither offers any explanation as to why MRC's stated intent is relevant to the fairness of the transaction nor sets forth any evidence that such an intention would render the transaction "fair and reasonable" under the meaning of the NPA. *See Vermont Teddy Bear*, 373 F.3d at 244 (stating that court may not rely solely on the moving party's statement of undisputed facts). Indeed, there is nothing in the parties' course of dealing to suggest that they have departed so far from the ordinary meaning of "fair and reasonable."

---

[7] Accordingly, § 10.1 of the Note Purchase Agreement requires that any transaction between XE–R transaction and an affiliate be "upon *fair and reasonable terms* no less favorable to [XE–R] ... than would be expected to be obtainable in a comparable arm's length transaction with a Person not an Affiliate" (emphasis added). *See generally International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 501 (S.D.N.Y. 2005) (analyzing terms of allegedly self–dealing transactions to assess substantive fairness); *Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1017 (S.D.N.Y. 1984) (same); *Cf. Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)(assessing fairness of settlement) ("The trial judge determines fairness, reasonableness, and adequacy of a proposed settlement by considering [] the substantive *terms* of the settlement compared to the likely result of a trial") (emphasis added); *Sablosky v. Edward S. Gordon Co., Inc.*, 73 N.Y.2d 133, 138 (N.Y. 1989) (assessing unconscionable contract) (looking to terms of contract to assess substantive fairness).

10

**B.**    <u>Triable Issues Exist as to the Breach of the XE–R Agreement</u>

Defendant contends that the Jenkins transaction does not violate § 3.6(a)(iv) of

the XE–R Agreement, which mandates that XE–R be the exclusive means by which MRC does

wholesale life settlement business, because the Jenkins transaction "is not a 'wholesaler'

transaction, which is a transaction that utilizes 'other life insurance brokers and intermediaries.'"

Def. Br. at 12.  Defendant makes a single factual assertion in support of this argument—that

MRC was in privity with the Jenkins Trust.  Yet XE–R cites no evidence in support of its claim

of privity,[8] and the evidence available so far clearly stands in contrast to this claim.

As explained, the Jenkins transaction was part of the Spurling portfolio of cases

introduced to XE Capital and XE–R through MCC and Sierra.  The policies executed through

Spurling were thus understood by XE–R to be, and were in fact, wholesale transactions.  *See*

Leighton Decl. ¶ 8, Ex. B.  Additionally, by email dated April 12, 2005 to Bradley Baker, XE

Capital notified XE–R by email of all the "closed policies executed through Spurling," attaching

a spreadsheet that included the Jenkins policies.  *See* Leighton Decl. Ex. C.  Notably, Defendant

does not assert that MRC had a relationship with Mr. Jenkins prior to the Spurling portfolio.  As

Ross learned of the Jenkins policies through its role as consultant and wholesaler in the Spurling

program, he cannot credibly claim that any transaction involving these policies is anything other

than a wholesale transaction.

MRC's unsupported claim to be in privity with the Jenkins Trust is made even

more dubious by MRC's past practice of improperly intruding upon business relationships.  For

instance, last fall, an Arche affiliate, XE L.I.F.E., LLC, sought and obtained a preliminary

---

[8]    *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970) ("[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented").

injunction against MRC to stop it from purporting to act on XE LIFE's behalf in negotiating the settlement of other life insurance policies. *See* Decision and Order dated October 30, 2006, entered in Case No. 06–603579 (N.Y. Sup.), attached to Reed Decl. as Ex. C. And more recently, MCC filed a cross–complaint against XE–R and MRC for tortious interference with business relationships and obtained a preliminary injunction to prevent them from continuing to interfere with MCC's business relationships in the life settlement market. *See* MCC's Amended Cross–Complaint and Preliminary Injunction in Case No. 07–CC–1223, attached to Reed Decl. as Exs. A and B. Again, Arche has every reason to be suspicious of MRC's unsupported MRC's claim of privity and is entitled to discovery on this issue of fact.

