# EXHIBIT A

fees paid
3/22/07
jh

1   Rick Richmond (S.B.N. 194962)
    Brent Caslin (S.B.N. 198682)
2   KIRKLAND & ELLIS LLP
    777 South Figueroa Street
3   Los Angeles, California 90017
    Telephone:    (213) 680-8400
4   Facsimile:    (213) 680-8500
    Email: rrichmond@kirkland.com
5   Email: bcaslin@kirkland.com

6   Attorneys for MUTUAL CREDIT
    CORPORATION, SIERRA LIFE
7   SOLUTIONS LLC, SPURLING
    GROUP LLC, SPURLING GROUP
8   II LLC, MICHAEL BROWN, and
    ANTHONY JACOBSON

ELECTRONICALLY
FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CIVIL COMPLEX CENTER

May 7 2007

ALAN SLATER, Clerk of the Court
by J. HAINES

9

10          SUPERIOR COURT FOR THE STATE OF CALIFORNIA

11                    FOR THE COUNTY OF ORANGE

12   TONI Y. JONES, in her capacity as Investment )   CASE NO. 07CC01223
     Trustee for the HARRY L. JENKINS            )
13   IRREVOCABLE INSURANCE TRUST,                )   The Honorable Ronald L. Bauer
     MARK ROSS & CO., INC., XE-R LLC,            )
14                                               )   Department CX103
              Plaintiffs,                        )
15                                               )   AMENDED CROSS-COMPLAINT FOR
         vs.                                     )   INJUNCTIVE RELIEF AND DAMAGES FOR:
16                                               )   (1) BREACH OF CONTRACT
     MUTUAL CREDIT CORPORATION,                  )   (2) MISAPPROPRIATION OF TRADE
17   SPURLING GROUP LLC, MICHAEL                 )   SECRETS
     BROWN, ANTHONY JACOBSON, and DOES )          (3) INTENTIONAL INTERFERENCE WITH
18   1 through 100, inclusive,                    )   PROSPECTIVE ECONOMIC RELATIONS
                                                 )   (4) NEGLIGENT INTERFERENCE WITH
19            Defendants.                        )   PROSPECTIVE ECONOMIC RELATIONS
                                                 )   (5) INDUCING BREACH OF CONTRACT
20   _____        )   (6) INTENTIONAL INTERFERENCE WITH
     MUTUAL CREDIT CORPORATION, SIERRA )           CONTRACTUAL RELATIONS
21   LIFE SOLUTIONS LLC, SPURLING GROUP )          (7) UNFAIR BUSINESS PRACTICE
     LLC, SPURLING GROUP II LLC,                 )   (8) DECLARATORY RELIEF
22                                               )
                                                 )
23            Cross-Complainants,               )
                                                 )   DEMAND FOR JURY TRIAL
24        vs.                                     )
                                                 )
25   MARK ROSS, MARK ROSS & CO., INC., XE-)
     R, LLC and ROES 1 through 10, inclusive,    )
26                                               )
              Cross-Defendants.                  )
27                                               )
                                                 )
28                                               )

_____
                        Amended Cross-Complaint

1    Cross-complainants Mutual Credit Corporation, Sierra Life Solutions LLC, Spurling Group

2   LLC, and Spurling Group II LLC bring this cross-complaint against cross-defendants Mark Ross,

3   Mark Ross & Co., Inc., XE-R, LLC, and Roes 1 - 10, and allege as follows:

4                                    **THE PARTIES**

5        1.    Cross-complainant Mutual Credit Corporation ("MCC") is a licensed California

6   premium finance agency organized and with its principal place of business in Orange County,

7   California.

8        2.    Cross-complainant Sierra Life Solutions LLC ("Sierra Life") is a Delaware LLC with

9   its principal place of business in Orange County, California.

10       3.    Cross-complainant Spurling Group LLC ("Spurling I") is a Delaware limited liability

11  company with its principal place of business in Orange County, California.

12       4.    Cross-complainant Spurling Group II LLC ("Spurling II") is a Delaware limited

13  liability company with its principal place of business in Orange County, California.

14       5.    MCC, Sierra Life, Spurling I, and Spurling II are referred to herein as

15  "Cross-Complainants."

16       6.    Cross-defendant Mark Ross is an individual who resides in San Diego, California and

17  New York, New York and conducts business in those places, as well as Orange County, California.

18       7.    Cross-defendant Mark Ross & Co., Inc. ("Ross & Co.") is a Florida corporation with

19  its principal place of business in New York.  On information and belief, Ross & Co. conducts

20  business in New York and California and is nothing more than a shell corporation for Mark Ross.

21       8.    Cross-defendant XE-R LLC ("XE-R") is a Delaware limited liability company with

22  its principal place of business in New York, New York.  XE-R conducts business in New York, New

23  York and has conducted substantial business in Orange County, California.

24       9.    Cross-defendants Roes 1 through 10 presently are unknown.  On information and

25  belief, Defendants Roes 1 through 10 include agents and/or employees of Ross & Co., XE-R and Mr.

26  Ross who are responsible, in whole or in part, for the actions alleged herein.  The

27  Cross-complainants reserve the right to amend this cross-complaint as the identities of cross-

28  defendants Roes 1 through 10 become known to them.

1       10.   Mr. Ross, Ross & Co., XE-R, and Roes 1 - 10 are referred to herein as "Cross-

2 Defendants."

3.                        **JURISDICTION AND VENUE**

4       11.   The Court has jurisdiction and Orange County Superior Court is the proper venue for

5 this action because MCC, Sierra Life, Spurling I, Spurling II, Ross & Co, Mr. Ross, and XE-R either

6 conduct business or reside in Orange County, the material facts that form the basis for the claims

7 herein occurred in substantial part in Orange County, and the significant injuries caused by the

8 Cross-Defendants' misconduct have been suffered in Orange County, California.

9                        **NATURE OF THE ACTION**

10       12.   This is an action for breach of contract, trade secrets misappropriation, interference

11 with prospective economic relations, negligent interference with prospective economic relations,

12 inducing breach of contract, intentional interference with contractual relations, unfair business

13 practices, and declaratory relief.

14       13.   Mr. Ross and XE-R have breached their promise to use their "best commercial

15 efforts" to maximize the value of asset portfolios in which several of the cross-claimants have

16 interests. Mr. Ross, Ross & Co., and XE-R are using private and confidential information that

17 rightfully belongs to the Cross-Complainants, in violation of confidentiality obligations, in order to

18 lure clients and business opportunities away from the Cross-Complainants to Mr. Ross's competing

19 business enterprises.

20       14.   Mr. Ross, Ross & Co., and XE-R are also engaged in an active and deceitful

21 campaign to tarnish the Cross-Complainants' business reputations, wrongfully depress the value of

22 certain loan portfolio assets, and to disrupt business relationships among the Cross-Complainants

23 and between the Cross-Complainants and their customers and clients, potential third party

24 purchasers, and insurance companies. Mr. Ross, Ross & Co., and XE-R use Cross-Complainants'

25 confidential information to contact Cross-Complainants' clients and customers, and other third

26 parties, and communicate false information to them with the goal of convincing them to breach

27 agreements and/or end business negotiations with Cross-Complainants and instead work with Mr.

28 Ross, Ross & Co., and XE-R. As a result of their actions Mr. Ross, Ross & Co., and XE-R have

1    caused at least one party to enter into agreements with Mr. Ross, Ross & Co., and XE-R that are in

2    violation of, or prohibited by, pre-existing agreements with Cross-Complainants.

