# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: RICHARD B. LOWE III, Justice    PART S6m

XE L.I.F.E., LLC

- v -

Mark Ross & Co et al

INDEX NO. 603579/06
MOTION DATE 10/20/06
MOTION SEQ. NO. 001
MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion: ☐ Yes ☒ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS DECIDED IN ACCORDANCE WITH ACCOMPANYING MEMORANDUM DECISION

FILED
NOV 08 2006
NEW YORK
COUNTY CLERK'S OFFICE

Dated: 10/30/06

RICHARD B. LOWE III
J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Check one: ☐ FINAL DISPOSITION ☒ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART 56

---------------------------------------------------------------x

XE L.I.F.E., LLC

Index No: 603579/06

*Plaintiffs*

-against-

**DECISION AND ORDER**

MARK ROSS & CO and MARK E. ROSS

*Defendants*

---------------------------------------------------------------x

FILED
NOV 08 2006
NEW YORK
COUNTY CLERK'S OFFICE

**RICHARD B. LOWE III, J:**

In *XE L.I.F.E., Inc v. Mark Ross & Co and Mark E. Ross*, Index No: 603579/06, Motion Sequence 001, ("Action 1") Plaintiff XE L.I.F.E, LLC ("XE LIFE") moves for a preliminary injunction pursuant to CPLR 6301 against defendants Mark Ross & Co ("MRC.") and Mark Ross ("Ross") preliminarily enjoining them from presenting themselves as XE LIFE's agents with respect to the sale or settlement of certain life insurance policies.

In *XE-R, LLC and Mark Ross & Co v. XE Capital Management, LLC and XE L.I.F.E., LLC*, Index No: 603658/06, Motion Sequence 001 ("Action 2"), Plaintiffs XE-R, LLC ("XE-R") and MRC move for a preliminary injunction pursuant to CPLE 6301 against defendants XE Capital Management, LLC ("XE Capital") and XE LIFE preliminarily enjoining them from preventing MRC and XE-R to broker certain life insurance policies.

Both motions are consolidated for disposition.

1

## BACKGROUND

XE LIFE is a limited liability company wholly owned by XE Capital, an asset management firm. XE LIFE is engaged in the business of financing life insurance policies, whereby they advance loans to persons seeking life insurance ("insureds") in order for the insureds to pay the policy's premium; the premium is the monetary amount paid for coverage. The insurance policy secures the loan, and in the event that an insured elects not to repay the loan, the policy becomes the property of the lender, who typically sells or "settles" the policy through a broker who acts as the lender's agent.

In June 2004, XE Capital and Ross's company, R2004, LLC ("R2004"), negotiated the creation of XE-R, a company that would finance life insurance policies for high-net worth individuals. The XE-R Agreement provides that R2004 holds the majority interest in XE-R and Ross is its president. Ross is also the president and Chief Executive Officer of MRC, which is in the business of reselling or settling life insurance policies.

Pursuant to the XE-R Agreement, MRC would act on XE-R's behalf to identify persons wishing to finance a life insurance policy purchase. If the candidate meets the firm's established criteria, XE-R undertakes the financing of the premiums using two components: a non-recourse premium finance loan and a brokerage agreement.

XE-R extends the premium finance loan to an irrevocable trust created by the insured. The trust then uses the proceeds of the loan to pay the premiums on the policy. At the end of two years, the loan matures and principle and interest become payable. The brokerage-agreement component provides that if at maturity date the insured decides to sell the loan rather than begin repayment, she/he will use MRC, through XE-R, as the broker for the policy's sale.