## II.    DEFENDANT'S MOTION TO STAY PENDING ARBITRATION SHOULD BE DENIED.

### A.    Defendant Waived Its Right To Arbitration by Seeking Summary Judgment.

"Submitting a case to the district court for decision is not consistent with a desire to arbitrate. A party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum." *St. Mary's Medical Center of Evansville, Inc. v. Disco Aluminum Products Co., Inc.*, 969 F. 2d 585, 589 (7th Cir. 1992). By seeking summary judgment, and, in the alternative, arbitration for "whatever remains" of the litigation, XE–R effectively waives its right to arbitrate. *See* Def. Br. at 1 (seeking to "stay whatever remains of this litigation, if anything"). Were the rule otherwise, parties could "waste scarce judicial time and effort and hamper judges' authority to control the course of proceedings before them." *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir. 1998) (holding that not even a "no waiver" clause precluded a finding of waiver). Requesting such alternative relief as to Arche's single claim is a clear attempt to "see how the case [is] going in ... court before deciding whether it would be better off there or in arbitration."

*Cabinetree*, 50 F.3d at 391 (defendant lost the right to arbitrate where it played "heads I win, tails you lose"). For this reason alone, Defendant's motion to stay should be denied.

**B.    Arche, a Non–Signatory to the XE–R Agreement, Cannot Be Compelled to Arbitrate.**

Even apart from XE–R's waiver of any right to compel arbitration, XE–R cannot compel Arche, a non–signatory to the XE–R Agreement, to arbitrate. XE–R advances two theories under which courts will compel non–signatories to arbitrate: estoppel and incorporation by reference. *See generally Mag Portfolio Consult, GBH v. Merlin Biomed Group*, LLC, 268 F.3d 58 (2d Cir. 2001). Neither one applies here.

1.    Arche is Not a Direct Beneficiary of the XE–R Agreement.

Under the direct beneficiary theory of estoppel, a nonsignatory may be bound by an agreement's arbitration clause only where it "directly benefits from" or "knowingly accepted the benefits of" the agreement. *Mag Portfolio*, 268 F.3d at 61. Tangential benefits to a non–signatory are irrelevant; the only benefits that subject a non–signatory to arbitration are those "flowing [to it] directly from the agreement." *Id. See also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from [the] contract containing [the] arbitration clause").

Cases finding "direct benefits" have little in common with the present case. *See, e.g., HRH Construction LLC v. Metropolitan Transp. Auth.*, 33 A.D.3d 568, 569 (1st Dep't 2006); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (in dispute concerning agreement governing the use of a trade name, non–signatory who had received a copy of the agreement, raised no objections to it, and made use of that trade name pursuant to the agreement was estopped from resisting the arbitration clause contained in the agreement). For instance, in *HRH Construction*, two entities entered into a business venture by

13

signing a contract that included an arbitration clause. The parent of one of these entities subsequently assumed some of the obligations under the contract, and thereby earned more than $7 million. Citing federal law, the First Department held that the parent company was subject to arbitration because, "since [it] knowingly assumed performance [under the contract] and derived a direct benefit therefrom. . ." *HRH Construction*, 33 A.D.3d at 569. Similarly, in *Deloitte*, which involved a dispute concerning the use of a trade name, the court held that a non–signatory was compelled to arbitrate under that agreement governing the use of the trade name. The non–signatory had received a copy of the agreement, raised no objections to it, and made use of the trade name pursuant to the agreement. Further, the agreement "expressly condition[ed] the continuing right ... to use the name "Deloitte" on [] adherence to the terms of the Agreement." *Deloitte*, 9 F. 3d at 1064.

XE–R does not and cannot explain how Arche is a direct beneficiary of the XE–R Agreement. As merely an unsecured lender to XE–R under the terms of a Note Purchase Agreement, Arche derives no direct benefits from the XE–R Agreement. It derives a single benefit *from XE–R itself*—repayment of the notes, with interest, pursuant to the *Note Purchase Agreement*. But Arche is neither mentioned in the XE–R Agreement nor receives any profits, directly or indirectly, from the XE–R business. Perhaps recognizing this difficulty, Defendant simply asserts without explanation that "Arche is certainly exploiting and obtaining a direct benefit from the XE–R Agreement pursuant to its interest in the notes, from which it derives substantial benefits." Def. Br. at 10. To Arche's knowledge, no legal authority suggests that merely lending money to an entity whose LLC agreement contains an arbitration clause commits the lender to arbitration. If it did, arbitration clauses would assume a breathtaking reach.