3        15.    In order to further their plans, Mr. Ross has worked in concert with various insurance

4    agents and brokers and life settlement providers, which provide valuations of and purchase life

5    insurance policies. Mr. Ross and these parties conspired to create artificially low bids on life

6    insurance policies so that they could profit from re-financing loans related to the policies, obtain re-

7    financing fees, and broker the policies on the secondary life insurance market. Cross-Defendants

8    sought to use this low-bid system to steal MCC's clients and obtain profits from the refinancing and

9    brokering of life insurance policies by avoiding payment of the full amounts owed on loans related

10    to the policies.

11        16.    Cross-Defendants' conduct has caused ongoing harm and threatens imminent

12    irreparable harm imperiling the Cross-Complainants' businesses. The Cross-Complainants seek

13    equitable relief to compel the Cross-Defendants' performance of their contractual duties and to stop

14    them from engaging in unlawful conduct that irreparably harms the Cross-Complainants. The Cross-

15    Complainants also seek damages and restitution on those claims.

16        **BACKGROUND OF THE DISPUTE**

17        **The Development of MCC's Financing Business**

18        17.    MCC is licensed by the California Department of Financial Institutions to loan money

19    to borrowers for the purchase of life insurance policies.

20        18.    In 2004, MCC developed a niche market for financing life insurance policies on a

21    non-recourse basis, based on years of experience, industry knowledge, and deep market research of

22    its owner, Anthony Jacobson. MCC focused on a highly select group of sophisticated, wealthy

23    clients. MCC utilized complex formulae to determine appropriate financing terms, interest rates,

24    pricing points, deal structures, and market valuations for potential transactions within their narrow

25    market segment. This information (and concomitant analyses of legal and tax aspects of potential

26    and actual transactions) is extremely confidential and proprietary to MCC and its successors in

27    interest, Spurling I and Spurling II, as described below.

28        19.    MCC has worked closely with specific high-end insurance brokers within the life

1   insurance industry to build its premium finance business focused primarily on the non-recourse

2   financing of life insurance policies that insure the lives of high net-worth individuals.  MCC's

3   information regarding high net worth contacts, and the identities of the most valuable brokers who

4   have successfully promoted their products to target candidates, are also confidential to MCC and its

5   successors in interest, Spurling I and Spurling II.

6       20.    MCC, Spurling I, and Spurling II have been very careful to protect against disclosure

7   of all of their confidential information, including the underlying analyses, operational processes and

8   deal structures that support their transactions, as well as valuable lists of candidates, clients, brokers,

9   and agents.  Through the use of confidentiality agreements, tight operational management of

10  confidential documents and information, and other steps to protect confidentiality, MCC, Spurling I,

11  and Spurling II have also been careful to protect and maintain as confidential the information

12  regarding each individual insured transaction, such as their client's personal information (e.g., name,

13  address, age, and health) and the specific terms of each loan transaction in which they have engaged

14  (e.g., policy value, loan amount, and loan terms), as well as all other confidential and proprietary

15  information, collectively referred to herein as "Confidential Information."

16  **Description of MCC's Non-Recourse Premium Financing**

17      21.    In general, MCC loans money for the purchase of life insurance policies (the

18  "Policies" or individually a "Policy") by irrevocable life insurance trusts (the "Trusts" or

19  individually a "Trust") created by the individuals insured under each such Policy (the "Insureds" or

20  individually an "Insured").  Each Trust is created for the sole benefit of the Insured's family.

21      22.    While MCC did not advertise or market its services, MCC and its owner, Anthony

22  Jacobson, had strong relationships with a specific group of agents familiar with the high end life

23  insurance market.  Those agents contacted potential Insureds to discuss their life insurance needs and

24  products that might be sensible for the potential Insured.  Typically, the candidate was given the

25  option to purchase a Policy with his or her own funds or to finance the premium payments using

26  recourse or non-recourse financing alternatives.

27      a.    The recourse lending alternative was available from a variety of lenders, at

28  relatively low rates because such loans were generally secured by cash or personal

1    guarantees of high net worth individuals.

2           b.     The non-recourse alternative was only offered by a small number of lenders,

3    including MCC, and was secured only by the life insurance policy being financed. Because

4    the future value of a life insurance policy was uncertain (particularly in 2004 when MCC

5    first developed its non-recourse lending structure), the non-recourse alternative was

6    significantly more expensive than the recourse lending alternative. However, if an Insured

7    did not want to provide collateral or personal guarantees in addition to the life insurance

8    policy being financed, the non-recourse alternative was very attractive, despite the financing

9    cost.

10          23.    The non-recourse alternative offered by MCC charged a 10% fixed rate of interest per

11   annum ("Fixed Interest"), an origination fee of 5% of the principal amount of the loan, and a

12   contingent interest amount that was tied to the fair market value of the Policy, as described below

13   ("Contingent Interest"). The non-recourse loan, secured solely by the Policy, would be reflected in

14   loan documents between MCC and the Trusts ("Notes"). The Notes were typically due and payable

15   at the end of twenty-four months (the "Note Term"). The Notes could be prepaid, including Fixed

16   Interest and Contingent Interest, without penalty. The Notes are binding payment obligations.

17          24.    If the potential Insured elected to utilize the non-recourse financing option, MCC

18   would negotiate the terms of the Note and the Trust would apply for and purchase the Policy. The

19   Policy would be collaterally assigned to MCC, based upon a collateral assignment agreement

20   ("Collateral Assignment"), as security for the Note. Upon repayment of the Note, the Collateral

21   Assignment of the Policy would be released.

22          25.    As part of the non-recourse financing, MCC also lent funds to the Trust to set up a

23   premium reserve account, which was an amount equal to a percentage of the face amount of the

24   Policy ("Reserve Amount"). The premium reserve account provided funds for the payment of future

25   premiums, but its use was not restricted and the Investment Trustee of the Trust was permitted to

26   invest or distribute the funds as he or she deemed appropriate.

27          26.    Because MCC assumed the risk that the Trust may default on the loan and leave

28   MCC with a potentially worthless policy at the end of the Note Term, in addition to Fixed Interest,

1  the Notes required the payment of an amount of money referred to as Contingent Interest. The

2  Contingent Interest is calculated based on the policy's fair market value. For the purposes of

3  calculating the Contingent Interest, the Trust is typically required to obtain at least two purchase bids

4  from licensed life settlement providers or, in the event the Trust and MCC do not agree that such

5  bids provide a true indication of value, the Trust should obtain an independent third-party valuation

6  to establish the policy's fair market value.

7      27.    On the date the Note is due ("Maturity Date") the Trust can pay the Note, including

8  the Fixed Interest and any applicable Contingent Interest, or surrender the Policy in lieu of

9  foreclosure. If the Trust chooses to surrender the Policy, the Trust and Insured usually have no

10  personal liability for the repayment of the Note. The Trust is also entitled to keep the Reserve

11  Amount. The Insured also benefits from having had life insurance throughout the Loan Term. If,

12  instead, the Trust chooses to pay off the Note and keep the Policy, it is required to pay the Note off

13  in full, including all applicable interest.

14      28.    When a Trust assigns the Policy to MCC in the Collateral Assignment, the Trust

15  covenants and agrees with MCC and its successors and assigns that the Trust will not amend,

16  modify, borrow funds under, or otherwise affect the Policy without the prior written consent of

17  MCC. The Trust also covenants and agrees with MCC and its successors and assigns that the Trust

18  will not incur any indebtedness for borrowed money or any obligation evidenced by a note, loan

19  agreement, or similar instrument, other than indebtedness evidenced by the Note, without the prior

20  written consent of MCC.