2

Prior to XE-R's formation, MRC entered into an agreement with Stuart and Phyllis Moldaw ("the Moldaws"), whereby MRC provided advice with respect to the purchase of life insurance policies. In October 2004, after XE-R was formed, the Moldaws received $7.7 million in interim financing for the policies. The financing was provided through MRC, which acquired it from XE-R, which had acquired it from XE LIFE. In November 2004, the parties agreed that the final loan financing would come directly from XE LIFE because it would make the administration of the loan more manageable. In order to facilitate the financing, the Moldaws transferred the policies to several companies owned by Moldaw Capital Partners, LLC ("Moldaw Capital"). In January 2005, XE LIFE lent approximately $10 million to Moldaw Capital. When the first of the loans matured, the Moldaws decided to surrender the loan rather then pay the principle and interest that became due. Moldaw Capital surrendered the policy to XE LIFE in June 2006.

When MRC learned that the Moldaws surrendered the policy, they approached XE LIFE regarding the policy's resale through XE-R. XE LIFE told MRC that they would not select them as the broker. At this time, the relationship between XE LIFE and Ross deteriorated. XE LIFE alleged that Ross was guilty of a "pattern" of misconduct, which included the mismanagement of XE-R.[1] XE LIFE cited this as their basis for not selecting MRC as the broker as well as their contention that since XE LIFE, and not XE-R, financed the policy, XE LIFE could select whomever they wish to act as their agent. XE LIFE eventually selected Sierra Life Solutions, LLC ("Sierra Life"), a competitor to MRC in the life insurance-brokerage business.

---

[1] XE LIFE commenced an arbitration proceeding against Ross on September 13, 2006 seeking damages and dissolution of XE-R.

3

In October 2006, Ross notified XE LIFE that XE-R is the exclusive broker for the Moldaw policy. Additionally, he notified them that MRC was "actively engaged in brokerage activity with respect to the Moldaw portfolio" and had already contacted "numerous settlement providers as the exclusive representative of these policies."

In the instant motion for Action 1, XE LIFE requests a preliminary injunction, preventing Ross and MRC from holding themselves out as their agents until the action's merits are decided. XE LIFE avers that they are likely to succeed on the merits because of the principle's power to prevent an agency relationship; that they will suffer irreparable harm if Ross and MRC continues to falsely present themselves as XE LIFE's agents; and that the balance of equities are in their favor because they will suffer long-term reputation damages, whereas Ross and MRC will suffer nothing if the preliminary injunction is granted.

In the instant motion for Action 2, XE-R and MRC request a preliminary injunction preventing XE LIFE and XE Capital from prohibiting them from brokering the Moldaw policy. XE-R and MRC contend that they will likely succeed on the merits because they have the exclusive rights to broker the Moldaw policy; that their business will suffer irreparable harm if their exclusive brokerage agreement is terminated; and that the balance of equities are in their favor because they have exclusive brokerage rights, which XE LIFE and XE Capital cannot revoke.

4

## **DISCUSSION**

A party seeking a preliminary injunction pursuant to CPLR 6301 must show "(1) a likelihood of success on the merits, (2) irreparable injury if provisional relief is not granted, and (3) that the equities are in [its] favor" (*J.A. Preston Corp. v Fabrication Enterprises, Inc.*, 68 NY2d 397, 406 [1986]). The purpose of a motion for a preliminary injunction is to maintain the status quo until the merits of the case are heard and determined. (*Id.*) However, because preliminary injunctions "determine the litigation and give the same relief which is expected to be obtained by the final judgment" (*Xerox Corp. v Neises*, 31 AD2d 195, 197 [1st Dept 1968], quoting 28 NY Jur, Injunctions § 19), a preliminary injunction will not be granted without "great caution and only when required by imperative, urgent, or grave necessity, and upon clearest evidence, as where the undisputed facts are such that without an injunction order a trial will be futile." (*Id.*)

*A. The Likelihood of the Success on the Merits*

*I. The Moldaw Loan-Financing Agreement*

XE LIFE avers that they, not XE-R, executed the loan for the Moldaw policy. Their contention is that since the loan was not subject to the XE-R Agreement, they are not required to use MRC to broker the loan's resale.