   2.   The Note Purchase Agreement Does Not Incorporate the XE–R
        Agreement

To compel Arche to arbitrate under the incorporation by reference theory, the

Note Purchase Agreement must "incorporate[] the existing arbitration clause" in the XE–R

Agreement. *Thomson–CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 777 (2d Cir.

1995). Here, the Note Purchase Agreement belies Defendant's assertion that "the NPA

specifically incorporates by reference the XE–R Agreement." Def. Br. 10. This is not

surprising, as the Note Purchase Agreement specifically addresses the forum for dispute

resolution and provides for litigation in the New York State or federal court in New York City.

NPA § 22.8(a).

   Courts typically find incorporation by reference where the related agreement

incorporates the *whole agreement* containing the arbitration clause or the totality of obligations

of the signatory party. *See, e.g., Progressive Casualty Insurance Co. v. C.A. Reaseguradora

Nacional de Venezuela*, 991 F.2d 42 (2d Cir. 1993); *Import Export Steel Corp. v. Mississippi

Valley Barge Line Co.*, 351 F.2d 503, 505–06 (2d Cir. 1965). For instance, in *Progressive

Casualty*, a group of reinsurers signed an insurance application outlining the agreed–upon terms

for a reinsurance policy. The application contained a provision stating that the policy was

"subject to [the] Facultative Reinsurance Agreement," ("FRA"), an agreement containing a

broad arbitration clause. This language, the Second Circuit held, incorporated the FRA into the

policy and made the reinsurers subject to arbitration. *Id.* at 46; *see also Import Export Steel

Corp.*, 351 F. 2d at 505–06 (incorporation by reference found where, by separate agreement,

nonsignatory expressly "assum[ed] all the obligations and privileges of [signatory party] under

the ... subcharter," which contained arbitration provision).

   In contrast, none of the provisions of the Note Purchase Agreement operates so

sweepingly. Although Defendant cites to six provisions of the Note Purchase Agreement in

15

support of its incorporation by reference theory, all of these provisions merely provide further protections to Arche by asserting that (i) XE–R has the authority and right to execute the other Transaction Documents and to perform the provisions thereof (§ 5.1); (ii) the information provided in all other Transaction Documents is correct (§ 5.3); (iii) the execution and performance of the Transaction Documents will not contravene any other agreement to which XE–R is bound (§ 5.6); (iv) XE–R has no properties or assets other than the rights under the Transaction Documents (§ 5.10); (v) XE–R will not dispose of property or assets except as contemplated by the XE–R Agreement (§ 10.2); and (vi) XE–R will not amend or modify the XE–R Agreement except as necessary to comply with the law (§ 10.8); and (vii) an Event of Default shall exist if XE–R defaults in the performance or compliance with any term in any other Transaction Document (§ 11(d)).  Notably, none of these provisions so much as mentions the arbitration clause or even suggests that Arche—as opposed to XE–R—shall be bound by any term in the XE–R Agreement.

## CONCLUSION

For the foregoing reasons, XE–R's motion for summary judgment and motion for a stay pending arbitration should be denied in their entirety.

Dated: New York, New York
      June 19, 2007

                     QUINN EMANUEL URQUHART
                     OLIVER & HEDGES LLP

                     By _____
                       Peter E. Calamari (PC–3964)
                       Kevin S. Reed (KR–5386)
                       Jaimie Leeser Nawaday (JL–4756)
                       51 Madison Avenue
                       New York, New York  10010
                       Telephone:  212–849–7107
                       Facsimile:  212–849–7100

                     *Attorneys for Plaintiff,*
                     *Arche Master Fund LP*

17