21      29.    The Insureds generally acknowledged to MCC and its assigns that in the event the

22  obligor on the Note defaults on the non-recourse financing, MCC or its assignees would be the sole

23  owner and beneficiary of the Policy and that none of the Insured, the spouse, or any heirs, executors,

24  or assigns of the insured or his/her estate would have any interest in the Policy or any of the

25  proceeds there from.

26      30.    Based upon financial information provided by the Insureds, MCC believed that each

27  Insured had, on the date of the issuance of the Policy, (i) an individual net worth, or joint net worth

28  with the Insured's spouse, in excess of $1,000,000, or (ii) individual income in excess of $200,000 in

1  each of the two years preceding such issuance or joint income with the Insured's spouse in excess of

2  $300,000 in each of those years and had a reasonable expectation of reaching such level of income in

3  the year of such issuance.

4       31.    As part of its agreement to service the Notes, MCC periodically sent notices to the

5  Trusts regarding the status of the Notes during the Loan Period, including the (i) Note issue date; (ii)

6  repayment date; (iii) principal amount; (iv) accrued fixed interest; and (v) estimated Contingent

7  Interest. These notices were typically sent 12 months, 18 months, and 22 months into the Loan

8  Period ("Note Status Notices"). MCC, as the service provider, also remained available to the Trusts

9  with respect to any issues that might arise with respect to the Notes and Policies.

10       32.    The premium life insurance finance transactions used by MCC and Sierra Life have

11  provided wealthy and sophisticated clients with valuable benefits, such as the following:

12       &bull;   The Insured is not personally liable for the loan, unless the Insured lied on his or her
13            life insurance application or commits suicide during the first two years of the term of
          the Policy.

14       &bull;   The Policy served as the only collateral for the loan.

15       &bull;   The loans enable insureds to bind coverage and lock in their insurability, and to do so
16            using leverage. Even if an insured or trustee surrenders a policy at the end of a loan
          term, the insured and his or her family have been insured for a period of time under a
17            high-benefit policy using solely the loan proceeds organized by the lender.

18       &bull;   The loans provide the insureds or their trustees with the ability to assess, at the end of
19            the loan term, the value of retaining the policy or the value of selling the policy at a
          profit.

20       &bull;   The loans provide the insured or a trust with a substantial amount of cash that can be
21            kept if the policy is surrendered at the end of the loan term to satisfy the loan.

22  **Implementing MCC's Premium Financing Business - XE-R's and Mr. Ross'**

23  **Involvement**

24       33.    To ensure that MCC would have adequate capital to fund its loans, MCC began

25  negotiations to sell its loans to XE Capital Management, LLC ("XE"). MCC was introduced to XE

26  by Sierra Life. Sierra Life was responsible for the distribution of information to XE and for

27  negotiating the terms of the XE agreements on MCC's behalf. Before Sierra Life provided any

28  Confidential Information to XE, XE was required to sign a confidentiality agreement (the "2004

1  Confidentiality Agreement"). Section 2.1 of that agreement limited use of Confidential Information

2  to the loan transactions XE was to evaluate and engage in and Section 2.3 of the Confidentiality

3  Agreement required written consent for any other use or disclosure.

4      34.    XE ultimately agreed to purchase MCC's loans, on an exclusive basis, through a

5  special purpose vehicle, Spurling I. MCC and Spurling I entered into an agreement (the "Note

6  Transfer Agreement"), whereby Spurling I would purchase loans originated by MCC. During

7  negotiation of the Note Transfer Agreement, Spurling I agreed to purchase individual loan

8  transactions of MCC, but only if XE's lawyers at Debevoise and Plimpton and a life insurance

9  specialist at XE-R were hired to individually evaluate each transaction. The initial members of

10 Spurling I included XE, a company affiliated with Sierra Life, and XE-R.

11     35.    XE-R is owned by XE and a company called R 2004, LLC ("R 2004"). R 2004, in

12 turn, is managed and controlled by Mr. Ross, a long time competitor of Sierra Life in the life

13 insurance business. R 2004 is the managing member of XE-R and Mr. Ross is the Chief Executive

14 Officer of XE-R.

15     36.    Despite the fact that Mr. Ross was a competitor of Sierra Life, XE required that MCC

16 and Sierra enter into a consulting agreement and warehousing agreement (the "Consulting

17 Agreements") whereby XE-R would provide consulting services to analyze, approve, and promote

18 the MCC non-recourse financing alternative. The Consulting Agreements contained a

19 confidentiality provision whereby the parties agreed to "keep confidential the records and other

20 information pertaining to the other parties, if any, obtained by reason of this [Consulting]

21 Agreement." XE-R was provided all of MCC's documentation, legal opinions, and loan processes

22 and procedures as a member of Spurling I and as MCC's consultant.

23     37.    Spurling I purchased substantially all of MCC's loans originated between November

24 of 2004 and April of 2005. In May of 2005, Spurling II was created and a new note transfer

25 agreement (together with the original Note Transfer Agreement, the "Note Transfer Agreements")

26 was entered into with MCC. The terms of the Note Transfer Agreements were identical and XE-R

27 was still providing consulting services under the Consulting Agreements for every MCC loan

28 transaction purchased by Spurling II. The initial owners of Spurling II were certain affiliates of

1   Sierra Life and XE. While XE-R was still receiving significant consulting fees from MCC for its

2   review of individual loan transactions, XE-R was not permitted to participate in the ownership of

3   Spurling II.

4         38.    The Note Transfer Agreements and other related agreements required that, prior to

5   funding any individual loan, MCC provide a complete package of data to XE's legal consultants for

6   legal analysis and to XE-R and Mr. Ross for financial analysis and approval. Thus, XE-R and Mr.

7   Ross were provided all of the information for the MCC loan transactions submitted to Spurling I or

8   Spurling II (300 or more) until such agreements were terminated in July of 2005. This information

9   included the name of the client, the broker, the client's personal information (contact, age, health),

10  the technical deal structure, policy specifics, and MCC's financial evaluation of the loan and policy

11  being applied for by the potential Insured. Mr. Ross was thus given access to a large amount of

12  Confidential Information.

13        39.    The Notes held by Spurling I and Spurling II are referred to herein, respectively, as

14  the Spurling I Portfolio and the Spurling II Portfolio (collectively, the "Spurling Portfolios"). The

15  value of the Spurling Portfolios varies based on the value of its primary assets, the Notes, and any

16  life insurance policies in their possession.

17        40.    Mr. Ross and XE-R invested in and profited from MCC's premium financing

18  business from the beginning. XE-R was a non-managing member of Spurling I and sold its interest

19  (Class B shares) at a profit. In exchange for providing consulting services for MCC and Sierra under

20  the Consulting Agreements, XE-R received "an amount equal to 50% of any loan origination fee

21  paid to MCC by a borrower" in connection with the Notes. MCC eventually paid XE-R more than

22  $5 million for its services.

23        **The Jenkins Trust Obtains MCC Premium Financing**

24        41.    An insurance agent, Steve Scammell, persuaded Harry Jenkins to apply for a life

25  insurance policy with Pacific Life Insurance ("Pacific Life"). Mr. Scammell and Mr. Jenkins had a

26  professional relationship that spanned close to 15 years in which Mr. Scammell advised Mr. Jenkins

27  with respect to his various insurance needs. Because of his long history working with Mr. Jenkins,

28  Mr. Scammell was aware that Mr. Jenkins had obtained numerous life insurance policies with

1  companies such Travelers, Jackson National, SunTrust, and Manulife. Mr. Scammell worked with

2  others in the life insurance business in obtaining these policies for Mr. Jenkins.