The threshold question for this Court in its review of the likelihood of success is whether the Moldaw loan was executed under the XE-R Agreement. Where "the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." (*R/S Assocs. v N.Y. Job Dev. Auth.*, 98 NY2d 29, 32 [2002].) "When parties set down their agreement

5

in a clear, complete document, their writing should as a rule be enforced according to its terms." (*Id.*)

Here, in support of their preliminary injunction motion, XE LIFE submitted the Assignment of Member's Interest Agreement ("Member Agreement"), which governs Modlaw Capital's assignment of the Modlaw's policies to XE LIFE. This agreement refers to the underlying loan financing agreement between these two parties. In reviewing the plain words of the agreement, it is clear that Modlaw Capital's financing arrangement and subsequent Member Agreement was with XE LIFE, not with XE-R.

In forming XE-R, R2004 and XE LIFE intended for XE-R to finance the loans made through it. Indeed, XE-R Agreement Section 2.2 states, *inter alia*, that the purpose of XE-R is "to originate loans collateralized by life insurance policies." Whether these loans ultimately derive from XE LIFE is irrelevant because XE-R would be the named party in the contract advancing the loan. Accordingly, since XE-R is not the party who advanced the loan to Modlaw Capital, this Court is not convinced that the Modlaw policy was subject to the XE-R Agreement.

*ii. Exclusive and Irrevocable Authorization as Agents*

XE LIFE avers that since this Moldaw loan was not subject to the XE-R Agreement, they could select whomever they wish to act as their agent in brokering the settlement. Ross, MRC, and XE-R contend that they have the exclusive right to broker the Moldaw policy, which derives from five sources: MRC and the Moldaws' agreement; XE-R's payment of the Moldaw's expenses in connection with the January 2005 loan financing; XE-R agreed to indemnify XE LIFE in order to induce them to provide the financing; it was understood between XE LIFE and

6

MRC that the latter would act as broker; and that the Modlaws gave XE-R the right to disclose the necessary information in conjunction with the policy's resale.

"A principle-agency relationship legally exists when there is a manifestation of consent of one person to allow another to act on his or her behalf." (*Maurillo v Park Slope U-Haul*, 194 AD 2d 142 [2d Dept 1993].) Since it was already determined that the Moldaw policy was not subject to the XE-R Agreement, the question here is whether Ross and MRC have a right, derived from another source, to broker the policies and act as XE LIFE's exclusive agents. The evidence offered is insufficient to convince this Court that such exclusivity exists.

First, MRC and Ross contend that they and the Moldaws agreed and expected that MRC would broker the policies' resale. An expectation that a party will perform in some way is not necessarily legally binding. Here, Ross and MRC offer no evidence that the parties expectation rose to the level of a legal obligation. With nothing more than assertions of "expectation", or "understanding", this Court cannot find that MRC and Ross had a legally-binding exclusive right to broker the Moldaw policies.

Even if there was an agreement in place between the Moldaws and Ross when the former sought the insurance policy, the situation changed when a) the Moldaws transferred the policies to Moldaw Capital; b) Moldaw Capital executed the final financing agreement with XE LIFE; and c) Moldaw Capital executed the Member Agreement, thereby agreeing to transfer the policies to XE LIFE if the Moldaws decided to resell the policies rather than repay the loan. Ross, MRC, or XE-R are not mentioned in the agreements between Moldaw Capital and XE LIFE as possessors of an exclusive brokerage right. Accordingly, there is insufficient evidence to warrant a finding of MRC's exclusive rights.

7

Second, Ross and MRC aver that their exclusive right to broker the policies arises from the fact that they paid the Moldaw's expenses in connection with the loan's financing. They make an argument that a *quid pro quo* arrangement is legally obligatory without any evidentiary support. Their argument that their advancement of money to pay the Moldaw's expenses was in consideration for the right to broker may have had some weight if their dispute was with the Moldaws. But it is with XE LIFE. The Moldaws surrendered the policies to XE LIFE, which then became XE LIFE's property. MRC and Ross offer nothing evidentiary to support that XE LIFE took on the Moldaw's alleged obligation when XE LIFE assumed the policies. Indeed, the Member Agreement contains no such provision. This Court is therefore not persuaded of MRC's exclusivity rights.