3      42.    Mr. Scammell approached Mr. Jenkins, sometime in late 2004, about seeking

4  premium financing from MCC to purchase the life insurance policy from Pacific Life. Other

5  companies in the life insurance business, working with Mr. Scammell, also facilitated Mr. Jenkins'

6  participation in MCC's premium financing program. Mr. Jenkins obtained a life insurance policy

7  with Pacific Life and, through the Harry L. Jenkins Irrevocable Insurance Trust ("Jenkins Trust"),

8  obtained financing for the policy through a loan from MCC.

9      43.    Mr. Jenkins' application for the Pacific Life policy contained representations as to the

10 amount of pre-existing coverage Mr. Jenkins had obtained. The application also contained

11 representations as to Mr. Jenkins' net worth. Mr. Jenkins reviewed and signed the Pacific Life

12 application, certifying that the content was true.

13     44.    In December 2004, Mr. Jenkins submitted an MCC premium financing application.

14 In the application, Mr. Jenkins certified "all statements in [the] Application and on each of the

15 documents submitted with [the] Application (including all information contained in the Insured's

16 insurance underwriting file) are true, correct and complete. Applicant/Insured agrees to notify

17 Mutual Credit Corporation of any material change in the information provided."

18     45.    As part of the financing from MCC, Mr. Jenkins also signed a consent and

19 acknowledgment form indicating that he understood "the insurance industry places certain

20 restrictions on the amount of life insurance that may be obtained on the life of a particular individual,

21 based upon factors including the age and net worth of such individual" and that purchasing "a large

22 insurance policy . . . on the life of the Insured will effectively limit the amount of life insurance that

23 may be purchased on such Insured's life in the future." Mr. Scammell and was likewise aware of

24 these restrictions.

25     46.    In processing Mr. Jenkins' application for premium financing, MCC read and relied

26 on the representations in the Pacific Life application and the application materials for the MCC

27 premium financing. MCC approved Mr. Jenkins' premium financing application on the basis of

28 these representations and premium payments for the Pacific Life policy were provided through a

1   Secured Nonrecourse Promissory Note ("Jenkins Note").

2       47.   Part of the MCC financing involved an "Assignment of Life Insurance Policy," where

3   the Jenkins Trust agreed that it would not:

4           a.   incur any indebtedness for borrowed money or any obligation evidenced by a

5       note, loan agreement, or similar instrument, other than that indebtedness evidenced by the

6       Jenkins Note, without the prior written consent of MCC; or

7           b.   create, assume or permit to exist any lien, security interest, or other

8       encumbrance, including any lien, security interest or other encumbrance resulting from any

9       act of or claim against the trustees of the Jenkins Trust, upon the Policy without the prior

10      written consent of MCC.

11      48.   Mr. Scammell received a commission for procuring, on behalf of Mr. Jenkins the

12  Pacific Life policy financed by MCC. After the commission was paid and the income received, Mr.

13  Scammell and the life insurance businesses working with him ceased to have any direct, economic

14  interest in the performance of the Jenkins Note. After receiving their initial income, Mr. Scammell

15  and the life insurance businesses working with him had no interest in the Jenkins Note regardless of

16  whether the Jenkins Trust and Mr. Jenkins ultimately decided to relinquish the life insurance policy

17  or repay MCC the appropriate amount on the Jenkins Note to keep the policy.

18      **The 2005 Dispute, the Settlement Agreement, and Reaffirmation of Prior Agreements.**

19      49.   In 2005, MCC and Sierra Life learned that XE-R and Mr. Ross were using MCC and

20  Sierra Life information (client contacts, broker contacts, specific transaction information) in

21  connection with the operation of a competing loan product developed by XE-R and receiving

22  funding through XE. MCC and Sierra Life filed a lawsuit in Orange County Superior Court. The

23  parties settled the lawsuit quickly and executed a settlement agreement ("Settlement Agreement").

24  With that settlement, the Consulting Agreements and certain other agreements relating to the

25  transaction were terminated, but MCC was required to continue making payments under the

26  Consulting Agreements to XE-R until being notified by XE that such payments were no longer

27  necessary in September of 2005. XE also agreed to continue funding Spurling II on a limited basis

28  and to release MCC from any exclusivity provisions. XE-R was required to pay certain sums to

1   Sierra Life for commissions earned by XE-R's competing program with respect to MCC clients.

2   XE-R and Mr. Ross personally also reaffirmed their obligations to the MCC/Sierra Life/Spurling line

3   of business; they agreed in the Settlement Agreement to "use their best commercial efforts to

4   maximize the value of the assets of Spurling I and Spurling II."

5       50.     Under the Settlement Agreement, confidentiality obligations were also reaffirmed.

6   Because Mr. Ross had instigated the problem in the first place, the parties required XE-R and Mr.

7   Ross personally to agree to abide by certain confidentiality obligations. The Settlement Agreement

8   states that "XE-R and Mr. Ross agree to be bound by the confidentiality and intellectual property

9   provisions" in various reaffirmed agreements, including the 2004 Confidentiality Agreement.

10      **The Spurling Portfolios Are Transferred and Sold to a Bank.**

11      51.     In 2006, after a series of transactions, Spurling I and Spurling II were sold to KBC

12  Financial Holdings, Inc. ("the Bank"). After the sale, through servicing agreements, MCC continues

13  to provide administrative services relating to the Spurling Portfolios.

14      **The Spurling Portfolios Are Again Attacked by Mr. Ross and XE-R.**

15      52.     Mr. Ross, Ross & Co., and XE-R have impermissibly and unlawfully taken steps to

16  devalue the assets in the Spurling Portfolios. Mr. Ross and XE-R are using the confidential

17  information obtained when they were consulting for XE, and intimately involved in evaluating and

18  approving the financing transactions of MCC, to identify individuals who have loans with Spurling

19  or MCC and contacting those individuals and their brokers. Mr. Ross, Ross & Co., and XE-R have

20  offered to step in and stepped into the role of acting as an "agent" or "broker" for various Trusts.

21  Mr. Ross apparently encourages the Insureds and Trustees to assign their Policies to him and XE-R

22  as part of XE-R's premium financing business that competes with MCC and Sierra Life and the

23  business that underlies the Spurling Portfolios. This relationship is improper given, among other

24  things, the Trusts' assignment of their Policies, the 2005 Settlement Agreement, the several

25  confidentiality provisions to which XE, Mr. Ross, and XE-R agreed, and various other legal and

26  ethical obligations binding Mr. Ross and XE-R.

27      53.     Upon information and belief, in an effort to convince the Trusts and Insureds to use

28  XE-R's services, Mr. Ross, Ross & Co., and XE-R have made or are making various public and

1    private statements about Spurling's and MCC's business that are false, misleading, or deceitful. Mr.

2    Ross and XE-R are also claiming to be able to perform functions on behalf of the Trust that they are

3    only able to achieve through false, misleading, or unfair business practices.

4         54.    Upon information and belief, Mr. Ross and XE-R have also induced or attempted to

5    induce various Trusts to breach their Notes in various way, including but not limited to, by

6    assigning, borrowing funds under or otherwise affecting their Policies without the prior written

7    consent of MCC or its assigns. Cross-Defendants caused the Jenkins Trust to attempt to enter into

8    agreements to borrow funds that affect Mr. Jenkins' Pacific Life policy and that violate or are

9    inapposite to agreements the Jenkins Trust has with MCC.