Third, MRC and Ross assert that their promise to indemnify XE LIFE from any losses connected with the Moldaw financing was in consideration for the exclusive brokerage rights. In support, they offer an excerpt from a letter dated January 14, 2005 that states ". . .to induce you to enter the Moldaw transaction, we hereby agree to treat any proceeds in excess of the applicable debt. . .as a backstop against any losses that may be incurred by XE LIFE. . ." Ross and MRC aver in their complaint that they ". . .made this undertaking only because it had control over the brokerage. . ." But they offer nothing concrete to convince this court that there was an agreement or mutual understanding between them and XE LIFE that in consideration for the indemnification, they would serve as the policies' exclusive brokers. Their only evidence is their contention that the sole reason for the indemnification was their alleged control over the policies' brokerage. But this single aversion is insufficient to convince this Court that Ross and MRC possessed the exclusive rights to broker the policies.

8

Fourth, Ross and MRC aver that it was the understanding between them and XE LIFE that they would broker all resales or settlements. This would be true if the loan was covered under the XE-R Agreement and advanced by XE-R. But, as stated *supra*, it was XE LIFE who executed the Moldaw loan. Accordingly, there can be no expectation that they would broker a policy outside of the XE-R Agreement.

Finally, they aver that their exclusivity rights derive from the disclosure forms mandated by the Health Insurance Portability and Accountability Act ("HIPAA"). HIPAA requires that in the event of a sale or settlement of a policy, the insured's medical information must be released. This information is used to determine the value of the policy in the resale market.

Ross and MRC contend that the Moldaws originally authorized XE-R or its designees ". . .to analyze, access, evaluate, or underwrite. . .medical condition. . .in connection with the possible sale. . ." A new HIPAA form was allegedly procured fraudulently, authorizing XE LIFE to disclose the information. They contend that the Moldaws never revoked the first HIPAA. Assuming, *arguendo*, that the HIPAA form authorizing XE-R to disclose the Moldaw's medical history is controlling, this does not lend support to Ross and MRC's contention that it provides them with exclusive brokerage rights. The form clearly authorizes the designee to release medical information *in connection with* the sale of the policy; it does not clearly authorize the designee *to actually* broker the policy. [2] The individual permitted to release the medical information is not necessarily the same person who brokers the policy in the marketplace.

---

[2] The Defendants did not produce a copy of the HIPAA form that authorized them. XE LIFE produced a copy of the form that authorized them.

9

Accordingly, with no additional information, this Court cannot find that the HIPAA form gives Ross and MRC exclusive brokerage rights.

Ross and MRC argue that their exclusive agency rights to broker the Moldaw policies are irrevocable. Since this Court does not find evidentiary support that they had exclusive agency rights under the XE-R Agreement or some other alleged agreement, the irrevocable-agency-relationship argument is moot.

The Moldaw policies were not subject to the XE-R Agreement and Ross, MRC, and XE-R failed to offer convincing evidence of their alleged exclusivity rights. Therefore, XE LIFE can select an agent of its choice to broker the policies. It is therefore likely that XE LIFE would succeed on their merits that Ross and MRC were not their agents with respect to these policies. Furthermore, for the same reasons, Ross, MRC, and XE-R are unlikely to succeed on the merits.

*B. Irreparable Harm*

XE LIFE contends that they will suffer irreparable harm if MRC and Ross are permitted to continue to represent themselves as XE LIFE's agents with respect to the Moldaw policies. The harm will allegedly derive from the deception in the marketplace if they are allowed to continue a false misrepresentation of an agency relationship; from the confusion generated by them purporting to act on behalf of XE LIFE when XE LIFE is seeking the dissolution of XE-R, the entity through which MRC brokers the policies; and from the association with Ross, who allegedly has a long-standing reputation for unfair dealing.