10        55.    Upon information and belief, Mr. Ross, Ross & Co., and XE-R have also induced or

11   attempted to induce various Trusts to breach their agreement with MCC by incurring indebtedness

12   for borrowed money or another obligation evidenced by a note, loan agreement, or similar

13   instrument, other than the indebtedness evidenced by the Note, without the prior written consent of

14   MCC or its assigns. Cross-Defendants caused the Jenkins Trust to attempt to enter into agreements

15   incurring indebtedness that affect Mr. Jenkins' Pacific Life policy and that violate or are inapposite

16   to agreements the Jenkins Trust has with MCC.

17        56.    Upon information and belief, Cross-Defendants intend to damage and discredit the

18   MCC and Spurling brands. Cross-Defendants hope to then purchase or otherwise encumber Policies

19   affiliated with those brands at depressed values. Cross-Defendants apparently intend to finance

20   those policies under the XE-R brand, and resell them on the market for substantial profits.

21        57.    In early February 2007 the Jenkins Trust attempted to enter into refinancing and other

22   agreements with XE-R which attempt to create an indebtedness with respect to Mr. Jenkins' Pacific

23   Life policy and which attempt to assign that policy to XE-R, all of which is prohibited by the

24   agreements the Jenkins Trust entered into with MCC. Cross-Defendants had actual knowledge of

25   and were well aware of the agreements between the Jenkins Trust and MCC.

26        58.    On information and belief, Cross-Defendants induced the Jenkins Trust to enter into

27   refinancing and other agreements with XE-R by promising to refinance the Jenkins Note with an

28   amount that would not cover the full amount owed on the Jenkins Note or by failing to disclose that

1    the refinancing would be based on valuations of Mr. Jenkins' policy that were fraudulently obtained

2    and based on artificially low bids.

3        59.    In February 2007 Anthony Jacobson, the President of MCC, received a telephone call

4    from an insurance agent that represents Mr. Jenkins. The agent communicated that Mr. Jenkins

5    would refuse to repay the full amount due upon the non-recourse loan and also refuse to forfeit his

6    policy as a result of the subsequent default on the loan.

7        60.    Mr. Jenkins' Trustee wrote to MCC claiming to have a bid on Mr. Jenkins' Policy for

8    under $1 million. When payment was tendered from XE-R by Mr. Jenkins' Trust, it failed to

9    account for either the appropriate interest amount or the proper principal amount. MCC later

10   received a letter from Mr. Ross, on XE-R letterhead, claiming that no Contingent Interest was due on

11   Mr. Jenkins' Note. Mr. Ross stated in the letter that he was authorized to communicate on behalf of

12   the Trust regarding its intention to repay its Note. Mr. Ross also wrote that he arrived at a Note

13   repayment amount that included zero Contingent Interest.

14       61.    Upon information and belief, the bids that Mr. Ross and XE-R secured valuing Mr.

15   Jenkins' Policy were, to their knowledge, artificially low. The analyses for the fair market value of

16   the policy did not take into account material facts, including accurate information about the health of

17   the Insured.

18       62.    Upon information and belief, Mr. Ross and XE-R are able to secure, or promise to

19   secure, artificially low bids on Policies by leaving out material information about the Policy or the

20   Insured to the entity providing the bid. These bids do not reflect the fair market value of the

21   Policies. Mr. Ross and XE-R, on information and belief, have engaged in other misleading,

22   fraudulent, deceitful, or unfair practices to secure artificially low bids for policies in the Spurling

23   Portfolios.

24       63.    In the case of the low bid for Mr. Jenkins's Policy, MCC secured two offers to

25   purchase Mr. Jenkins' Policy that exceeded the value of the artificially low bids provided by Mr.

26   Ross and XE-R. MCC secured these valuations by providing complete and accurate information

27   about the Policy and the Insured. The offers MCC secured were for more than double the amount of

28   the bids provided by Mr. Ross and XE-R.

1    64.    At the end of February 2007, MCC received another letter from Mr. Ross and XE-R

2    concerning a different insured ("Insured No. 2") in a Spurling Portfolio. Mr. Ross stated that as XE-

3    R's president, he had been engaged by Insured No. 2's Trust to "represent it and act as its agent in

4    respect of all matters concerning the repayment of the [Note]." Writing as president of XE-R, Mr.

5    Ross also called into question notices for payment issued on Insured No. 2's Note. Without

6    providing any bid related to the Policy, or other justification, the letter states that the Trustee's

7    counsel will tender payment for the Note "in an amount which assumes a Contingent Interest of

8    zero."

9    65.    In the first week of March 2007, MCC received a letter from Mr. Ross's law firm,

10    Barger & Wolen LLP, purporting to represent a third Insured from the Spurling Portfolios named

11    Larry Bieber. The letter does not say why the law firm was apparently retained by Mr. Bieber. All

12    it says is that communications regarding Mr. Bieber and Mr. Bieber's Policies should be directed to

13    the law firm or, XE-R or Mr. Ross.

14    66.    Mr. Ross individually, and through XE-R and his lawyers at Barger & Wolen LLP,

15    has interposed himself between the Trusts and the holders of the Notes. Aside from contacting

16    Insureds and their Trusts, Mr. Ross also contacted the Bank, threatening that he would harm the

17    Spurling Portfolios if the Bank did not work with him to divert business from MCC and Sierra Life

18    to a new company to be created by Mr. Ross. Mr. Ross threatened that he was setting up a "PR

19    machine" to promulgate his false claims. Mr. Ross suggested that the Bank should only do business

20    with him and that, if that did not happen, "it would not be pretty."

21    67.    Upon information and belief, Mr. Ross has also made statements that suggest he is

22    attempting to cause panic among the Insureds that have Policies affiliated with the Spurling

23    Portfolios and the insurance companies, agents, and brokers who work with MCC and Sierra Life.

24    Mr. Ross is falsely telling the Insureds that they will have millions of dollars in taxable income if

25    they pay of their Notes and they will suffer other adverse consequences as a result of their affiliation

26    with MCC.

27    68.    Upon information and belief, Mr. Ross and XE-R have taken Counter-Claimants' lists

28    of clients, agents, brokers, and other contacts and used that information to begin disseminating false

1    information about Sierra Life and MCC for the purpose of contacting and soliciting business from

2    their clients and interfering with insurance and financing contracts with those clients. Mr. Ross has,

3    on information and belief, already contacted scores of Cross-Complainants' customers to convince

4    them to work with him against MCC, Sierra Life, and the Spurling Portfolios.

5        69.    Although he is using confidential information covered by confidentiality restrictions,

6    neither XE-R nor Mr. Ross has ever requested or received consent to use the detailed information

7    from XE, Sierra Life, or MCC regarding clients, agents, policy values, deal structures, market

8    opportunities or any other confidential information for the purpose of contacting clients from the

9    Spurling Portfolios, MCC, or Sierra Life.

10       70.    Upon information and belief, Mr. Ross and XE-R have also used Confidential

11   Information, including individual policy information and deal structures to value specific policies,

12   cherry picking the largest ones and contacting them with promises of money if they work with Mr.

13   Ross and XE-R against MCC, Sierra Life, and the Spurling Portfolios.

14       71.    Upon information and belief, Mr. Ross has threatened to use his deep knowledge of

15   MCC's loan structures to set up competing ventures and convince customers they should no longer

16   work with MCC, Sierra Life, or the Spurling Portfolios.