In order to authorize the issuance of a preliminary injunction, the "complainant must allege appropriate and sufficient facts to show that plaintiff will suffer imminent and irreparable injury unless injunction is granted, that plaintiff will suffer substantial damages unless injunction

10

is granted, and that plaintiff has no adequate remedy at law." (*Mancias v City of Buffalo*, 39 Misc 2d 389 [1963].) In the commercial context, a plaintiff can establish irreparable harm when it is demonstrated that said behavior is detrimental to its reputation in the business community. (*Forty-Seventh-Fifth Co v Nektalov*, 225 AD 342 [1st Dept 1996].) When a defendant has no right to act as the agent for the plaintiff, but continues to do so, "the continuance of such practice might be highly injurious to the plaintiff." (*Star Fire Ins. Co v Ring*, 118 AD 107 [1907].) XE LIFE proffers three arguments in its attempt to demonstrate that it will suffer immediate and irreparable harm if this Court does not enjoin the Defendants from marketing the Moldaw policies.

First, XE LIFE argues that it will suffer because the marketplace will be duped into believing that MRC and Ross are its agents. To be for sure, there would be deception if the MRC and Ross present themselves to the policy's potential buyers as XE LIFE's agents because there is no agency relationship in existence. The agency relationship is a powerful one, which grants the agent the authority to act on the principle's behalf.

The misrepresentation that such an association exists would undoubtedly cause XE LIFE harm. For example, the marketplace would be presented with two competing brokers for the Moldaw policies - MRC and Sierra. A tug-of-war could ensue between the two, with each contending they are XE LIFE's authorized agent with respect to the policy. This could cause the marketplace to view XE LIFE negatively if competing brokers are asserting they are agents for the same policy. XE LIFE may be viewed as an organization that is unable to manage its business in an effective and organized manner. To some in the marketplace, MRC would be cloaked with apparent authority to bind XE LIFE; XE LIFE could therefore become liable for

11

MRC's actions, when in reality no authorization was given. Accordingly, to allow MRC and Ross to continue to present themselves as XE LIFE's agents during the pendency of this case would cause deception in the marketplace, which in turn would cause XE LIFE irreparable and immediate harm.

XE LIFE's second and third arguments in support of their contention that they will suffer irreparable harm are without merit. Accordingly, they will not be addressed.

XE LIFE will suffer irreparable and immediate harm if MRC and Ross are allowed to continue to misrepresent themselves as XE LIFE's agents. Moreover, there is no finding that MRC and XE-R will suffer irreparable and immediate harm if XE LIFE uses Sierra Life as its agent because there is no finding that MRC and XE-R have exclusive and irrevocable brokerage rights with respect to the Moldaw policy.

C. *Balance of the Equities*

"In exercise of its discretion and in balancing equities, court would have to weigh relative hardships that might be imposed on each of the parties by issuance or denial of preliminary injunction. . ." (*Western New York Motor Lines, Inc v Rochester-Genesee Regional Transp. Authority*, 72 Misc 2d 712 [1973].) XE LIFE avers that there are no countervailing equities in this case; MRC and Ross will not suffer any irreparable harm if the preliminary injunction is granted. This Court agrees.

Here, if this injunction is not granted, MRC will be permitted to converge on the marketplace to falsely present themselves as XE LIFE's agent. To allow this, by failing to grant the injunction, would cause harm upon XE LIFE's business and its reputation, as discussed

12

*supra*. On the other hand, if the injunction is granted, MRC and Ross will not suffer harm because, quite simply, there is no evidence that they are XE LIFE's agents. They have no right to settle the Moldaw policies, and therefore cannot be harmed from being denied from doing something that they have no right to do. Accordingly, the balance of the equities tip in XE LIFE's favor.

## CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the preliminary injunction sought in Action 1 is granted; and it is further

ORDERED that the preliminary injunction sought in Action 2 is denied.

Dated: October 30, 2006

ENTER:



RICHARD B. LOWE, III, J.S.C.

FILED
NOV 08 2006
NEW YORK
COUNTY CLERK'S OFFICE

13