17       72.    Mr. Ross, through XE-R, Ross & Co., and his lawyers at Barger & Wolen LLP,

18   recently made good on some of his threats by filing a lawsuit against MCC and the Spurling Group,

19   containing many false and misleading allegations. The lawsuit contains pages of allegations

20   attacking the business of MCC, Sierra Life, and Spurling I as "predatory" and stating that the

21   financing they provide is part of a "premeditated attempt to defraud policyholders" even though

22   *Mark Ross and XE-R previously invested in and made millions of dollars from MCC's financing*

23   *business* and approved the exact transactions over which they now complain. Further, these

24   statements relate to the very portfolios, the Spurling Portfolios, that Mr. Ross and XE-R promised to

25   use their "best commercial efforts" to maximize in value.

26       73.    Mr. Ross (through his company Ross & Co.) also issued a lengthy press release in

27   their effort to further publicly disparage and devalue the Spurling Portfolios. This press release

28   parrots many of the false and misleading accusations contained in Mr. Ross' lawsuit. This press

1   release was disseminated by Mr. Ross and is available on the Internet.

2       **The Conduct of Mr. Ross, Ross & Co., and XE-R is Causing Harm**

3       74.     Mr. Ross', Ross & Co.'s, and XE-R's conduct causes immense harm to the value of

4   the Spurling Portfolios.  Third parties negotiating transactions with MCC and the Spurling Portfolios

5   have backed out of those negotiations.  Parties already under contract to purchase assets from MCC

6   and the Spurling Portfolios have indicated they may breach their purchase agreements, backing out

7   of the deals.  All of these problems have been caused by Mr. Ross' misconduct.

8       75.     The disparagement of the Spurling Portfolios affects their value on the open market.

9   If Mr. Ross and Ross & Co. continue to go forward with their false public relations campaign,

10  disparaging the Notes and the Spurling Portfolios, and scouring the country to convince Insureds and

11  their Trusts to breach their Notes, they may tremendously and irreparably reduce the value of the

12  Spurling Portfolios.  Mr. Ross', Ross & Co.'s, and XE-R's conduct may further cause current

13  Insureds and potential Insureds, as well as agents, brokers, and insurance companies to stop doing

14  business with the Spurling Portfolios, Sierra Life, and MCC,  and may even encourage further

15  baseless yet costly lawsuits against those companies.

16      76.     Mr. Ross', Ross & Co.'s, and XE-R's conduct also threatens to reduce the value of

17  the Policies that that the Insured and Trusts have various interests in.  If Mr. Ross and Ross & Co.

18  continue to publicly call into question the legitimacy of the Policies, this will have a negative affect

19  on the value of these Policies that can be sold on the open market.  Already, third parties have

20  contacted the Cross-Complainants regarding the false allegations being made by the Cross-

21  Defendants and the accusations have negatively affected active contracts and negotiations.  Further

22  harm will affect other third parties, including the Trusts and Insureds which have interests in the

23  Policies and the Notes.

24      77.     Upon information and belief, publicly available records demonstrate there are several

25  substantial legal judgments against Mr. Ross.  Mr. Ross and XE-R will likely not be able to pay

26  damages in full in the event the Counter-Claimants are successful in their cross-claims.

27      **FIRST CAUSE OF ACTION - BREACH OF CONTRACT**
         **(MCC and Sierra Life Against Mr. Ross and XE-R)**

28

78.   Paragraphs 1 through 77 above are incorporated herein by reference.

79.   On or about July 20, 2005, XE-R, Mr. Ross, MCC, Sierra, and XE Capital Management, LLC ("XE") entered into a Settlement Agreement.

80.   Section 5.07 of the Settlement Agreement states, in relevant part: "The Parties agree to use their **best commercial efforts** to maximize the value of the assets of Spurling I and Spurling II. The Parties hereby reaffirm all agreements and documents executed in connection with the November 2, 2004 funding of Spurling I and the May 3, 2005 funding of Spurling II . . . This reaffirmation also includes the August 11, 2004 Confidentiality Agreement between XE and Sierra, including the mutual understanding of those parties set forth in a letter agreement dated August 16, 2004, and other confidentiality, intellectual property, and misappropriation provisions contained in the various other agreements relating to Spurling I and Spurling II."

81.   Section 5.07 of the Settlement Agreement further states: "XE-R and Mark Ross agree to be bound by the confidentiality and intellectual property provisions contained in the foregoing reaffirmed agreements to the extent applicable to XE or its Affiliates with respect to information received directly from XE or any of its Affiliates."

82.   MCC has performed all obligations under the Settlement Agreement, except those obligations MCC was prevented or excused from performing.

83.   Sierra Life has performed all obligations to under the Settlement Agreement, except those obligations Sierra Life was prevented or excused from performing.

84.   Mr. Ross and XE-R have breached the Settlement Agreement by engaging in the misconduct described above, including, without limitation, their duty to use their best efforts to maximize the value of the assets of Spurling I and Spurling II, and by using and disclosing without authorization Cross-Complainants' confidential information.  Mr. Ross and XE-R have failed to perform their obligations under the Settlement Agreement and committed the acts and omissions alleged herein above for the conscious purpose of withholding from MCC, Sierra Life, and the Spurling Portfolios the rights and benefits to which they are entitled under the Settlement Agreement.

85.   Mr. Ross and XE-R have breached the implied covenant of good faith and fair

1  dealing by, among other things, using confidential information obtained from MCC and Sierra Life

2  — to which Mr. Ross and XE-R had access during their business relationship with MCC and Sierra

3  Life — to pilfer clients from MCC. Mr. Ross and XE-R are also attempting to frustrate the entire

4  purpose of the Settlement Agreement by utilizing underhanded tactics to steal MCC's and the

5  Spurling Portfolios' clients and engaging in conduct that has the effect of preventing MCC and

6  Sierra Life from receiving the fruits of their bargain with Mr. Ross and XE-R in the Settlement

7  Agreement.

8      86.    Mr. Ross' and XE-R's conduct has caused, and unless enjoined will continue to

9  cause, substantial irreparable injury and other damages to MCC, Sierra Life, the Spurling Portfolios

10  and others.

11  **SECOND CAUSE OF ACTION - MISAPPROPRIATION OF TRADE SECRETS**
    **(All Cross-Complainants Against Mr. Ross, Ross & Co. and XE-R)**

12

13      87.    Paragraphs 1 through 86 above are incorporated herein by reference.

14      88.    By reason of the foregoing acts, the Cross-Defendants have engaged in

15  misappropriation of trade secrets, without MCC's, Sierra Life's, Spurling I's, or Spurling II's

16  express or implied consent, in violation of New York trade secret law. Sylmark Holdings Ltd. v.

17  Silicone Zone Intern. Ltd., 783 N.Y.S.2d 758 (2004). By reason of the foregoing acts, Mr. Ross,

18  Ross & Co., and XE-R have also engaged in misappropriation of trade secrets in violation of

19  California Civil Code Sections 3426-3426.10.

20      89.    MCC, Sierra Life, Spurling I, and Spurling II have highly valuable confidential

21  information and trade secrets, including but not limited to complex formulae to determine

22  appropriate financing terms, interest rates, pricing points, deal structures, and market valuations for

23  potential and actual transactions within their narrow market segment of premium financing of life

24  insurance policies; and databases of highly select sets of life insurance candidates and clients, and

25  the identities of the specific high-end insurance brokers who have successful promoted MCC, Sierra

26  Life, Spurling I, and Spurling II products to target candidates, as well as the specific terms of

27  individual transactions in the Spurling Portfolios.

28      90.    These trade secrets (i) are not generally known to the public, or to other persons, who

1  could obtain economic value from their disclosure or use; (ii) derive independent economic value

2  from not being so known, in that they have been generated over a long period of time through the

3  expenditure of substantial money, expertise, and effort; and (iii) are the subject of reasonable efforts

4  to maintain their secrecy as described at least partly above.

5       91.    These trade secrets afford Cross-Complainants an essential competitive edge in the

6  marketplace for premium financing of life insurance policies and are important to the continuing

7  operation of Cross-Complainants' businesses.

8       92.    Mr. Ross and XE-R gained access to these trade secrets pursuant to their past

9  business partnership with MCC, Sierra Life, Spurling I, and Spurling II; indeed, Mr. Ross and XE-R

10  and other companies for which they worked such as XE agreed to refrain from using or disclosing

11  without written authorization confidential information acquired via their work with MCC, Sierra

12  Life, Spurling I, and Spurling II for other purposes. Ross & Co. acquired access to the trade secrets

13  with full knowledge of Mr. Ross and XE-R's confidentiality obligations.

14      93.    Mr. Ross, Ross & Co., and XE-R have breached their duty of confidentiality by using

15  the trade secrets, in ways described above, including but not limited to efforts to evaluate specific

16  policies within the Spurling I and Spurling II portfolios, identify the most valuable loans and polices

17  in which cross-complainants hold an interest, contact clients to try to convince them to end their

18  relationships with Cross-Complainants and instead work with Mr. Ross, XE-R, and his other

19  companies, to sell or refinance the polices in a manner that would benefit the Cross-Defendants.

20      94.    Mr. Ross, Ross & Co. and XE-R's conduct has caused, and unless enjoined will

21  continue to cause, substantial injury and damages to MCC, Sierra Life, Spurling I, and Spurling II.

22      95.    As a result of the aforementioned conduct, MCC, Sierra Life, Spurling I, and Spurling

23  II have also suffered damages and will imminently suffer further damages, including the loss of their

24  trade secrets and competitive position. Such damages cannot presently be ascertained with precision

25  but will be evidenced at the trial of this matter.

26      96.    The aforementioned conduct has been despicable, wanton, oppressive, willful,

27  malicious, duplicitous, and performed with conscious disregard of MCC's, Sierra Life's, Spurling

28  I's, and Spurling II's rights and with the intent to deprive MCC, Sierra Life, Spurling I, and Spurling

II of their rights.  Accordingly, MCC, Sierra Life, Spurling I, and Spurling II are entitled to an award

of punitive and exemplary damages pursuant to New York law and/or California Civil Code Sections

3294 and 3426.3(c), and reasonable attorneys' fees pursuant to New York law and California Civil

Code Section 3426.4.

## THIRD CAUSE OF ACTION - INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (All Cross-Complainants Against Mr. Ross, Ross & Co., and XE-R)

97.   Paragraphs 1 through 96 above are incorporated herein by reference.

98.   Spurling I and Spurling II are owners of numerous Notes wherein the various

Insureds promise to repay a sum consisting of principal, interest, and contingent interest.  These

Notes contain the probability of future economic benefit to Spurling I and Spurling II.  With a

contract to administer these notes, MCC also has prospective economic advantage in the continued

performance of these Notes.  The Cross-Complainants hold prospective economic relations with

their clients and other prospective clients in the ordinary course of their business, including the sale

of other loan and life insurance products and the sale of certain assets with which the Mr. Ross, Ross

& Co., and XE-R are intentionally interfering.  Cross-Complainants also have prospective economic

relations with other third parties with whom they have negotiated to sell certain assets; and other

third parties with whom they engage in life insurance financing transactions, including insurance

companies, brokers, and banks.

99.   Mr. Ross, Ross & Co., and XE-R knew about the Notes held by Spurling I and

Spurling II, on which the Insured owe payment to Spurling I and Spurling II and were fully aware of

the Cross-Complainants' intention to continue in the business of selling loan and life insurance

products to customers and administering those products, as well as their intention to market and sell

related assets as described in the previous paragraph.

100.   Mr. Ross, Ross & Co., and XE-R intentionally and wrongfully interfered with these

relationships by, *inter alia*, intentionally taking actions — utilizing confidential and trade secret

information misappropriated from MCC and Sierra Life and engaging in the dissemination of false

information regarding the Cross-Complainants and their products — that would negatively impact

1    the Cross-Complainants' prospective economic relations.

2         101.    As a direct and proximate result of the aforementioned conduct, Cross-Complainants'

3    relationships with the Insureds, prospective customers, insurers, and other third parties such as

4    investors and banks have been and are being disrupted and damaged in an amount to be proven at the

5    trial of this matter.

6         102.    The aforementioned conduct of Cross-Defendants has been despicable, wanton,

7    oppressive, willful, malicious, duplicitous, and performed with conscious disregard of Cross-

8    Complainants' rights and with the intent to deprive them of their rights. Accordingly, the Cross-

9    Complainants are entitled to an award of punitive and exemplary damages.

10
11

**FOURTH CAUSE OF ACTION - NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**
**(All Cross-Complainants Against Mr. Ross, Ross & Co., and XE-R)**

12

13         103.    Paragraphs 1 through 102 above are incorporated herein by reference.

14         104.    Spurling I and Spurling II are owners of numerous Notes wherein the various

15    Insureds promise to repay a sum consisting of principal, interest, and contingent interest. These

16    Notes contain the probability of future economic benefit to Spurling I and Spurling II. With a

17    contract to administer these notes, MCC also has prospective economic advantage in the continued

18    performance of these Notes. The Cross-Complainants hold prospective economic relations with

19    their clients, other prospective clients, insurance companies, third party investors and banks with

20    whom they have negotiated in the ordinary course of their business, including the sale of other loan

21    and life insurance products and the sale of certain assets with which the Cross-Defendants are

22    interfering.

23         105.    Mr. Ross, Ross & Co., and XE-R knew about the Notes held by Spurling I and

24    Spurling II, on which the Insured owe payment to Spurling I and Spurling II and were fully aware of

25    the Cross-Complainants' intention to continue in the business of selling loan and life insurance

26    products to customers and administering those products, their relationships and potential transactions

27    with life insurance companies, as well as their intention to market and sell related assets to other

28    third parties such as banks and investment firms.

106. Mr. Ross, Ross & Co., and XE-R interfered with these relationships by, *inter alia*, taking actions — utilizing confidential and trade secret information misappropriated from MCC and Sierra Life and engaging in the dissemination of false information regarding the Cross-Complainants and their products — that would negatively impact Cross-Complainants' prospective economic relations. It was reasonably foreseeable that Mr. Ross', Ross & Co.'s, and XE-R's wrongful conduct would interfere with Cross-Complainants' relationships and these defendants failed to exercise reasonable care and Cross-Complainants have been damaged in an amount to be proven at the trial of this matter.

107. As a direct and proximate result of the aforementioned conduct, Cross-Complainants' relationships with the Insureds and prospective customers have been disrupted and Cross-Complainants have been damaged in an amount to be proven at the trial of this matter.

## FIFTH CAUSE OF ACTION - INDUCING BREACH OF CONTRACT
### (Spurling I Against Mr. Ross, Ross & Co., and XE-R)

108. Paragraphs 1 through 107 above are incorporated herein by reference.

109. Spurling I owns a Note wherein the Harry Jenkins Irrevocable Insurance Trust promised to pay by February 11, 2007 a sum consisting of principal, interest, and contingent interest as evidenced by the Jenkins Note. The Jenkins Trust agreed not to encumber the Jenkins Note.

110. Mr. Ross, Ross & Co., and XE-R knew of the Jenkins Note and related agreements and knew that the Jenkins Note was held by Spurling I.

111. Mr. Ross, Ross & Co., and XE-R intentionally caused the Jenkins Trust to breach the terms of the Jenkins Note by assisting in the acquisition of sham market valuations, *i.e.* Lowball Bids, on the Jenkins Note. Cross-Defendants also counseled the Jenkins Trust to refuse to pay the sum it owed to Spurling I on February 10, 2007 and to encumber the Note.

112. Due to the efforts of Mr. Ross, Ross & Co., and XE-R the Jenkins Trust failed to pay the required amount and defaulted on the Jenkins Note and encumbered the Note.

113. As a result of the aforementioned conduct, Spurling I has suffered damages and will imminently suffer further damages. Such damages cannot presently be ascertained with precision, but will be evidenced at the trial of this matter.

114.  The aforementioned conduct has been despicable, wanton, oppressive, willful, malicious, duplicitous, and performed with conscious disregard of Spurling I's rights and with the intent to deprive Spurling I of its rights.  Accordingly, Spurling I is entitled to an award of punitive and exemplary damages.

**SIXTH CAUSE OF ACTION - INTENTIONAL INTERFERENCE**
**WITH CONTRACTUAL RELATIONS**
**(MCC, Spurling I, and Spurling II Against Mr. Ross, Ross & Co., and XE-R)**

115.  Paragraphs 1 through 114 above are incorporated herein by reference.

116.  Spurling I and Spurling II own numerous Notes wherein the various Insureds promise to repay a sum consisting of principal, interest and contingent interest.  MCC has contracted to administer these Notes.

117.  Mr. Ross, Ross & Co., and XE-R knew of the existing contract and business relationship between the Insureds and Spurling I and Spurling II and of MCC's administration contract.

118.  Mr. Ross, Ross & Co., and XE-R  intentionally interfered with these contract and business relationships by committing the wrongful acts alleged herein.  These defendants intended to prevent Spurling I and Spurling II from collecting the sums owed by Insureds pursuant to the terms of the Notes and intentionally sought to interfere with MCC's ability to perform its administration contract.

119.  Mr. Ross', Ross & Co.'s, and XE-R's conduct has already damaged performance of the Jenkins Note, and has made performance more expensive and more difficult, disrupting other Notes and the agreement under which MCC administers the Notes.

120.  Mr. Ross, Ross & Co., and XE-R do not have any direct economic interest in the performance of the Spurling I and Spurling II Notes.

121.  As a result of the aforementioned conduct, MCC, Spurling I, and Spurling II have suffered damages and will suffer further damages.  Such damages cannot presently be ascertained with precision but will be evidenced at the trial of this matter.

122.  The aforementioned conduct has been despicable, wanton, oppressive, willful,

24

malicious, duplicitous, and performed with conscious disregard of MCC, Spurling I, and Spurling II's rights and with the intent to deprive them of their rights. Accordingly, MCC, Spurling I, and Spurling II are entitled to an award of punitive and exemplary damages.

## SEVENTH CAUSE OF ACTION - UNFAIR BUSINESS PRACTICE
### (CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.)
### (All Cross-Complainants Against Mr. Ross, Ross & Co., and XE-R)

123.    Paragraphs 1 through 122 above are incorporated herein by reference.

124.    Mr. Ross', Ross & Co.'s, and XE-R's acts as set forth herein constitute business practices that are unlawful, unfair, and fraudulent in violation of California Business & Professions Code Section 17200 *et seq.*

125.    Mr. Ross', Ross & Co.'s, and XE-R's unfair business acts and practices have caused, and unless enjoined will continue to cause, irreparable injury and other losses to all Cross-Complainants for which they have no adequate remedy at law. Cross-Complainants are therefore entitled to restitution and a permanent injunction prohibiting Cross-Defendants, their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from engaging in the wrongful conduct described herein.

## EIGHTH CAUSE OF ACTION - DECLARATORY JUDGMENT
### (All Cross Complainants Against Mark Ross, Ross & Co., and XE-R)

126.    Paragraphs 1 through 125 above are incorporated herein by reference.

127.    Mr. Ross, Ross & Co. and XE-R have caused the Jenkins Trust to enter into various agreements with Mr. Ross, Ross & Co. and XE-R ("Prohibited Agreements") that unlawfully encumber, affect, violate, or otherwise interfere with agreements the Jenkins Trust entered into with MCC, including the Jenkins Note and the Assignment of Life Insurance Policy.

128.    The Prohibited Agreements call into question the status of the Jenkins Note and Mr. Jenkins' Pacific Life policy and the status of and ability to effect assignment of that policy. Cross-Complainants are therefore entitled to declaratory judgment that the Prohibited Agreements are void or otherwise unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, Cross-Complainants pray for judgment as follows:

1.    That preliminary and permanent injunctive relief, enjoining and restraining Cross-Defendants from the wrongful acts and conduct set forth above, including an order:

    (a)    that Cross-Defendants, their directors and officers, agents, servants, employees, and all other persons acting in active concert or in privity or in participation with them, be enjoined:

        (i)    from taking any action that adversely or negatively affects the value of the assets of Spurling I or Spurling II, or taking any action which contravenes Cross-Defendants' "best commercial efforts to maximize the value of the assets of Spurling I and Spurling II"; and

        (ii)    from further use or disclosure of confidential information obtained from the Cross-Complainants, including but not limited to information regarding customers, clients, agents, brokers, or the specifics (e.g., structure, value, terms) of any loan agreement in the Spurling I or Spurling II portfolios;

        (iii)    from further interfering with any agreements of any kind between Sierra Life, MCC, Spurling I, or Spurling II and their customers, clients, insureds, and agents, by soliciting, suggesting, or asking contracting parties to breach the agreements in any way; and

        (iv)    from soliciting to represent, or representing or advising, directly or indirectly, any borrower of any loan in the Spurling Portfolios with respect to such loan or the life insurance policy securing such loan.

    (b)    that Cross-Complainants receive such other injunctive relief as the Court deems just and proper;

2.    That Cross-Complainants be awarded general damages according to proof except on those damage claims subject to arbitration;

3.    That Cross-Complainants be awarded special damages according to proof except on those claims subject to arbitration;

4.    That Cross-Complainants be awarded punitive and exemplary damages in an unspecified sum;

1        5.    That Cross-Complainants be awarded reasonable attorney fees, including their costs

2    of suit incurred in this action;

3        6.    That Cross-Complainants be awarded the declaratory relief requested; and

4        7.    That Cross-Complainants be awarded such other and further relief as the Court may

5    deem just and proper.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Cross-Complainants hereby demand trial by jury on each of their claims for relief that are triable before a jury.

DATED:  May 7, 2007                              KIRKLAND & ELLIS LLP


By: _____


Attorneys for MUTUAL CREDIT
CORPORATION, SIERRA LIFE SOLUTIONS
LLC, SPURLING GROUP LLC, SPURLING
GROUP II LLC, MICHAEL BROWN, and
ANTHONY JACOBSON